UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COALITION TO DEFEND AFFIRMATIVE
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY
ANY MEANS NECESSARY (BAMN), et. al.,

     Plaintiffs,                         Case No. 06-15024
                                         Hon. David Lawson

     vs.

REGENTS OF THE UNIVERSITY OF
MICHIGAN, et. al.,

     Defendants

     And                             CONSOLIDATED CASES

CHASE CANTRELL, et. al.

     Plaintiffs                         Case No. 06-15637

     Vs.                                Hon. David Lawson

MICHAEL COX, et. al.,

     Defendants.

_____

**PLAINTIFF COALITION TO DEFEND AFFIRMATIVE ACTION, ET.AL.'S
BRIEF IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT
FILED BY THE ATTORNEY GENERAL AND ERIC RUSSELL**

George B. Washington (P26201)
Shanta Driver (P65007)
SCHEFF & WASHINGTON, PC
645 Griswold St., Suite 1817
Detroit, MI 48226
(313) 963-1921
scheff@ameritech.net

Winifred Kao*
DAVIS COWELL & BOWE, LLP
595 Market Street, Suite 1400
San Francisco, CA 94105
Tel: (415) 597-7200
Fax: (415) 597-7201

  * Application for pro haec vice status pending.

**TABLE OF CONTENTS**

**ISSUES PRESENTED**                                                              i

**INDEX OF AUTHORITIES**                                                         iii

    **INTRODUCTION:  THE HISTORY WE MUST NOT REPEAT**                        1

**STATEMENT OF FACTS**                                                           10

A.     Michigan's central role in the fight for affirmative action             10

B.     Myth One: Discrimination has ended                                      13

C.     Myth Two: The defendant Universities' admission criteria are racially
        neutral                                                             17

D.     Proposition 209 enforces a permanent reduction in the number of black,
        Latina/o, and Native American students at the most selective public
        universities in California                                          19

E.     Proposal 2 was intended to force, and will force, a permanent reduction
        in the number of black, Latina/o, and Native American students in
        Michigan's public universities                                      21

**ARGUMENT**                                                                     24

I.     **RUSSELL AND THE ATTORNEY GENERAL'S MOTIONS FOR
        SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE
        THERE ARE CLEARLY DISPUTES OF FACT OVER
        WHETHER PROPOSAL 2 VIOLATES THE EQUAL
        PROTECTION CLAUSE OF THE FOURTEENTH
        AMENDMENT BY DISCRIMINATING AGAINST BLACK,
        LATINA/O, AND NATIVE AMERICAN STUDENTS AND
        RESIDENTS**                                                         24

        A.     Proposal 2's two-pronged attack on the Fourteenth Amendment          24

        B.     Proposal 2 intentionally excludes black, Latina/o, and Native
            American students from selective public universities                25

        C.     Proposal 2 deprives black, Latina/o, and Native American
            citizens of equal political rights                                  30

        D.     The Ninth and Sixth Circuit panels erred by holding that the
            white majority can deprive racial minorities of equal political
            rights simply by claiming that it is eliminating "preferences"        32

II.     **DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
        SHOULD BE DENIED BECAUSE THERE ARE CLEARLY
        DISPUTES OF FACT OVER WHETHER PROPOSAL 2
        VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
        FOURTEENTH AMENDMENT BY DISCRIMINATING AGAINST
        WOMEN STUDENTS AND RESIDENTS**                                  34

III.    **TITLE VI AND TITLE IX PREEMPT PROPOSAL 2**                     36

IV.     **THE *COALITION* PLAINTIFFS HAVE STANDING TO
        RAISE THE CLAIMS THAT THEY HAVE ASSERTED**                       38

        A.  Plaintiffs have been and continue to be subject to an unequal
            political process to secure anti-discrimination and
            desegregation measures in university admissions               38

        B.  Plaintiffs' ability to fairly compete in university admissions has
            been and continues to be diminished                          38

        C.  Plaintiffs' ability to receive an integrated education has been and
            continues to be diminished                                   39

**CONCLUSION**                                                          40

**ISSUES PRESENTED**

I

WHETHER THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER
PROPOSAL TWO VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT BECAUSE ITS PURPOSE WAS TO
SEVERELY LIMIT THE NUMBER OF BLACK, LATINA/O, AND NATIVE
AMERICAN STUDENTS ADMITTED TO THE DEFENDANT
UNIVERSITIES.

II

WHETHER THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER
PROPOSAL TWO VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT BECAUSE IT IMPOSES A FAR MORE
ONEROUS BURDEN ON RESIDENTS SEEKING TO SECURE POLICIES
THAT WILL ALLOW THE ADMISSION OF BLACK, LATINA/O, AND
NATIVE AMERICAN STUDENTS INTO THE DEFENDANT
UNIVERSITIES.

III

WHETHER THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER
PROPOSAL TWO VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT BECAUSE ITS PURPOSE WAS TO LIMIT
THE ABILITY OF WOMEN STUDENTS TO SECURE ADMISSION TO
SCIENCE, ENGINEERING AND OTHER PROGRAMS AT THE
DEFENDANT UNIVERSITIES.

IV

WHETHER THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER
PROPOSAL TWO VIOLATES THE EQUAL PROTECTION CLAUSE OF THE
FOURTEENTH AMENDMENT BECAUSE IT IMPOSES A FAR MORE
ONEROUS BURDEN ON RESIDENTS SEEKING TO SECURE POLICIES
THAT WILL ALLOW THE ADMISSION OF WOMEN STUDENTS INTO
CERTAIN PROGRAMS AT THE DEFENDANT UNIVERSITIES.

V

WHETHER THERE ARE DISPUTED ISSUES OF FACT AS TO WHETHER
PROPOSAL TWO IS PREEMPTED BY TITLE VI OF THE CIVIL RIGHTS
ACT OF 1964 AND TITLE IX OF THE EDUCATION AMENDMENTS OF
1972.

VI

WHETHER THE PLAINTIFFS HAVE STANDING TO ASSERT THEIR
CONSTITUTIONAL AND STATUTORY CLAIMS.

# INDEX OF AUTHORITIES

**Cases**

*Alexander v. Sandoval,* 532 U.S. 275 (2001)                                      37

*Allen v. Wright*, 468 U.S. 737 (1984)                                            40

*Arthur v. City of Toledo*, 782 F. 2d 565 (6th Cir.1986)                          26, 27

*Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272 (1997)                      37

*Bob Jones University v. United States*, 461 U.S. 57 (1983)                       39

*Brown v. Board of Education*, 347 U.S. 483, (1954)                               passim

*Buckeye Community Hope Foundation v. City of Cuyahoga Falls,* 263 F.
   3d 627 (6th Cir.2001), *rev'd on other grounds* 538 U.S. 188 (2003)            26

*Coalition for Economic Equity v. Wilson*, 946 F. Supp. 1480 (N.D. Cal.
   1996), *rev'd on other grounds,* 122 F.3d 692, (9th Cir. 1997), *cert
   den*, 522 U.S. 963 (1997)                                                      20, 32, 33, 35

*Coalition to Defend Affirmative Action, et. al. v. Granholm*, 473 F. 3d 237
   (2006)                                                                         32, 33, 35

*Crawford v. Board of Education of the City of Los Angeles*, 458 U.S. 527
   (1982)                                                                         28, 29, 31

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960)                                     27

*Grutter v. Bollinger,* 539 U.S. 306 (2003)                                       passim

*Hunter v. Erickson*, 393 U.S. 385 (1969)                                         passim

*Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189 (1973)                 25

*Larsen v. Valente*, 456 U.S. 228 (1982)                                          39

*McLaughlin v. Florida,* 379 U.S. 184 (1964)                                      30

*Milliken v. Bradley*, 449 U.S. 870 (1980)                                        14

*Operation King's Dream v. Connerly,* 501 F.3d 584 (6th Cir. 2007)               4

*Personnel Administrator v. Feeney*, 442 U.S. 256 (1979)                          28

*Planned Parenthood Assoc. v. Kempiners*, 700 F.2d 1115 (7th Cir. 1983)          39

*Plessy v. Ferguson*, 163 US 537 (1896) — 1, 3, 7, 8, 9. 24

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) — 11, 33, 39

*Romer v. Evans,* 517 U.S. 620 (1996) — 32, 33, 38

*Strauder v. West Virginia,* 100 U.S. 303 (1880) — 24

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977) — 7, 26, 27, 29, 33

*Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982) — 7, 31, 33, 34, 38

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) — 27

**Statutes**

Const 14th Amend, sec 1 — 24

Const 1963, art 1, sec 26 — 37

34 C.F.R. s. 100.3(b)(2) — 37

34 C.F.R. s. 106.21(b)(2) — 37

20 U.S.C. s. 1681 — 36

42 U.S.C. s. 2000d — 36

20 U.S.C. s. 1682 — 36

42 U.S.C. s. 2000d-1 — 36

**Other authorities**

William G. Bowen and Derek Bok, *Shape of the River,* Princeton University Press: Princeton, 1998 — 12

Howard Brotz, ed., *African-American Social & Political Thought, 1850-1920.* Transaction Publishers: New Brunswick, 1997 — 2

Ward Connerly, *Creating Equal,* Encounter Books: San Francisco, 2000 — 19, 20

Eric Foner, *Reconstruction: America's Unfinished Revolution 1863-1877.* Harper & Row Publishers, New York 1988 — 8

C. Vann Woodward, *Origins of the New South 1877-1913.* Louisiana State University Press, 1971 — 1

iv

## INTRODUCTION:
## THE HISTORY WE MUST NOT REPEAT

The *Coalition* plaintiffs are students who grew up in segregated neighborhoods, attended segregated schools, and believe that their futures do not have to be the same as their past. Forty years after the death of Martin Luther King, his dream burns brightly in their hearts. The outcome of this case will go a long way toward determining whether those dreams can be realized.

In deciding the legal and factual issues in this case, the *Coalition* plaintiffs ask this Court to begin by looking at some of the most profound lessons in the history of our nation so that the tragic mistakes of the past will not be repeated here.

In its infamous decision, *Plessy v. Ferguson*, 163 US 537 (1896), the U.S. Supreme Court ratified a state's supposed right to adopt laws imposing segregation in public accommodations.

At the time that *Plessy* was decided, New Orleans and numerous other cities in the American South still had integrated neighborhoods, streetcars, public parks, legislatures, and courthouses.[1] But *Plessy* gave the racists a license to reverse those gains. One by one, the legislatures and city councils enacted new segregationist laws. To maintain that system, they created new, Jim Crow voting procedures and resorted to bribery and terrorism on a huge scale.

Segregation codified a new racial caste system. It inflamed the divisions between black and white and ended the possibility of racial unity between poor black and poor white southerners, which had previously been achieved in some areas of the South on the basis of shared economic, political, and social interests.

---

[1] Ex EE. *Origins of the New South*, pp. 209-213.

In the new racial caste system, all white people, irrespective of income, education or other class distinctions, occupied a social position superior to that of all black people. Black people were relegated to second-class segregated schools.[2] Only a tiny handful of black citizens were able to achieve a higher education and become teachers, lawyers, doctors and scientists. Segregation prevented the development of a numerically significant black middle class—and the absence of black professionals reinforced the myth of black inferiority.

Segregation was neither "natural" nor inevitable. Writing in 1915 to oppose the final phase of the creation of segregation—the forced removal of black middle-class families from majority white neighborhoods—Booker T. Washington described the political process that instituted segregation:

> In all of my experience I have never found a case where the masses of the people of any given city were interested in the matter of segregation of white and colored people; that is, there has been no spontaneous demand for segregation ordinances. In certain cities politicians have taken the leadership in introducing such segregation ordinances into city councils, and after making an appeal to racial prejudices have succeeded in securing a backing for ordinances which would segregate the Negro people from their white fellow citizens. After such ordinances have been introduced it is always difficult, in the present state of public opinion in the South, to have any considerable body of white people oppose them, because their attitude is likely to be misrepresented as favoring Negroes against white people.[3]

Washington and others accommodationists counseled black people to submit to the new system. But black people resisted segregation. Powerful business interests from the North and the South, the Democratic Party, which openly supported segregation, and the Republican Party, which formally opposed it, joined together to support segregation

---

[2] Ex W, Report of Foner, at 10.
[3] Ex HH, *African-American Social & Political Thought, 1850-1920.* Transaction Publishers: New Brunswick 1997, p. 460-61.

2

and white privilege under the aegis of the Fourteenth Amendment. A racist and dishonest federal judiciary abandoned its responsibility to enforce the Fourteenth Amendment. Under those conditions, black people could not prevail.

The *Plessy* decision marked the beginning of a particularly cynical phase of judicial rewriting of the Fourteenth Amendment. Separate but equal was a lie—and everyone knew it. In his dissent, Justice Harlan made clear that no black person and few white people could understand the Court's decision as anything other than support for the attempt to establish a color line premised on the myth of black inferiority:

> [E]veryone knows that the statute in question had its origin in the purpose, not so much to exclude white persons from railroad cars occupied by blacks, as to exclude colored people from coaches occupied by or assigned to white persons…The thing to accomplish was, under the guise of giving equal accommodation for whites and blacks, to compel the latter to keep to themselves while traveling in railroad coaches. No one would be so wanting in candor as to assert the contrary.

*Plessy v. Ferguson* at 557 (Harlan, J., dissenting).

Black people—and the nation as a whole—paid a terrible price for segregation. Human life and human potential were squandered. Racist ideology weakened and diminished America as whole. The courts and the rule of law were discredited.

Six decades and thousands of lynchings later, *Brown* reversed *Plessy*. It proudly announced that segregated schools were unconstitutional—and soon the entire system of legal segregation was declared illegal.

But ten years after *Brown*, the consequences of slavery and segregation had not ended. The task confronting America's black communities was how to make the promise of *Brown* real. In higher education, virtually every selective public university in both the South and the North had only a handful of black or Latina/o students. Black, Latina/o and

other minority and women students faced even more complete exclusion from public and private law, medical, engineering, and other professional and graduate schools.

The powerful civil rights movement led by Martin Luther King, coupled with enormous social convulsions and urban uprisings of the 1960's, were required before the federal and state governments finally forced some level of integration of public education at every level.

In higher education, the desegregation programs were called affirmative action. By conscious measures, the universities changed their admissions and other policies to open up all universities—and, in particular, elite universities like the University of Michigan (UM)—to black and other minority students. The admission of greater numbers of women students also required the creation of conscious admission policies aimed at recruiting and admitting large numbers of women into programs once considered the domain of men only.

Turning reality on its head, the opponents of desegregation immediately attacked the new affirmative action policies as giving an unfair advantage or "preference" to minorities and women and discriminating against white men. Four decades later, after the success of affirmative action has been made plain in every profession, Ward Connerly, Jennifer Gratz and the proponents of Proposal 2 merely repeat the same old clichés.

The process by which Proposal 2 was adopted is much like the process that Booker T. Washington describes for the adoption of open segregation. There was no army of volunteers seeking to end affirmative action. Rather, Connerly and company hired a group of desperate circulators who obtained signatures under false pretenses. *Operation King's Dream v. Connerly,* 501 F.3d 584 (6th Cir. 2007). They then used the

code word "preference" to appeal to white people's fears of being displaced by the growing minority populations of this nation.

The sole support for Prop 2 came from white voters. Comprising 87 percent of the electorate, white voters approved Prop 2 by a two-to-one majority. Black voters rejected it by a nine-to-one majority.[4]

Black, Latina/o and Native American residents, however, bear the sole burden and entire cost of Proposal 2. They—*and they alone*—will be excluded from the universities. They—*and they alone*—will be deprived of the right to lobby the governing boards for exceptions, modifications, and amendments to the admissions policy that will prevent their wholesale exclusion from those universities.

The future that Proposal 2 holds for Michigan has been written in the history of the largest state in the Union. When Proposition 209 eliminated affirmative action in California, there was a huge, unrecoverable drop in black, Latina/o and Native American students at the University of California at Berkeley (UC-Berkeley) and UCLA, the two flagship campuses of the UC system (Ex I, Dec of Laird, para 16, 17). It also led to intensified segregation and inequality in K-12 education.

Instead of restoring a legal color bar—which is too provocative—some of the proponents of Proposal 2 hope to achieve through the back door what they cannot achieve through the front door. They know placing a legal bar on consideration of race as a factor in the admissions decision-making process guarantees that large numbers of black, Latina/o and other minority students will be driven from UM and out of all of the public law schools, medical schools and other professional and graduate schools in this state.

---

[4] Ex C, Dep of Joseph Lenski, p. 33. Lenski supervised the exit polls for every major national news organization. The vote totals in predominantly black cities like Benton Harbor, Detroit, Highland Park, Inkster and even Southfield ranged from 83 to 94 percent No.

Everyone knows that the conditions that led UM and other state universities to adopt affirmative action programs still exist today. Racially separate and unequal K-12 education, residential segregation, limited minority access to resources, opportunities and programs, racial stereotyping and bias, and the myriad of other obstacles still limit opportunities for racial minorities—and still structure everyone's worldview and consciousness. Barring this state's universities from taking any meaningful and lawful steps to maintain racially integrated and diverse campuses will again result in the nearly complete exclusion of minority students from the universities.

In fact, the UM admissions procedures, thoroughly scrutinized in *Grutter v. Bollinger*, 539 U.S. 306 (2003), were approved by the Supreme Court precisely *because* the Court concluded that there were no other means by which UM could achieve an integrated and diverse student body.

At the same time Eric Russell and the Attorney General and the proponents of Proposal 2 know that black, Latina/o and Native American voters can do nothing to alter the outcome of Proposal 2 if it is upheld by the courts. Far beyond the question of expense, there is the undeniable fact that there has been virtually no time in American history in which a majority white electorate, confronted with the choice of securing white privilege or furthering the attainment of black equality, has ever voted for black equality.

The supporters of Proposal 2 have placed black, Latina/o and Native American residents in the jaws of a vise. They cannot secure admission to the universities as long as Proposal 2 exists—but they also have no possibility whatever of repealing Proposal 2.

As Connerly and his supporters blow through the Midwest and West—where they expect to pile up more victories based on the white vote—the question of the validity of

6

this Proposal has assumed national proportions. The question today, as it was in 1896, is whether the courts will hold that the Fourteenth Amendment prevents a white majority from imposing discriminatory laws upon racial minorities.

The question today arises in a nation that has changed profoundly from the one that existed in 1896. Black people are now concentrated in the nation's cities. Latina/os are a new, large, and fast-growing minority. By all accounts, the nation will soon be majority-minority. The huge civil rights demonstrations for immigrant rights which began in 2006 and which were led by the Latina/o communities make clear that what it means to be a part of the American Republic, a citizen with equal rights, is still the question which will define whether or not our society progresses. The development of a new, integrated civil rights movement, whether marching in Jena, Louisiana for black equality or in Los Angeles for Latina/o equality, place black and Latina/o communities in a far stronger position than they were in 1896. And, of course, there is *Brown*.

Following *Brown v. Board of Education*, 347 U.S. 483 (1954), there is no question that the governing Supreme Court precedent requires that Proposal 2 be struck down. The Court has held repeatedly that the Fourteenth Amendment prevents a white majority from (1) passing laws that intentionally exclude racial minorities from education, or (2) imposing more onerous political burdens on racial minorities when they attempt to win passage of programs that they hope will eliminate or lessen the problems caused by racial discrimination.[5]

Stealing a page from the supporters of *Plessy*, however, the supporters of Proposal 2 have asked the courts to "redefine" the Fourteenth Amendment for statutes that ban so-

---

[5] See, e.g., *Hunter v. Erickson*, 393 U.S. 385, 390-391 (1969); *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982); *Village of Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252, 267-271 (1977).

called "preferences." They have even persuaded two circuit court panels to adopt this "redefinition." Like the *Plessy* Court, those courts have ignored history and reality in order to reach their desired conclusion.

From Andrew Johnson's veto of the Freedman's Bill[6] through the segregationists' opposition to the Civil Rights Act of 1964, the opponents of integration have always called a change in the existing (and discriminatory) state of affairs a "preference." If the proposed construction of the Fourteenth Amendment were upheld, every civil rights bill could have been outlawed—and minorities would never have had the right to fight any form of discrimination.

Even more fundamentally, in *Brown* and in the legion of cases that followed it, the Supreme Court insisted that in cases of racial discrimination the courts must look at reality and not at the verbal formulas used to justify that reality. Unlike the Sixth and Ninth Circuit panels that expressed approval for Proposal 2 and Proposition 209 based upon their linguistic analysis of the terms "equal" and "preference," *Brown* did not compare the language of the Equal Protection Clause with the language "separate but equal." On the contrary, it held that the constitutional legitimacy of "separate but equal" could *only* be decided by considering the *actual effects* of segregation on minority students "*in light of [public education's] full development and its present place in American life…" Brown, supra,* 347 U.S. at 492-493.

And so it is here. This Court can only decide whether Proposal 2 violates the Fourteenth Amendment by looking at the *reality* of how it excludes minorities' access to higher education and at the *reality* of how it relegates black, Latina/o and Native American residents to a separate and unequal political procedure in fighting for relief

---

[6] Ex FF, Eric Foner, *Reconstruction*, p. 247-250.

8

from the discrimination inherent in the universities' admission criteria without affirmative action.

The Attorney General's and Russell's motion for summary judgment should be denied forthwith because they ask the Court to violate not only governing precedent but to ignore reality and the entire purpose of the Fourteenth Amendment.

As to the *Cantrell* plaintiffs motion for summary judgment, much as the *Coalition* plaintiffs agree that Proposal 2 should be struck down as a matter of law, we must oppose that motion because there must be a full factual record so that no appellate court can claim that this is a battle about preferences.

The crucial factual disputes in this case are (1) whether affirmative action programs are the only means for keeping the universities desegregated, (2) whether the universities' admission criteria without affirmative action are irremediably discriminatory against black, Latina/o, and Native American students, (3) whether Proposal 2 was an intentional attempt to exclude minorities from the state's universities, and (4) whether Proposal 2 has relegated racial minorities to a Jim Crow procedure for securing relief from the discrimination that they otherwise will face in university admissions.

Whether the fight to defend and extend affirmative action is a fight for "racial preferences" so as to exempt it from the well-established protections of the Fourteenth Amendment is, of necessity, a federal question.

If we are to avoid the lie of a new *Plessy*, it is vital that the trial court develop a full factual record so that no one can claim that Proposal 2 is anything other than a law designed to exclude black, Latina/o, and Native American students from the universities

9

and to prevent black, Latina/o, and Native American residents from doing anything whatever to prevent that exclusion.

## STATEMENT OF FACTS

A.     <u>Michigan's central role in the fight for affirmative action</u>.

For the last forty years, the State of Michigan and, in particular, the University of Michigan (UM) have been central in the fight to open up selective public universities to black, Latina/o and Native American students.

Before affirmative action, UM had very few black or Latina/o students. Its Law School, for example, graduated 3,032 white students—and only nine black students during the entire decade of the 1960s. Its undergraduate college had only 3.5 percent enrollment in 1969.[7]

In 1970, a student strike led by the Black Action Movement (BAM) demanded that UM take the steps needed to correct the de facto segregation at UM. BAM demanded that UM admit minority students in proportion to the minority population in the State, which was then ten percent. The Governor of Michigan openly supported the BAM demands. The Regents agreed to those demands and signed an agreement pledging to increase the admission of black and Latina/o students to ten percent by 1973. As UM recognized, it had to experiment with its then newly-promulgated admissions standards in order to admit significantly more minority students.[8]

 In the years that followed, there was a continuous conflict—and dialogue— between UM and black and Latina/o students and their supporters, often aided by leaders

---

[7] Ex L, Report of Dr. James Anderson, at 18.
[8] Ex L, at 19, see also Ex Q, 1970 memorandum of Vice President Arthur Ross to UM faculty.

of the state and national civil rights movements. When there were racist attacks, the students demanded that UM take action to stop them. When enrollment of minorities dropped, the students demanded that UM adhere to its prior commitments.[9]

After *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), prevented UM from guaranteeing a certain number of seats to minority students, UM adopted a holistic approach that considered race as a factor in admissions. Those who opposed the actual integration of the universities—including Jennifer Gratz and Ward Connerly—opposed even that plan and filed suit against it.

In the middle of the fight against those suits, BAMN presented thousands of petitions to then President Lee Bollinger calling on UM to reverse the drop in underrepresented minorities that occurred after Gratz and Grutter filed suit.[10]

Spurred on by its students, UM became the only university to successfully defend its affirmative action policies before the Supreme Court. On April 1, 2003, the day the US Supreme Court heard oral arguments in *Grutter* and *Gratz*, 50,000 young people from all over the nation assembled in Washington DC in defense of affirmative action.

Inside the Court, the legal arguments centered on the right of UM to adopt admissions policies that would make it possible to admit a diverse student body. To the majority black, Latina/o and other minority youth who attended the rally, defending the UM's affirmative action policies was necessary to save *Brown v. Board of Education* and to maintain the modest gains towards integration and equal opportunity that were achieved through affirmative action programs.

---

[9] Ex L, p. 29.
[10] Ex CC, Dec of Kate Stenvig.

UM's victory in *Grutter* put it in the forefront of the struggle to defend the measures required to achieve any semblance of the promise of *Brown*. At great expense, UM revised its undergraduate admissions programs to comply with the *Grutter* standards.

In a deposition in this case, however, the director of admissions at UM's Law School stated that acting under those standards, UM had never achieved the critical mass of black, Latina/o and Native American students required to achieve the full benefit of educational diversity and integration.[11] But even the progress that it has made has been of crucial importance to minority communities and to the nation as a whole.

In the United States today, almost every law, medical and professional school and thirty to forty percent of undergraduate colleges is selective.[12] The selective schools, and in particular, the most selective schools have the most resources, the most accomplished professors, and the most access to further education and better jobs. It is those schools that produce the majority of the political, business and intellectual leaders of the nation—and it is in those schools that affirmative action has been crucial.[13]

The ability of young black and Latina/o students to be admitted to those colleges has been decisive. Once admitted, a very high percentage of those students graduate and are able to attend a graduate or professional school. Seventy-nine percent of black students at selective universities graduate within six years. In comparison, only 40 percent of black students and 59 percent of white students who attend non-selective NCAA colleges graduate within six years.[14] They can close the wage gap between black and white, develop the confidence, social skills and contacts needed to be leaders, and

---

[11] Ex D. Dep of Sarah Zearfoss, p. 92.
[12] Ex BB. *Shape of the River*, p. xli.
[13] Ex BB, p. xxxix-xl.
[14] Ex BB, p. 256.

break through the myths of prejudice that affect society—and the minority students themselves. It is no accident that Hillary Clinton and Barack Obama, among many others, have been the beneficiaries of affirmative action at selective universities.

  B.  <u>Myth One: Discrimination has ended.</u>

  The entire argument of the opponents of affirmative action is built on two myths. First, they claim, racial discrimination has decreased so dramatically that minorities can compete under the existing criteria if only they work harder.[15] Second, they claim, the existing admissions criteria are so neutral that any demand that they be considered only in the context of race is a "racial preference" outside the normal protections of the Fourteenth Amendment.

  Both myths are actually statements of prejudice—on which there are, at the very least, strongly disputed issues of fact.

  UM's undergraduate admissions program provides one example of the vast inequalities that exist.[16] UM admits two thirds of its undergraduate class from the high schools of Michigan and one third from the high schools of the nation.[17]

  By far the majority of black, Latina/o, and Native American students attend schools that are segregated or intensely segregated.[18] Nationally, three quarters of black and Latina/o students attend schools that have over 50 percent minorities; 38 percent

---

[15] In her deposition, for example, Jennifer Gratz testified that she did not know whether there was any racial discrimination in education today (Ex GG, Dep of Gratz, p. 102-107).

[16] For reasons of space, we do not address the problem of admissions to graduate schools. But there, too, inequality exists in the colleges attended, in the racial hostility that minority students encounter, and in a myriad of other factors that are set forth in the testimony of Orfield, Dr. Walter Allen, and other witnesses in the *Grutter* trial.

[17] In Michigan, 72 percent of the state's high-school students are white; 20 percent are black; four percent are Latina/o; two percent are Asian; and one percent is Native American. In the Nation, 59 percent of high-school students are white, 17 percent are black, 18 percent are Latina/o, four percent are Asian, and one percent is Native American. Ex E, Deposition of Ted Spencer, p. 93.

[18] By common convention, schools with more than 50 percent minorities are called "segregated" while those with more than 90 percent minorities are called "intensely segregated."

attend schools that have more than 90 percent minority students.[19] Michigan is far more segregated: 75 percent of Michigan's minority students attend schools that are more than 50 percent minority and 58 percent attend schools that have over 90 percent minority students (Cantrell Ex M, Report of Jeannie Oakes, p. 10-11). [20]

In his testimony in the *Grutter* trial, one of the nation's leading experts on education, Professor Gary Orfield divided minority students into those who attended (1) urban schools; (2) magnet schools within an urban school system; (3) segregated or largely segregated suburban schools; and (4) integrated suburban or private schools. He described the inequalities in education received by minority students in each category. [21]

Beginning with the urban school districts where so many minority students reside, Orfield described the inequality as follows:

> There never was a separate but equal school system. That's because of many things. It's because the poverty levels in segregated schools are much higher. Almost the only intensely impoverished schools that we have in the metropolitan areas are for black and Latina/o children.[22] They are [unequal] also because there are fewer minorities in teacher training. There are many fewer teachers who choose to go to work in schools of this sort. Most teachers who start in schools that are segregated leave faster. The curriculum that is offered is more limited. The probability that the teacher will be trained in the field is much more limited.

---

[19] Ex M, Trial Testimony of Dr. Gary Orfield, p. 11.

[20] There are two institutional reasons for this. First, there is a huge concentration of black students in Detroit. Second, Michigan tends to have small school districts, which parallel city lines. After *Milliken v. Bradley*, 449 U.S. 870 (1980), the district lines became lines of segregation as whites fled to the suburbs and the suburbs successfully resisted most attempts at integration.

[21] In the description that follows, Orfield refers in general to the effects of segregation upon minority students. There are, however, important differences in how that segregation affects the three minority groups at issue. Latina/os, for example, are separated not only by residential segregation but by language and national background and, in some cases, by their current immigration status. Similarly, Native Americans may live on reservations and attend reservation schools. Nevertheless for purposes of this motion, Orfield's general description of segregation is adequate for explaining the discriminatory intent and effect of Proposal 2.

[22] In his writings and in his testimony in *Grutter*, Orfield emphasized that racial segregation means that minority poverty was far more concentrated than poverty among white people. As he testified, "poor white children are much less likely to end up in impoverished schools than poor minority children because they're just not that concentrated residentially" (Orfield, at 99). That concentration, he has testified, means that poor minority students receive a poorer education and have less chance of going to any college than poor white students.

The level of competition is less. The respect for the institution [in] the outside world is less. The connections to colleges are less. There are more children with health problems because minority children are much more likely to live in rental than ownership housing. The population is much more unstable. Many segregated schools have a vast turnover of students every year and there's tremendous educational instability as far as students go and faculty go. It's a different world in every respect.

Ex M, Trial Testimony of Dr. Gary Orfield, at 92.

Orfield's description explains the data that UM provided in this litigation. In 2005—with affirmative action programs still in effect—UM offered admission to *no* students from 19 different Detroit high schools. The only schools in Detroit that had more than a few students admitted to UM were the four exam schools: Renaissance, Cass Tech, King, and Fine and Performing Arts (Ex J, Dec of Miller, p. 9).

Orfield sent his children to the urban exam schools in Chicago, and, he testified, "…even though [those schools] may look like a very elite school inside the city, [they] really look like a very average or low average school in suburban terms" (Orfield, 132).

Just outside Detroit and other urban centers are suburbs that once were integrated but are now largely segregated districts (e.g. Southfield). While those districts have more money per student than Detroit, the education is not, and cannot be, equal to more integrated districts further out. Orfield explained why those schools and the exam schools could not provide an education equal to that in the white suburbs:

And those schools, even middle class schools that serve minority students typically have substantially higher numbers of low income children. Many of the teachers that are in suburban schools are completely unprepared to teach minority kids. They have no experience or comfort, and they have lots of stereotypes. This goes to tracking and placement and so forth and they often leave the schools when they go through racial transition.

Minority schools have a much greater difficulty recruiting teachers than white schools do partly because the vast majority of teachers who are trained are not trained how to work in a diverse setting and are white themselves.

15

       What you basically have is a downgrading of the curriculum that takes place. You go through lots of teachers and through the lack of a critical mass of students who are prepared to take certain kinds of courses.
       You have a very different kind of structure of a group that takes place in the classes. Gangs tend to penetrate in neighborhoods a few years after they go through racial change which has a very, very negative effect on high schools. There's kind of a systematic process of detachment from mainstream and downgrading of the educational opportunities after racial transition.

Ex M, Orfield, at 106-107.

Further out—and in a tribute to *Brown* and the achievements that have been made—there is now a significant minority of black students in some majority-white suburban districts and even in some private schools. Even there, however, there is not equality. Again, Orfield stressed some crucial differences:

       [B]eing middle class is not the same across racial lines. [Minority] families are less middle class. They have less middle-class networks, resources, respect, connections. Their middle class is much more vulnerable. Their ability to isolate their children from lower class and negative influences is much less…
       There's also preferential treatment in schools. I've had professional colleagues at all the great universities that I've been at who are African-American or Latina/o and almost always they tell me that one or more of their children have been placed in a lower track when they first go to their school.

Ex M, Orfield, at 103-104.

UM draws a disproportionate share of its minority students from those integrated schools. In 2005, 399 of the 676 black, Latina/o, and Native American Michigan residents who received admission offers from Michigan came from schools that were over 50 percent white (Ex J, Dec of Miller, p. 2).

       Racial discrimination has not ended: only a tiny fraction of minority students have any opportunity to attend UM and even those few students receive an education that is *not* equal to that given to their white peers.

16

C.   Myth Two: the Defendant Universities' admission criteria are racially neutral.

In *Grutter* and every other judicial challenge to affirmative action, Connerly, Grutter, Gratz and others asserted that minority students benefited from a "racial preference" because they were admitted with grade point averages and test scores that were, on average, lower than white or Asian students who had been rejected. When *Grutter* rejected that claim, Connerly sought to amend the state constitution to achieve the same objective.

But there is no proof whatever that the existing admission standards are neutral measures of merit. As Orfield stated, minority students attend schools with less trained teachers and fewer of the AP and honors courses that can inflate a grade point average.[23] Black and other minority students in suburban integrated schools are often placed in non-college tracks and are subjected to racial stereotyping. The few minority students who are tracked into college prep often face racial isolation and the added responsibility of feeling that they must represent their whole race.

Standardized tests are even more discriminatory. In 2007, the test manufacturer's own statistics show that students from families with incomes over $100,000 per year had a total score on the SAT that was 336 points higher than students who had family incomes less than $10,000 per year (Ex K, Dec of Schaeffer, Ex 1). Even more significantly, white students had average combined scores of 1579 on the SAT that were, respectively, 125, 208, and 292 points higher than those of Native American, Chicano and African American backgrounds (Ex K, Schaeffer, Ex 1).[24]

---

[23] Ex M, Orfield, p. 92.
[24] Necessarily, the aggregate comparisons based on race and income are interrelated because black, Latina/o, and Native American test takers are on average far poorer than white test takers.

17

Moreover, numerous studies soon demonstrated that race is an independent and decisive factor. As Connerly himself admitted, black students from the highest income levels scored lower than whites in the lowest income levels (Ex A, Dep of Connerly, at 101).[25]

In fact, in a study of thousands of applicants to UC-Berkeley's famous Boalt Hall Law School, researchers found that black students with the same grade point average in the same major in the same college scored 9 points less on average on the LSAT than their white counterparts—a gap wide enough to ensure that they could not be admitted to any selective law school if the scores were applied rigidly and without consideration of an applicant's race.[26]

Under pressure, the manufacturers of the tests have been forced to give up any claim that the tests measure "aptitude," "intelligence," or any similar quality. Moreover, they have been forced to admit that tests could only predict, rather weakly, a variation in first year grades—and even that claim is highly disputed.[27]

Neither the test makers nor the universities nor any other reputable source has ever suggested that test scores are a racially neutral standard for decisions regarding admissions, much less for decisions regarding rights under the Fourteenth Amendment.

---

[25] From this data, only two conclusions are possible. Either, as the eugenicists have claimed since similar test results first became known, the test results measure differences in intelligence; or, as the unanimous weight of scientific authority now recognizes, the tests measure some combination of bias in the educational system, bias in the society and bias in the tests themselves.

[26] Ex K, Dec of Schaeffer, para 18.

[27] Id, para 23-24.

D. <u>Proposition 209 enforces a permanent reduction in the number of black, Latina/o, and Native American students at the most selective public universities in California.</u>

Proposal 2 is unique in Michigan history in that it is a direct carbon copy of a ballot proposition that the electorate of another state had previously passed. The California experience is thus directly relevant to determining both the intent and the effect of Proposal 2.

In 1993, Republican Governor Pete Wilson appointed Ward Connerly to the Board of Regents of the University of California (UC) system. Soon after the November 2004 elections, Wilson, who was running for President, and Connerly launched a public attack upon the UC system and, in particular, on UC-Berkeley for admitting minority students with lower grade point averages and test scores than white students who were rejected. Wilson and Connerly agreed between them to call affirmative action by the inflammatory name "racial preferences"—a name that Connerly now uses as a matter of principle. And they agreed to sponsor a resolution in the Regents (which was eventually called Special Policy 1 (SP-1)) to eliminate affirmative action (Ex H, *Creating Equal,* p. 133-134).

In his deposition, Connerly said that he knew that the California K-12 educational system was highly unequal and that this contributed to the lower adjusted grade point averages of black, Latina/o and Native American applicants to the UC. He admitted that white students are given an advantage when test scores are used in an admissions system that does not consider race (Ex A, Dep of Connerly, at 84, 95).

Even though he now denies it, those concessions alone mean that Connerly knew that eliminating affirmative action would cause a drastic decline in minority admissions

19

in California (Ex A, Dep of Connerly, at 120). Moreover, the admissions director at UC-Berkeley has declared that the admissions staffs in the UC system were unanimous in informing the Regents that such a decline was inevitable if the Regents eliminated affirmative action. On July 20, 2005, however, the Regents voted 14 to 10 in favor of SP-1, Connerly's resolution eliminating affirmative action (Ex I, Dec of Laird, para 15).

Connerly and Wilson recognized, however, that their victory was extremely fragile. They feared that racial minorities might persuade the Regents to reconsider the policy. As Connerly openly states in his book, he and Wilson led the fight for Proposition 209 in order to put the ban on affirmative action in California's Constitution so that neither minorities nor the Regents could change it (Ex H, *Creating Equal*, at 166.).

In the November 2006 elections, white voters approved Proposition 209 by a two-to-one margin. Black, Latina/o, and Asian voters rejected it by a vote of three to one. Solely because the majority of California's electorate was white, Proposition 209 passed by a 54 to 46 percent majority. *Coalition for Economic Equity v. Wilson,* 946 F. Supp. 1480, 1495 n.12 (N.D. Cal. 1996), *rev'd on other grounds* 122 F.3d 692 (9th Cir. 1997), *cert den.* 522 U.S. 963 (1997).

The effects of SP-1 and Proposition 209 were disastrous. In fall 1997, they went into effect in the graduate and professional schools. At UC-Berkeley's Boalt Hall Law School, there was exactly one black student—who came from the class that entered in fall 1996. There were also sharp drops among Latina/os and Chicanos at Boalt Hall, at UCLA, and in the most of the UC Medical Schools (Ex I, Dec of Laird, para 16).

In fall 1998, Proposition 209's ax fell on the undergraduate schools. The entering class at UC-Berkeley had 55 percent fewer black, Chicano, Latina/o, and Native

American students. The entering class at UCLA also had fewer black, Chicano, Latina/o, and Native American students (Ex I, Dec of Laird, para 17).

In the years since, California's universities have attempted to halt the drop. But minority students have been forced out of the premier campuses and into less selective campuses in the UC system and California State University (CSU) system. As Bob Laird, UC-Berkeley's former admissions director, and Mary Sue Coleman have stated, California's universities tried everything, but nothing could substitute for the explicit consideration of race (Ex I, Dec of Laird, at paras 44, 67-71) Indeed, Connerly himself, in one of his most striking concessions, admitted that admissions officers could do nothing unless there was a massive move towards racial equality in K-12 education—of which there is no sign (Ex A, Dep of Connerly, at 118, 120).

A large campaign, led by BAMN and many of the other *Coalition* plaintiffs, persuaded the Regents to rescind SP-1 in the spring of 2001. But while that was enormously important in political terms, it did not change the admissions outcomes.

As Dr. Jeannie Oakes set forth in a report prepared for the *Cantrell* plaintiffs, the gap between the burgeoning minority populations of California and the increasingly white and Asian student bodies of its premier universities has grown substantially over the ten years since Proposition 209 went into effect. Especially at UC-Berkeley and UCLA, the UC system is being resegregated (Cantrell Ex M, Report of J. Oakes, p. 6).

     E.     <u>Proposal 2 was intended to force, and will force, a permanent reduction in the number of black, Latina/o, and Native American students in Michigan's public universities.</u>

Whatever doubt there was about the intent or the effect of Proposition 209, there was none on Proposal 2. After a decade of drastic and irremediable decline in minority

enrollment at California's most selective undergraduate and graduate schools, Connerly admitted that he knew beforehand that Proposal 2 would drive down the number of minority students at selective schools—and that there was nothing the admissions officers could do to stop it. Moreover, he admitted, that was the result he wanted—in order to administer what he called "tough love" to minority students (Ex A, Dep of Connerly, at 120).

Since the passage of Proposal 2, the three defendant Universities have adopted the stance held by their California counterparts. They eliminated all consideration of race from the admissions process—and implemented a set of policies including consideration of social and economic disadvantages that have already been tried in California and failed (Ex K, Dec of Schaeffer, para 16).

The ax has not yet fallen in Michigan. Whether by accident—or, more likely, by design—UM and other schools admitted far more minority students before December 29, 2006, the effective date of Proposal 2, than were usually admitted before that date (Ex D, Zearfoss, Ex 4). Many schools have not yet reported the drastic declines that occurred in California. But minority admissions at Wayne State and Michigan State's Medical Schools fell by 50 percent (Ex DD, p. 2). Moreover, after Proposal 2 took effect, only 5 percent of the minorities who applied to UM's Law School were admitted—compared to the normal acceptance rate of 20 percent (Ex D, Zearfoss, Ex 4).[28]

In her report, Dr. Oakes has asserted that because of the far higher degree of racial segregation in Michigan, the drop in minority admissions may be worse in Michigan than

---

[28] Wayne State Law School had an absolute drop in the number of minorities admitted.  However, because the school decided to reduce the size of its class in order to increase its standings in the competitive rankings of law schools, the percentage of minorities did not change significantly in the last admission season.

in California.[29] Laird, the director of undergraduate admissions at UC-Berkeley during

the implementation of Proposition 209, has also stated that the decline will be sharp,

because of the large differences in grades and test scores caused by the racial inequalities

in education. In fact, Laird declared, the drop in minority admissions will be particularly

great in the integrated suburban schools from which UM and all universities take so many

of their minority students. The minority students who would do best at UM and other

schools will be wiped out because their grades and scores will, on average, be less than

those of their white peers—but because they have not attended segregated, poor inner-

city schools, they cannot benefit from socioeconomic affirmative action (Ex I, Dec of

Laird, para 69).

        Finally, the effects of Proposal 2 will not be confined to Michigan alone. The

effect is national. Connerly himself is now trumpeting it as a decisive victory and is

calling for a "Super Tuesday" in 2008, where the white majority in five more states can

pass proposals to exclude black, Latina/o and Native American students. Twenty-four

states have provisions for referenda in their state constitutions. Already, many public

schools in the East and private schools across the nation have dismantled their affirmative

action programs for fear of lawsuits.

        The Radical Republican Congress ratified the Fourteenth Amendment to provide

national protection for racial minorities. Under clear precedent, that Amendment bars an

attempt by the white majority to exclude minority students from the most selective

universities and to prevent minority citizens from doing anything to reverse that

---

[29] There is, so far, one salient difference between California and Michigan.  In California, the Regents themselves enforced Proposition 209 with a vengeance.  In Michigan, the governing boards have so far attempted to mitigate the effects of Proposal 2.  But that may well change if the supporters of Proposal 2 carry out their threats to use Michigan's courts to enforce a draconian interpretation of Proposal 2.

exclusion. If this attack on the Fourteenth Amendment is to be stopped, it needs to stop here and it needs to stop now.

**ARGUMENT**

I.  **RUSSELL AND THE ATTORNEY GENERAL'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE CLEARLY DISPUTES OF FACT OVER WHETHER PROPOSAL 2 VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY DISCRIMINATING AGAINST BLACK, LATINA/O, AND NATIVE AMERICAN STUDENTS AND RESIDENTS.**

A.  <u>Proposal 2's two-pronged attack on the Fourteenth Amendment.</u>

On the strength of the Union victory in the Civil War, the Congress of the United States declared that, for the first time in human history, the United States would attempt to build a multi-racial democratic republic.

As its first step, Congress proposed the Thirteenth Amendment which abolished slavery. As its next step, Congress recognized that the newly-freed black minority had to be protected against unfair and discriminatory laws passed by a still hostile white majority. In majestic words, the Fourteenth Amendment declared that no state had the power to "…deny to any person within its jurisdiction the equal protection of the laws." Const 14th Amend, sec 1.

In its earliest decision, the Supreme Court stated that the Amendment protected the black minority from "unfriendly legislation…implying inferiority in civil society [and] lessening the security of their enjoyment of the rights which others enjoy…" *Strauder v. West Virginia,* 100 U.S. 303, 307-308 (1880). *Plessy* destroyed that understanding—but *Brown* revived it.

24

In two separate but interrelated ways, the white majority that was the sole support for Proposal 2 violated the Fourteenth Amendment rights of black, Latina/o, and Native American students and residents.

First, Proposal 2's ban on "preferential treatment" has one aim—and one aim only. It aims to eliminate the only programs that have made it possible for universities to admit significant numbers of black, Latina/o, and Native American students. It thus aims at sharply cutting the number of minority students who can be admitted to the universities.

Second, Proposal 2 attempts to make the exclusion of minority students permanent by placing its terms in the state constitution so that black, Latina/o and Native American students and their supporters will have no practical political means to win the reinstatement of the programs that made it possible for them to be admitted.

The two aspects of Proposal 2 are part of a common plan. Moreover, they overlap at key points. Nevertheless, it is necessary to separate them for analytic purposes to make clear that *both* aspects of Proposal 2 violate entire lines of decisions under the Equal Protection Clause.

B.   <u>Proposal 2 intentionally excludes black, Latina/o, and Native American students from selective public universities.</u>

In the *Grutter* trial, John Hope Franklin testified that racism has always been extremely inventive in formulating excuses for limiting the rights of racial minorities. "Separate but equal," "grandfather clauses," and "state's rights" are but three of the excuses that have been used.

Over the decades, the Supreme Court has struck down many ostensibly neutral justifications for racial exclusion. In *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S.

189 (1973), the Court rejected a school board's excuses and found that it had segregated students by race. More generally, in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 US 252 (1977), the Court held that *any* governmental action, including zoning regulations, was unlawful if *one* of the reasons for that action was unlawful racial discrimination.

In determining whether racial discrimination was *a* reason for a particular government action, the *Arlington* Court directed the lower courts to look beyond the words of the statute. In some cases, the Court held, the discriminatory impact of the law might be so great that the purpose was apparent from the impact alone. *Id*, at 266. In most cases, however, the Court held that the lower courts should examine "the background of the decision," "the specific sequence of the events leading up to the challenged decision," the departures, if any, from the normal substantive and procedural standards, and the statements of the act's sponsors. *Id.*, at 267-268.

Judged by *any* of the *Arlington* standards—and more surely by *all* of them together—the substantive proscriptions of Proposal 2 are clearly an excuse for discrimination.

Russell apparently, and rightly, fears an inquiry into the purposes of Proposal 2 under the *Arlington* standards. Citing *Arthur v. City of Toledo*, 782 F. 2d 565, 573-574 (6th Cir.1986), which dealt with a law that was neutral on its face, he claims that referendums can only be set aside if *every* conceivable purpose for the law is discriminatory (Russell Br, at 13-16). But whether *Arthur* is still good law—or whether it was ever wise law[30]—need not be debated. For *Arthur* itself held that "…absent a

---

[30] See *Buckeye Community Hope Foundation v. City of Cuyahoga Falls*, 263 F. 3d 627 (6th Cir.2001), *rev'd on other grounds* 538 U.S. 188 (2003). In his Opinion, Judge Jones sharply criticized the *Arthur* standard.

referendum that facially discriminates racially…a district court cannot inquire into the electorate's motivations in an equal protection context." *Id.*, at 575.

Proposal 2 is such a law. By its terms, it openly targets what it calls "racial preferences."[31] Despite the fact that universities have traditionally given "preferences" to veterans, poor students, residents, alumni, large donors, and the children of politicians, it attacks none of those preferences. Its attack falls *only* upon black, Latina/o, and Native American students. It is only those students who will be excluded—and they will be excluded in large numbers.

A review of the *Arlington* factors makes clear that there must be a trial on the plaintiffs' claims. In *Arlington*, the Court held, that "a clear pattern, unexplainable on grounds other than race" can be sufficient to strike down a law for violating the Fourteenth Amendment. *Id.* at 564, *citing, inter alia, Yick Wo v. Hopkins*, 118 U.S. 356 (1886) and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). In *Yick Wo*, the Court struck down a requirement that laundries be constructed of brick or stone because it had only been enforced against Chinese nationals. In *Gomillion*, the Court struck down an attempt to change the borders of Tuskegee, Alabama because the change excluded the only black neighborhood in the city. Under *Arlington*, *Yick Wo*, and *Gomillion*, a law that *only* excludes black, Latina/o and Native American students should be struck down at once.

But it is not simply its impact that condemns Proposal 2. Its history makes clear that it is an attempt to overturn *Grutter*—which had upheld programs designed to admit

---

Id, at 637-638, n.2, 3, 4. In her opinion for the Supreme Court, Justice O'Connor ignored the *Arthur* standard, which had clearly been presented to her, and declared that the results of a referendum would be subject to review under some of the factors set forth in *Arlington*. *Id.*, 538 U.S. at 196-197.

[31] Indeed, insofar is it targets "preferences" based on national origin, it, as a practical matter targets Chicanos and Latina/os, who are considered a "race" by the United States government.

black, Latina/o, and Native American students. Moreover, the terms of Proposal 2 make clear that it is not concerned with banning preferences, assuring merit, or any other neutral purpose.

Likewise, Proposal 2 is a sharp departure from the substantive and procedural standards set by 150 years of Michigan history. *Never* before have the voters attempted to regulate their universities' decisions on which students to admit or what standards to adopt. But suddenly, Proposal 2 asserts regulation over the universities in one area and one area alone—the admission of black, Latina/o and Native American students.

In his brief, Russell weakly claims that the "mere awareness that a provision may have an adverse impact on a protected class, without more, is insufficient to establish discriminatory intent." Russell Br, at 16-17, citing *Personnel Administrator v. Feeney*, 442 U.S. 256, 259 (1979). But in the veterans' preference act at issue in *Feeney,* the legislature clearly had a neutral purpose of aiding veterans. It knew that this act would adversely impact women—but that was clearly not its purpose. In this case, however, there is no purpose *other* than ending the affirmative action programs and excluding the minority students whom those programs have been designed to admit.

Nor may the defendants sustain Proposal 2 under *Crawford v. Board of Education of the City of Los Angeles*, 458 U.S. 527 (1982). In that case, the Court held that "…the simple repeal or modification of desegregation or antidiscrimination laws, without more, has never been viewed as embodying a presumptively invalid racial classification." *Id.*, at 539 (emphasis added).

*If* the Regents or another governing body repealed or modified an affirmative action program, *Crawford* might shield them from liability. But far more is at stake here.

28

Proposal 2 bans all programs—and it puts that ban in the State constitution where it cannot be changed by the minority.

Moreover, *Crawford* made clear that even a simple repeal, if found to be racially motivated under the *Arlington* standards, violated the Fourteenth Amendment. *Crawford*, 458 U.S. at 543-545. In stark contrast to the facts the Court found decisive in affirming a finding that the law in *Crawford* was not racially motivated, Proposal 2 burdens *only* racial minorities and was passed *only* because of the votes of the white majority. *Id.*, at 544, 545 n. 33.

Connerly—the chief and indispensable sponsor of Proposal 2—made clear its discriminatory purpose:

> I knew that…the only way we're going to close this academic gap between black and Latina/o on the one hand and Asian and white on the other, is not to keep papering over it with preferences, but to apply the tough love that's necessary to get black and Latina/o students up to the bar. That was a value judgment then, it's a value judgment now.

(Ex A, Dep of Connerly, at 120).

But this amounts to saying that whatever bar is set, the university may not vary the bar or recognize the deficiencies in the bar *only* for racial minorities. Everyone may be given a free pass—unless you happen to be black, Latina/o, or Native American.

Whatever Connerly may believe, the state may not hold entire races of students hostage until there is some change in the tests, some change in the educational system, or some unspecified changes in the students themselves. Indeed, using white voters to impose "tough love" in order to force some unspecified changes in the "values" of black, Latina/o and Native American students is the very definition of intentional discrimination in violation of the Fourteenth Amendment.

C.      Proposal 2 deprives black, Latina/o, and Native American citizens of equal political rights.

In *Hunter v. Erickson,* 393 U.S. 385 (1969), the Akron, Ohio City Council

enacted a Fair Housing Ordinance in 1964. Almost immediately, white citizens circulated

a petition for a referendum on whether to amend the City charter to prohibit any fair

housing ordinance from being passed without a referendum of the voters.

The Court struck down the amendment on the specific grounds that a racial

majority could not place a special burden on enacting legislation or policies that a racial

minority believed would further its interests:

> Moreover, although the law on its face [Section 137] treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that. Like the law requiring specification of candidates' race on the ballot [citation omitted], s 137 places special burden on racial minorities within the governmental process. This is no more permissible than denying them the vote, on an equal basis with others.

> *Hunter, supra,* 393 U.S. at 391.

Concurring, Justice Harlan held that while a city or a state normally had the right to

allocate power as it saw fit, if it did so on racial issues alone, that decision could be

justified, if at all, only by showing a compelling state interest:

> In the case before us, however, the city of Akron has not attempted to allocate governmental power on the basis of any general principle. Here, we have a provision that has the clear purpose of making it more difficult for certain racial and religious minorities to achieve legislation that is in their interest. Since the charter amendment is discriminatory on its face, Akron must 'bear a far heavier burden of justification' than is required in the normal case. *McLaughlin v. Florida*, 379 U.S. 184, 194 (1964). And Akron has failed to sustain this burden.

> *Hunter, supra*, 393 U.S. at 563 (Harlan, J. concurring).

Thirteen years later, the Court reaffirmed *Hunter* when it struck down a

Washington ballot initiative that took from local school boards the power to order busing

30

for the purposes of racial desegregation by amending the state constitution to insert a

provision that allowed busing for all conceivable purposes except racial integration.

*Seattle School District No. 1*, *supra*, 458 U.S. at 470. Even though the state constitutional

amendment did not even mention race or desegregation, the Court looked at the reality of

the history, terms and effect of the referendum and held that it was inherently

discriminatory:

> …[W]hen the political process or the decision-making mechanism used to address racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the governmental action clearly rests on distinctions based on race [citation omitted]. And when the State's allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the "special condition" of prejudice, the governmental action seriously "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities." [citation omitted]. In a most direct sense, this implicates the judiciary's special role in safeguarding the interests of those groups that are "relegated to such a position of powerlessness as to command extraordinary protection from the majoritarian political process."

> *Id*., at 485-486.

As is absolutely obvious, these words apply equally to assignment programs that

determine which high schools students will attend and to admission programs that

determine which colleges students will attend.[32]

Fourteen years later, the Supreme Court once again reaffirmed the principle of

*Hunter* when it struck down a Colorado constitutional amendment, adopted in a

referendum, that provided that all local and state bodies could not adopt ordinances or

policies protecting lesbians and gay men against discrimination. Writing for a six-Justice

---

[32] Russell claims that the majority in *Seattle* and Justice Blackmun, the author of the majority opinion in *Seattle*, made clear that the holding of that opinion did not extend to college admissions program (Russell Br, at 5-6). But that is frankly nonsense, as any review of the citations referred to by Russell will show. In fact, the very quotation relied upon by Russell makes clear that Justice Blackmun regarded "statutory affirmative action programs or anti-discrimination programs" as the same category of programs. *Crawford*, 458 U.S. at 546-547. The legislature—or, in this case, the Regents—that enacted them may repeal them— but the state may not change its procedures in a way that both repeals the programs and imposes a new political hurdle that must be surmounted before they can ever be enacted again.

majority, Justice Kennedy stated that "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Romer v. Evans,* 517 U.S. 620, 633 (1996).

As Proposal 2 plainly and obviously denies that right for any exceptions or modifications based on race or national origin, it is plainly and obviously a violation of the Fourteenth Amendment guarantee of equal protection of the laws.

> D.   <u>The Ninth and Sixth Circuit panels erred by holding that the white majority can deprive racial minorities of equal political rights simply by claiming that it is eliminating "preferences."</u>

Russell and the Attorney General wrap themselves in the opinions of the Ninth Circuit panel that approved Proposition 209 and the Sixth Circuit panel that dissolved the stay issued by this Court (Russell Br, at ; Atty Gen Br, at , citing *Coalition for Economic Equity, et. al. v. Wilson*, 122 F. 3d 692 (9th Cir.1997), *cert. den.* 522 U.S. 963 (1997); *Coalition to Defend Affirmative Action, et. al. v. Granholm*, 473 F. 3d 237 (2006).)

Neither decision is binding on this Court. Both profoundly depart from the holdings of the Supreme Court. Even more profoundly, both depart from the analysis of reality that the Supreme Court has demanded from *Brown* forward.

On two occasions, the United States Supreme Court has directly held that a university has a *compelling* interest in assuring that it has a racially diverse student body and that that interest is so strong that the university may explicitly favor applicants who score lower on its tests and other criteria in order to obtain that diversity. On both occasions, the Court held that the universities had no practical means to assure a racially

integrated student body unless it departed from those standards. *Grutter, supra; Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978).

If the state bodies that are charged with educating students have a right to adopt an affirmative action program, minority citizens and their supporters have a right to demand that those bodies exercise that right. What the Ninth Circuit and Sixth Circuit panels have done, however, is to decide that affirmative action programs are a second-class demand and that minorities may be relegated to a second-class, more onerous procedure in fighting for that demand. But there is not a *syllable* in *Grutter* or *Bakke*—or in *Hunter*, *Seattle,* or *Romer*—that even hints that minority citizens may be relegated to second-class status in a fight for demands that the Supreme Court has already determined comply with the Fourteenth Amendment.

What the panels that decided *Wilson* and *Coalition for Affirmative Action* have done is obvious. They do not like affirmative action. They believe, respectively, that *Bakke* and *Grutter* were wrongly decided. And they have decided to implement their view by making it impossible for minorities to defend the programs the Supreme Court has held are lawful. The *Wilson* and *Coalition* panels, whose members repeatedly inveigh against "judicial legislation," have engaged in judicial legislation of the worst sort.

What *Brown, Arlington, Hunter, Seattle*, and a host of other cases have demanded is precisely what the Ninth and Sixth Circuit panels have avoided: an analysis of reality. In their opinions, there is not a word about the reality of separate and unequal education at the elementary and secondary level. Nor is there a word about the inadequacy and discrimination that is captured or magnified by the existing admissions criteria, including especially standardized tests.

33

Without examination, the panels have transformed the existing admissions standards into the standards for determining rights under the Fourteenth Amendment. Anyone who demands a departure from the existing admissions standards is demanding a "preference." Such persons stand outside the pale of protection guaranteed by *Hunter* and *Seattle*—and the white majority can, if it so chooses, enact a procedure that makes it impossible for those minorities to ever demand that those standards be applied with race consciously taken into account.

It is obvious where this leads. The majority can deny racial minorities access to any political process in which the minority demands an exception to any existing standard. The majority can declare that racial discrimination has ended—that its standards are neutral—and use the Fourteenth Amendment as a shield against anyone who claims that the standards are not neutral.

Minimally, there is a question of fact whether the demand for affirmative action is a racial preference—as the supporters of Proposal 2 claim—or a factor that offsets massive discrimination against minority students, as the *Coalition* plaintiffs claim.

II.   **DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE CLEARLY DISPUTES OF FACT OVER WHETHER PROPOSAL 2 VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT BY DISCRIMINATING AGAINST WOMEN STUDENTS AND RESIDENTS**

In addition to eliminating the consideration of race in admissions, Proposal 2 has eliminated the defendant Universities' prior consideration of gender for admission in the fields of math, science, and engineering where women remain underrepresented.[33] Instead of petitioning the defendant Universities directly, plaintiffs seeking to reinstate

---

[33] (Ex E, Dep of Spencer at 208-211).

the consideration of gender in admissions can now do so only through constitutional amendment.

Contrary to defendants' assertions, the *Wilson* and *Coalition* decisions do not require dismissal of plaintiffs' gender-based *Hunter* claim.

For reasons analogous to those on plaintiffs' race-based *Hunter* claim, the *Wilson* and *Coalition* panels' attempt to define Fourteenth Amendment rights based on what the panels believe are preferences is unfounded in law or fact. In both *Wilson* and *Coalition* the panels falsely *assumed*, without hearing any evidence on point, that the existing admission programs are gender neutral and that any demand for the consideration of gender is thus a demand for a preference. There is no basis for the assumption—and in fact voluminous evidence shows that a whole set of discriminatory conditions have excluded or restricted women in the sciences for many years.

Defendants' claim that *Hunter* itself precludes a gender-based claim where women are the political majority, does not change the need for a trial on plaintiffs' claim. The fact that black citizens were a political minority only underscored the underlying *Hunter* violation. The equal protection violation recognized by *Hunter* is the discriminatory imposition of a different, more onerous political procedure on a group that is in a suspect class due to past discrimination. By noting the plaintiffs' status as the numerical minority, the *Hunter* court was merely recognizing that in the addition to this injury, the hurdle of having to amend the city charter to enact the plaintiffs' desired legislation essentially barred the legislation. The court did not hold that status as a voting minority was a pre-requisite to a *Hunter* claim.

35

Any assertion to the contrary requires untenable results. The assertion suggests that women as an interest group can be made to jump through any number of additional procedural hoops that other groups need not follow, no matter how onerous those hoops may be, simply because they are a bare majority of the population.[34] The suggestion that women can simply pass a referendum to correct these discriminatory requirements, blithely ignores the reality of the expense, organization, and time required for any such corrective effort. It also ignores the reality that while bare majority support for a proposition may exist, that support by no means guarantees that the proposition will ever actually be proposed and passed.

The Court should also reject defendants' argument that no *Hunter* claim can lie because women and racial minorities together constitute the political majority of this state. The groups are obviously discrete and separate—and a law cannot justify a violation of the Fourteenth Amendment rights of a minority simply by throwing enough other groups in to make the sum total of targets a "majority."

## III.    TITLE VI AND TITLE IX PREEMPT PROPOSAL 2

Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments prohibit recipients of federal funds from excluding persons from programs due, respectively, to their race and national origin or their gender.  42 U.S.C. s. 2000d; 20 U.S.C. s. 1681.  Both direct the departments disbursing funds to promulgate regulations to enforce the respective statutes.  42 U.S.C. s. 2000d-1; 20 U.S.C. s. 1682.

As is undisputed, the United States Department of Education disburses substantial sums to Michigan's three constitutional universities.  Acting under Title VI, the

---

[34] While Russell asserts that women are the voting majority in Michigan, the reference Russell relies on states only that women are the majority of the overall population in the state, not the majority of registered voters.

Department of Education has prohibited the universities from using "criteria or methods that *have the effect of* subjecting individuals to discrimination because of their race, color or national origin."  34 C.F.R. s. 100.3(b)(2)(emphasis added).  Acting under Title IX, the Department has promulgated an identical regulation barring the use of criteria that have the effect of discriminating on account of gender.  34 C.F.R. s. 106.21(b)(2).

The federal civil rights acts preempt any state law that "stands as an obstacle to the accomplishment and execution of the full purposes of Congress."  *Cal. Fed. Sav. & Loan Ass'n. v. Guerra*, 479 U.S. 272, 281 (1997)(plurality).

Proposal 2, however, has not only the effect but the intent of excluding persons based on their race, national origin, or gender.  When Proposal 2 forced the universities to amend their admissions policies, it clearly forced the universities to act in ways that directly contradicted the federal regulations.

Contrary to the claims in Russell's brief, the Supreme Court has never held that the disparate impact regulations promulgated by the Department exceeded its authority.  Russell Br, at 24, citing clear dicta in Justice O'Connor's concurring opinion in *Alexander v. Sandoval,* 532 U.S. 275, 286 n. 6 (2001).

Moreover, contrary to the claims in the Attorney General's brief, Proposal 2 is not saved by its provision stating it does not prohibit action that must be taken to establish eligibility for federal funds "if ineligibility would result in a loss of federal funds to the state."  Atty. Gen. Brief, at 31, citing Const 1963, art 1, sec 26(4). By requiring the university to defy federal agencies until such time as the actual loss of funds is imminent, Proposal 2 clearly thwarts the attempts of federal agencies to assure voluntary compliance with the regulations that they have issued pursuant to statutory authority.

37

**IV.    THE *COALITION* PLAINTIFFS HAVE STANDING TO RAISE THE CLAIMS THAT THEY HAVE ASSERTED**

 A. <u>Plaintiffs Have Been and Continue to be Subject to An Unequal Political Process To Secure Anti-Discrimination And Desegregation Measures in University Admissions</u>

 First, it is well-recognized that a concrete and particularized injury exists where plaintiffs seeking aid from the state, are subject to a different and more difficult process than that imposed on other groups. *Romer, supra*, 517 U.S. at 627, 631; *Hunter, supra*, 393 U.S. at 391.

 Here, the *Coalition* plaintiffs are organizations and individuals who have fought for equal, integrated education for black people, Latina/os, and other minorities and women. These efforts have included demands for and the defense of affirmative action in admissions at the defendant Universities. The *Coalition* plaintiffs also include black and other minority students and women who would have applied or plan to apply to the defendant Universities.

 As implemented by defendants, Proposal 2 deprives plaintiffs of an equal political process to petition the Universities to reinstitute and maintain affirmative action in admissions. For the reasons set forth above, the State cannot deny them of this by labeling their demands as ones for "preferences."

 B. <u>Plaintiffs' Ability To Fairly Compete in University Admissions Has Been and Continues to be Diminished</u>

 Because Proposal 2 has eliminated affirmative action programs that previously offset ongoing discrimination in the Universities' admissions process, the individual plaintiffs who have applied to or plan to apply to the Universities, have also suffered injuries from the Universities' continued and now unmitigated application of admissions

criteria that are unfairly biased against black people and other minorities. In addition to the discrimination suffered, the ability of those plaintiffs to fairly compete in university admissions has also been diminished. The diminished ability to fairly compete in university admissions is a recognized injury. *Bakke, supra*, 438 U.S. at 280-81; *see also Planned Parenthood Assoc. v. Kempiners*, 700 F.2d 1115, 1119 (7th Cir. 1983).

Defendants' argument that plaintiffs' nonetheless lack standing because plaintiffs cannot show that they would have been admitted to the Universities even if affirmative action were still in place, should be rejected. The courts have recognized a justiciable injury from the plaintiff's compromised ability to fairly compete alone. *Bakke,* 428 U.S. at 281; *Planned Parenthood*, 700 F.2d at 1119-20 ("It is not necessary … for the purposes of standing in this case, to foresee a successful application and a subsequent grant of funds to [Plaintiff]). It is more than sufficient that the elimination of the offending provisions of the Act will simply enable [Plaintiff] to compete freely with other organizations in the field…."), citing *Larsen v. Valente*, 456 U.S. 228 n.15 (1982)).

C.      Plaintiffs' Ability To Receive An Integrated Education Has Been and Continues To Be Diminished

Contrary to Defendants' assertions, the courts have also recognized that an injury exists from the failure to receive a racially integrated education. As the Supreme Court has said, "[T]he diminished ability to receive an education in a racially integrated school is, beyond any doubt, not only judicially cognizable, but as shown by cases from *Brown v. Board of Education, supra*, to *Bob Jones University v. United States*, 461 U.S. 57

(1983), one of the most serious injuries recognized in our legal system." *Allen v. Wright*,

468 U.S. 737, 756 (1984). [35]

## CONCLUSION

For the reasons stated, the Coalition plaintiffs ask the Court to deny the motions

for summary judgment filed by Russell and by the Attorney General and to set this matter

down for trial.

By the *Coalition* plaintiffs' attorneys,

s/ George B. Washington                  Winifred Kao*
George B. Washington (P26201)             DAVIS COWELL & BOWE, LLP
Shanta Driver (P65007)                    595 Market Street, Suite 1400
SCHEFF & WASHINGTON, PC                   San Francisco, CA 94105
645 Griswold St., Suite 1817              Tel: (415) 597-7200
Detroit, MI 48226                         Fax: (415) 597-7201
(313) 963-1921
scheff@ameritech.net

Dated: January 7, 2008

* Application for pro haec vice status pending.

---

[35] Insofar as Russell and the Attorney General assert that the plaintiffs lack standing or have failed to assert a claim for violation of the First Amendment, the plaintiffs rely on and incorporate the arguments made in the their brief in opposition to the University defendants' motion for summary judgment.

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2008, I electronically filed the **COALITION PLAINTIFFS' BRIEF IN RESPONSE TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY THE FILED BY THE ATTORNEY GENERAL AND ERIC RUSSELL** with the Clerk of the Court, who will  automatically send notification of filing to counsel of record, including, but not limited to:

Charles J. Cooper

John Saurer

Michael E. Rosman

Kerry L. Morgan

Leonard Niehoff

Margaret Nelson

Mark D. Rosenbaum

Karin A. DeMasi

　　　　　　　　　　　　　　　 /s/George B. Washington_____
　　　　　　　　　　　　　　　 George B. Washington (P-26201)
　　　　　　　　　　　　　　　 SCHEFF & WASHINGTON, P.C.
　　　　　　　　　　　　　　　 645 Griswold—Ste 1817
　　　　　　　　　　　　　　　 Detroit, Michigan 48226
　　　　　　　　　　　　　　　 (313) 963-1921
　　　　　　　　　　　　　　　 scheff@ameritech.net

Dated: January 7, 2008