UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COALITION TO DEFEND AFFIRMATIVE ACTION,
INTEGRATION AND IMMIGRATION RIGHTS AND
FIGHT FOR EQUALITY BY ANY MEANS NECESSARY          Case No. 06-15024
(BAMN), UNITED FOR EQUALITY AND AFFIRMATIVE       Hon. David M. Lawson
ACTION LEGAL DEFENSE FUND, RAINBOW PUSH
COALITION, CALVIN JEVON COCHRAN, LASHELLE
BENJAMIN, BEAUTIE MITCHELL, DENESHA RICHEY,
STASIA BROWN, MICHAEL GIBSON, CHRISTOPHER
SUTTON, LAQUAY JOHNSON, TURQOISE WISE-            **OPINION AND ORDER**
KING, BRANDON FLANNIGAN, JOSIE HUMAN,             **GRANTING IN PART AND**
ISSAMAR CAMACHO, KAHLEIF HENRY,                   **DENYING IN PART**
SHANAE TATUM, MARICRUZ LOPEZ,                      **UNIVERSITY DEFENDANTS'**
ALEJANDRA CRUZ, ADARENE HOAG, CANDICE             **MOTION TO DISMISS,**
YOUNG, TRISTAN TAYLOR, WILLIAMS FRAZIER,          **DENYING *CANTRELL***
JERELL ERVES, MATTHEW GRIFFITH,                   **PLAINTIFFS' MOTION FOR**
LACRISSA BEVERLY, D'SHAWNM                         **SUMMARY JUDGMENT,**
FEATHERSTONE, DANIELLE NELSON,                     **GRANTING ATTORNEY**
JULIUS CARTER, KEVIN SMITH, KYLE                   **GENERAL'S MOTION FOR**
SMITH, PARIS BUTLER, TOUISSANT KING,              **SUMMARY JUDGMENT, AND**
AIANA SCOTT, ALLEN VONOU, RANDIAH                 **DISMISSING CASES**
GREEN, BRITTANY JONES, COURTNEY DRAKE,
DANTE DIXON, JOSEPH HENRY REED,
AFSCME LOCAL 207, AFSCME LOCAL 214,
AFSCME LOCAL 312, AFSCME LOCAL 836,
AFSCME LOCAL 1642, AFSCME LOCAL 2920,
and the DEFEND AFFIRMATIVE ACTION PARTY,

Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY OF MICHIGAN,
the BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY, the BOARD OF GOVERNORS OF WAYNE
STATE UNIVERSITY, the TRUSTEES of any other public
college or university, community college, or school district,
ATTORNEY GENERAL MICHAEL COX, and ERIC
RUSSELL,

Defendants,

-and-

CHASE CANTRELL, M.N., a minor child, by Karen Nestor,
Mother and Next Friend, KAREN NESTOR, Mother and
Next Friend of M.N., a minor child, C.U., a minor child, by
Paula Uche, Mother and Next Friend, PAULA UCHE,
Mother and Next Friend to C.U., a minor child, JOSHUA
KAY, SHELDON JOHNSON, MATTHEW COUNTRYMAN,
M.R., a minor child, by Brenda Foster, Mother and Next Friend,
BRENDA FOSTER, Mother and Next Friend of M.R., a minor
child, BRYON MAXEY, RACHEL QUINN, KEVIN GAINES,
DANA CHRISTENSEN, T.J., a minor child, by Cathy Alfaro,
Guardian and Next Friend, CATHY ALFARO, Guardian and
Next Friend of T. J., a minor child, S. W., a minor child, by
Michael Weisberg, Father and Next Friend, MICHAEL
WEISBERG, Father and Next Friend of S. W., a minor child,
CASEY KASPER, SERGIO EDUARDO MUNOZ, ROSARIO
CEBALLO, KATHLEEN CANNING, EDWARD KIM, M.C.C. II,
a minor child, by Carolyn Carter, Mother and Next Friend,
CAROLYN CARTER, Mother and Next Friend of M.C.C., II,
a minor child, J.R., a minor child, by Matthew Robinson,
Father and Next Friend, MATTHEW ROBINSON,
Father and Next Friend of J.R., a minor child,

|                                | CONSOLIDATED CASES |
|                                |                    |
|                                | Case No. 06-15637  |
|                                | Hon. David M. Lawson |

                    Plaintiffs,

v.


ATTORNEY GENERAL MICHAEL COX and ERIC
RUSSELL,

                    Defendants,

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART UNIVERSITY DEFENDANTS' MOTION TO DISMISS, DENYING *CANTRELL* PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING ATTORNEY GENERAL'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING CONSOLIDATED CASES

The plaintiffs in these consolidated actions challenge the constitutionality of an amendment to Michigan's state constitution that was adopted by a majority vote of the electorate at the November 2006 election.  The amendment, referred to throughout this opinion as Proposal 2, prohibits the State and its political subdivisions from "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Mich. Const. art. I, § 26(1).  Before the Court are several dispositive motions filed by the parties, which were fully briefed and presented at oral argument held on February 6, 2008.  For reasons discussed in detail below, the Court determines that there are no material fact issues that require a trial on any of the claims, and the Court must find that Proposal 2 does not violate the United States Constitution.  Therefore, the Court will grant in part and deny in part the university defendants' motion to dismiss, deny the *Cantrell* plaintiffs' motion for summary judgment, grant the attorney general's motion for summary judgment, and dismiss these consolidated cases.

## I.  Facts and Proceedings

### A.  Background

In the 1960s, minority racial groups in Michigan began lobbying the University of Michigan Board of Regents to consider an applicant's race in making admissions determinations, thereby treating minority status as a positive factor.  In 1992, the University of Michigan law school crafted an admission policy that used an applicant's race as one of many factors in assembling classes consisting of "a mix of students with varying backgrounds and experiences who will respect and learn from each other."  *Grutter v. Bollinger*, 539 U.S. 306, 314 (2003) (internal quotes omitted).

The undergraduate school considered race in its admissions decisions since at least 1995. *Gratz v. Bollinger*, 539 U.S. 244, 254-55 (2003).

In 1997, white applicants who were rejected under those systems challenged the state schools' admission policies in federal court, arguing that they violated the Equal Protection Clause of the Fourteenth Amendment because race was considered as a factor in deciding whom to admit. However, the Supreme Court eventually held that "student body diversity is a compelling state interest that can justify the use of race in university admissions." *Grutter*, 539 U.S. at 325. In the case of the law school, the Court held that its admissions system "bears the hallmarks of a narrowly tailored plan," *id.* at 334, and upheld it against the constitutional challenge. The Court invalidated the undergraduate school's program because it resembled a quota system bereft of the necessary individualized consideration found in the law school's program, and therefore the system was not narrowly tailored to achieve the compelling state interest. *Gratz*, 539 U.S. at 275-76.

Not satisfied with that result, the plaintiff in *Gratz* joined forces with Ward Connerly and the Michigan Civil Rights Initiative (MCRI) to place on the November 2006 statewide ballot a proposal to amend Michigan's constitution to bar programs for state school admission, public employment, and public contracting that grant preferential treatment on the basis of race or gender. The petition drive eventually was designated officially as Proposal 06-2, although throughout the process and this litigation it is known as Proposal 2, and it has been characterized by the Michigan Attorney General at oral argument in this case as an anti-affirmative action measure.

The signature-gathering phase of the initiative process generated considerable controversy. The Sixth Circuit found that "the solicitation and procurement of signatures in support of placing Proposal 2 on the general election ballot was rife with fraud and deception. . . . By all accounts,

-4-

Proposal 2 found its way on the ballot through methods that undermine the integrity and fairness of our democratic processes." *Operation King's Dream v. Connerly*, 501 F.3d 584, 591 (6th Cir. 2007). Nevertheless, Proposal 2 was allowed to remain on the ballot, and the Michigan voters approved the constitutional amendment with approximately 57.9% of the voters in favor and 43.1% disapproving. *See* State Proposal-06-2: Constitutional Amendment: Ban Affirmative Action Programs, at http://miboecfr. nictusa.com/election/results/06GEN/90000002.html (last visited Feb. 10, 2008). Only three of Michigan's 83 counties rejected the measure; the rest approved it.

Proposal 2 amended the state constitution by adding the following provisions:

(1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(3) For the purposes of this section "state" includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.

(4) This section does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state.

(5) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex that are reasonably necessary to the normal operation of public employment, public education, or public contracting.

(6) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national origin, as are otherwise available for violations of Michigan anti-discrimination law.

(7) This section shall be self-executing.  If any part or parts of this section are found to be in conflict with the United States Constitution or federal law, the section shall be implemented to the maximum extent that the United States Constitution and federal law permit.  Any provision held invalid shall be severable from the remaining portions of this section.

(8) This section applies only to action taken after the effective date of this section.

(9) This section does not invalidate any court order or consent decree that is in force as of the effective date of this section.

Mich. Const. art. I, § 26.  Although an exit poll conducted by Edison Media Research found that 86% of black voters voted "No" on Proposal 2, the reliability of that poll has been questioned.  *See* Eric Russell Resp. to *Cantrell* Mot. for Summ. J., Ex. 1, Wilson Dec. at ¶ 4 (explaining that the reliability of this figure cannot be determined without knowing the sample size and how many people refused to respond).

The day after the election, a collection of interest groups and individuals (the *Coalition* plaintiffs) brought suit alleging that the state constitutional amendment violated the United States Constitution and federal law.  They filed their complaint in this Court on November 8, 2006. Another group (the *Cantrell* plaintiffs) brought suit on December 19, 2006, contending that Proposal 2 was unconstitutional as it is applied to public colleges and universities.  This Court consolidated these cases on January 5, 2007.

Proposal 2 took effect on December 23, 2006.  Although the Court granted the plaintiffs and the University defendants a measure of relief by entering a stipulated order temporarily enjoining Proposal 2's implementation at Michigan's universities, that injunction was short-lived.  On December 29, 2006, the Sixth Circuit issued a stay of the injunction pending a full appeal as to the injunction only.  *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 253 (6th Cir. 2006).  That appeal subsequently was dismissed as moot, since the injunction merely put off the

-6-

effective date of Proposal 2 until July 1, 2007.  The universities thereafter implemented Proposal 2 and applied its requirements to the 2006-2007 admissions cycle.  The *Coalition* plaintiffs amended their complaint on December 17, 2006, and again on March 28, 2007.  The *Cantrell* plaintiffs amended their complaint on January 17, 2007.

Thereafter, the Court instructed the parties to attempt a stipulation of facts that would have permitted the issues to be adjudicated promptly by dispositive motion, but the attempt failed and the parties proceeded with discovery.  On May 15 and 16, 2007, the plaintiffs filed motions to certify the matter as a class action.  Those motions were argued and taken under advisement, and they will be adjudicated in a separate order.  On October 5, 2007, the *Cantrell* plaintiffs filed a motion for summary judgment as to intervening defendant Eric Russell.  The University defendants filed their motion to dismiss on October 17, 2007.  On November 30, 2007, the Michigan attorney general filed a motion to dismiss or for summary judgment, intervening defendant Russell filed a motion for summary judgment, and the *Cantrell* plaintiffs filed a motion for summary judgment.  These motions were submitted for decision after oral argument on February 6, 2008.

These motions raise issues of standing, the propriety of joining the Michigan universities as defendants, and challenges to the plaintiffs' arguments that Proposal 2 violates the Equal Protection Clause, Title VI of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972.  A discussion of the allegations in the complaints and the facts elicited through discovery, therefore, is necessary.

B.  The Amended Complaints

1.  The *Cantrell* Plaintiffs

The thrust of the *Cantrell* plaintiffs' complaint is that Proposal 2 violates the Equal Protection Clause of the Fourteenth Amendment, but not in the traditional sense.  Unlike the *Coalition* plaintiffs, whose complaint is discussed below, the *Cantrell* plaintiffs do not base their challenge on the argument that denying preferential treatment to minority students is unlawful *per se*, but rather on the idea that Proposal 2 places an undue burden on the ability of minority groups to effect changes in policy by altering the political structure.  Their theory is tied to language in *Hunter v. Erickson*, 393 U.S. 385 (1969), *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982), and *Romer v. Evans*, 517 U.S. 620 (1996).

The *Cantrell* plaintiffs exclusively challenge Proposal 2 as it is applied to Michigan's public universities, and the University of Michigan in particular.  The named plaintiffs are eighteen individuals who all bear some connection to the University of Michigan and believe Proposal 2 is bad for that institution's future.  Three of the named plaintiffs are students at the law school; four are undergraduate students; six are high school students who plan to apply to the university; one is a Ph.D. candidate; and four are professors.  The majority of the named plaintiffs are members of a minority racial group, although a handful are Caucasians who believe that racial diversity is important to their educational experience.  The plaintiffs purport to "represent a class of all present and future students and faculty at the University of Michigan who applied to, matriculated at, or continue to be enrolled at or employed by the University of Michigan in reliance upon the University's representation that it would continue to admit and enroll a diverse group of students

at the school consistent with its former policies, which took race into account among other factors." *Cantrell* Amend. Compl. at ¶ 31.

These plaintiffs claim that Proposal 2 places an undue political burden on individuals or groups who would seek to alter public university polices regarding the consideration of race in the admissions process, because the only way to alter the policy is a state-wide ballot initiative rather than a petition to the governing body of the university, to which they would have had access before Proposal 2's passage.  According to the *Cantrell* plaintiffs, persons seeking to alter admissions policies with respect to other factors, such as legacy status or geographic origin, can simply appeal to the individual colleges or schools.  On the other hand, "[t]his avenue is foreclosed . . . to those seeking beneficial admissions policies that include consideration of race . . . in the decision-making process."  *Id.* at ¶ 51.  These plaintiffs support their claim that obtaining a voter-approved constitutional amendment is more difficult than successfully petitioning individual university governing bodies to alter admissions policies by alleging, *inter alia*, the fact that access to the state ballot requires gathering signatures totaling "'not less than eight percent . . . of the total vote cast for all candidates for governor at the last preceding general election.'"  *Id.* at ¶ 53 (quoting Mich. Const. art. 2, § 9).

Citing *Hunter* and *Seattle* for the proposition that "a state law violates the Equal Protection Clause when it 'disadvantage(s) any particular group by making it more difficult to enact legislation in its behalf,'" *Cantrell* Amend. Compl. at ¶ 57 (quoting *Hunter*, 393 U.S. at 393, and citing *Seattle*, 458 U.S. at 468), the *Cantrell* plaintiffs argue that "[b]y creating a political process that sets aside race, among other categories, for consideration 'at a new and remote level of government,' Proposal 2 imposes a 'substantial and unique burden on racial minorities.'"  *Id.* at ¶ 58 (quoting *Seattle*, 458

U.S. at 470, 483).  Based on this theory, the plaintiffs seek to permanently enjoin application of Proposal 2 at the University of Michigan and other public universities.

### 2. The *Coalition* Plaintiffs

Like the *Cantrell* plaintiffs, the *Coalition* plaintiffs focus principally, if not exclusively, on Proposal 2's impact on public universities.  In contrast to the *Cantrell* plaintiffs, however, the *Coalition* plaintiffs include persons and entities that bear a connection to schools other than the University of Michigan.

The named plaintiffs include the following organizations and individuals: (1) the Coalition to Defend Affirmative Action, Integration, and Immigrant Rights and Fight for Equality By Any Means Necessary (BAMN); (2) the United for Equality and Affirmative Action Legal Defense Fund (UEAALDF), a non-profit corporation founded by BAMN; (3) the Rainbow PUSH coalition; (4) the Defend Affirmative Action Party (DAAP), a student organization at the University of Michigan; (5) some twenty-seven minority high school students who plan to attend either the University of Michigan, Michigan State University, or Wayne State University; (6) three recent graduates from the University of California at Berkeley who plan to attend graduate school at one of either Michigan, Michigan State, or Wayne State; (7) two minority community college students who plan to apply to either Michigan, Michigan State, or Wayne State; (8) three other individuals with "substantial college credits" who plan to apply to either Michigan, Michigan State, or Wayne State; (9) one minority student currently attending Michigan; (10) an individual who helped circulate the petition for Proposal 2; and (11) six local unions with large minority memberships.  The named plaintiffs purport to represent three classes of individuals: the first class is comprised of all African American, Latino, and Native American applicants to or students at Michigan, Michigan State, and

-10-

Wayne State; the second class is made up of all women applicants to or students at those schools; and the third includes all African American, Latino, and Native American citizens who want to lobby for or vote for changes in the admission and other policies at the University of Michigan, Michigan State University, and Wayne State University that benefit African American, Latino, and Native American citizens.

These plaintiffs present a political-burden argument that is similar to the one made by the *Cantrell* plaintiffs, except that it extends to gender.  The *Coalition* plaintiffs also claim that Proposal 2 directly discriminates against university applicants on the basis of their race and gender because "Proposal 2 has as its primary aim reducing the admission of black, Latino, and Native American students and of women students into some programs," *Coalition* Sec. Am. Compl. at ¶ 107, by eliminating the "desegregation plans that have resulted in the admission of significant numbers" of such students, *id.* at ¶ 106.  Paradoxically, the *Coalition* plaintiffs contend that elimination of so-called preferential treatment actually amounts to discrimination, explaining:

> In its history, in its evident purpose, in its defiance of the state tradition of control of the universities by the governing boards, and in its adoption of explicit race and gender classifications, Proposal 2 violates the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against black, Latino/a, Native American and women students.

*Id.* at ¶ 111.

In addition, the *Coalition* plaintiffs contend that Proposal 2 violates the First Amendment and is preempted by Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.  The *Coalition* plaintiffs' First Amendment argument is premised on the Supreme Court's pronouncement in *Grutter v. Bollinger* that institutions of higher learning have a right to academic freedom rooted in that Amendment.  According to the *Coalition* plaintiffs,

-11-

universities have a First Amendment right to consider race and gender in the selection of faculty and students in order to promote diversity and fruitful education; and students, in turn, are the beneficiaries of that right, which Proposal 2 violates.

The *Coalition* plaintiffs also argue that Proposal 2 conflicts with Title VI of the Civil Rights Act of 1964 and is therefore preempted by that Act. They contend that Title VI, specifically 42 U.S.C. § 2000d, prohibits race- and national origin-based discrimination in programs that receive federal funding. Pursuant to Title VI, the Department of Education promulgated regulations that prohibit universities receiving federal funds from using admission criteria that either discriminate on the basis of race or impede the goal of eliminating racial discrimination. *See* 34 C.F.R. 100.3(b)(2). In light of California's experience with Proposition 209, the *Coalition* plaintiffs allege that Proposal 2 will "result in a devastating decline in the number of black, Latino/a and Native American students, in direct violation of the purpose of Title VI and of the specific prohibitions of the regulations that implement Title VI." *Coalition* Sec. Amend. Compl. at ¶ 127. Finally, the *Coalition* plaintiffs claim that Proposal 2 is preempted by Title IX of the Education Amendments of 1972, the gender-based analog to Title VI. *See* 20 U.S.C. § 1681; 34 C.F.R. § 106.23).

Based on these claims, the *Coalition* plaintiffs ask the Court to enjoin permanently the implementation of Proposal 2 at the University of Michigan, Michigan State University, and Wayne State University.

### C. Facts Presented From Discovery

The information gathered by the parties through discovery falls into two categories: the prospect for minority enrollment after Proposal 2's implementation compared with beforehand; and the difficulty involved in amending the state constitution.

-12-

1.  Minority Admissions Before and After Proposal 2

Pursuant to the state constitution, the University of Michigan, Michigan State University, and Wayne State University are controlled by boards of regents.  Mich. Const. art. VIII, § 5.  These boards are endowed with a high degree of autonomy; each enjoys the power of "general supervision of its institution and the control and direction of all expenditures from the institution's funds."  *Ibid.* These governing bodies have delegated the responsibility to establish admissions policies to departments within the respective institutions.  These "admitting units" have "establish[ed] admissions systems that allow for the consideration of a variety of factors."  *Cantrell* Mot. for Summ. J as to Russell [dkt # 172], Ex. I, Univ. RFA Resp. at ¶ 5.

Over time and partly as a result of lobbying efforts, the universities' admissions systems and standards have evolved.  Students and other individuals have always been "free to lobby the Universities for or against the adoption of particular admissions policies."  *Id.* at ¶ 7.  Beginning in the 1960s, African Americans and other groups of minorities lobbied for the consideration of race in admissions, and it appears that the universities embraced the concept.

As noted above, in 2003 the United States Supreme Court weighed in on the legitimacy of the admissions policies at Michigan and Michigan Law in *Gratz v. Bollinger* and *Grutter v. Bolinger*, invalidating the undergraduate admission plan and sustaining the law school's plan. Following these decisions, Michigan amended its undergraduate admissions policy to comply with the Supreme Court's instruction.  According to Theodore Spencer, associate vice-provost and director of undergraduate admissions, the *Grutter* decision provided a "great road map of what a holistic [and permissible] review process should look like."  *Cantrell* Mot. for Summ. J., Ex. D, Spencer Dep. at 38.  The key to this "holistic" process was that no single factor was dispositive.

-13-

"[H]olistic means that the decisions are not just based on grades and test scores, it means that it's not just based on perhaps being an alum or any one particular factor, race or anything else, but rather on the composite review of all the information that the student provides." *Ibid.* Race was still considered, but admissions officers would consider "50 to 80 different categories" in conducting their review. *Id.* at 35.

Frank H. Wu, dean at Wayne State University Law School, testified similarly that prior to Proposal 2, the admissions committee considered a wide variety of non-academic factors that "contribute to a diverse and engaged law student body." *Cantrell* Mot. for Summ. J., Ex. F, Wu Dep. at 32. Therefore, if a minority applicant failed to possess an LSAT score and GPA that would on their own qualify her for admission, the admissions committee would consider race, in addition to other factors that might "reduce[] the reliability of GPA as an index of academic achievement and promise." *Ibid.*

In response to Proposal 2's passage, the universities eliminated race from their admissions criteria but continued to consider various other non-academic factors, such as geography, alumni connections, socioeconomic status, and athletic ability. At Michigan Law, for instance, "the meat of th[e] [pre-Proposal 2] policy is the same [as the post-Proposal 2 policy] . . . with the exception of race." *Cantrell* Mot. for Summ. J., Ex. E, Zearfoss Dep. at 192. It is the undisputed testimony of university officials that Proposal 2 prohibits them from considering race to any degree.

Based on the information offered by the parties, the most that can be said is that it is not clear exactly how Proposal 2 will affect minority admissions in the long run. What evidence there is suggests that minority admissions will fall at the state's more selective schools, but the degree to which this will occur is subject to debate. Two different types of evidence have been submitted on

-14-

the matter: (1) testimony by admissions officials; and (2) testimony by outside experts. Both draw heavily on California's experience under Proposition 209.

Theodore Spencer, Sarah Zearfoss (dean of admissions at Michigan Law), and Frank Wu all testified that Proposal 2 will depress minority enrollment. Spencer expressed doubts over the ability to maintain minority enrollment through the use of a proxy, like socioeconomic status. He explained that university officials in California, Washington, Texas, and Georgia (states with laws similar to Proposal 2) "cannot achieve the same sort of racial and ethnic diversity that they had prior to such measures . . . without considering race." Spencer Dep. at 100-01. Similarly, Zearfoss testified that she excepts a decline in minority admissions because, in her view, it is impossible "to get a critical mass of underrepresented minorities . . . without considering race." Zearfoss Dep. at 56-57, 193. Wu stated that although some creative approaches might mitigate the effects of Proposal 2, he "did not think that any one of these proposals or any combination of these proposals was reasonably likely to result in the admission of a class that had the same or similar or higher numbers of African Americans, Latinos and Native Americans as the prior policy." Wu Dep. at 78. Even Ward Connerly, the architect of Proposal 2, admitted that, following the amendment, "the University of Michigan would be virtually resegregated as the University of California Berkeley and UCLA have," *Cantrell* Mot. for Summ. J., Ex. K, Connerly Dep. at 120, although he stated that this was not his intent.

In terms of expert testimony, the *Cantrell* plaintiffs offer the declarations of two purported experts in the field of race and admissions, William Bowen and Jeannie Oakes. Mr. Bowen is a former president of Princeton University and the author of two books on race-conscious admissions policies. In addition to highlighting the salutary effects of affirmative action, Bowen states that

"[t]he available evidence indicates that race-neutral alternatives are unlikely to be as effective as race-conscious admissions in enrolling a diverse student body." *Cantrell* Mot. for Summ. J., Ex. L, Bowen Decl. at ¶ 11.  In particular, "income-based strategies are unlikely to be good substitutes" because, although African Americans and Latinos are "overrepresented in the country's poor population, the great majority of that population is still white." *Id.* at ¶ 12.

Jeannie Oakes, Presidential Professor in Educational Equity at UCLA, is of a similar mind. In her study, Oakes "dr[ew] from the experiences of Texas and California and contrast[ed] relevant circumstances in these states with those in Michigan." *Cantrell* Mot. for Summ. J., Ex. M, Oaks Decl., Ex. 1, The Viability of Race-Neutral Approaches for Achieving Diversity at the University of Michigan, at 2.  In 2005 and 2006, Oakes found that blacks at the University of Michigan were underrepresented by almost 300% when compared with K-12 enrollment figures at public schools in the state.  She used these and other pre-Proposal 2 figures to calibrate a baseline; she did not assume that these numbers constituted sufficient diversity, but simply inquired whether these levels (whether adequate or not) could be maintained.  She stated her findings as follows:

> A.    Race-neutral admissions strategies (e.g., Percent Plans) have not been effective as replacements for race-conscious strategies in maintaining or increasing diversity in the public universities in Texas and California, two states with restrictions on race-conscious practices in university admissions similar to those required under Michigan's Proposal 2.
>
> Race-neutral Percent Plans that guarantee admission to the top ranked graduates of each public high school have not been successful in either California or Texas in maintaining levels of racial diversity comparable to those achieved with race-conscious policies prior to the *Hopwood* case in Texas or the passage of Proposition 209 in California that made race-conscious policies impermissible.
>
> B.    Michigan differs from California and Texas in ways that make it even more unlikely that race-neutral approaches would result in the diversity required at the University of Michigan.  In fact, such strategies would likely exclude

-16-

from admission in-state African American and Latino high school graduates with academic preparation sufficient to succeed at the university.

B.1.    Whereas the top-tier universities in California and Texas draw their freshman classes almost exclusively from graduates of California [and Texas] high schools, a majority of those offered admission as first-time freshmen at the University of Michigan (including a majority of those from underrepresented minority groups) are not Michigan residents.  Race-neutral admissions criteria (e.g., Percent Plans) and outreach strategies focused on Michigan high schools would not benefit the large percentage of underrepresented minority students who are drawn from other states.  Moreover, given the substantially lower scores on academic admissions criteria of non-resident underrepresented admits, in comparison to non-underrepresented admits, few of these underrepresented out-of-state admits would likely be admitted were race not a consideration in the admissions processes.

B.2.    The high degree of racial segregation in Michigan high schools means that students from underrepresented minority groups are concentrated in a very small percentage of the state's high schools.  As a result, a plan guaranteeing admission to high ranking students at each of the state's high schools would have its greatest benefit to students in schools with predominantly white populations and yield a relatively small number of underrepresented minority students.

B.3.    The small number of Michigan high schools with predominantly URM populations produces relatively few graduates with the academic records that would make them competitive for admission at the University of Michigan.  This, in part, results from the relationship between the high concentration of poverty at racially isolated minority schools and the low level of opportunity associated with these schools.  Lower levels of opportunity, in turn, affect the academic performance of students, specifically their ability to meet state standards on assessment tests, qualifying for state merit aid for college.  These low levels of achievement are related to the racial and/or poverty composition of a student's high school.  Consequently, race-neutral "Percent Plans" would likely result in the admission of underrepresented minority students with academic preparedness far below that required to succeed in an "elite" university.

*Id.* at 3-4.

-17-

Although the defendants have not produced evidence directly contradicting these conclusions, they have taken the position that they are mere speculation.  *See* Cox Resp. Br. at 20-21.  In addition, defendant Eric Russell challenges the underlying assumption that preferential treatment is good for racial minorities.  In support of this argument, he submits the declaration of Richard H. Sander, a law professor at UCLA who has garnered much attention for his development of the "mismatch effect" theory, first introduced in an article appearing in the *Stanford Law Review*. *See A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004).  The driving principle of that theory is that affirmative action harms minorities in the long run by placing them in institutions where they cannot compete or keep up with the pace of instruction.  According to Sander, this theory finds support in the case of the University of Michigan's law school: data from 2004, 2005, and 2006 "show very large disparities in bar passage rates across racial lines," with black graduates of Michigan Law "about eight times as likely to fail on their first attempt as were white graduates."   Russell Reply [dkt # 181], Ex. 1, Sander Decl. at ¶ 6.

In addition, the *Coalition* plaintiffs offer evidence and argument that the conditions that necessitated resort to affirmative action programs to achieve parity in opportunity for minority students still exist after the passage of Proposal 2.  They cite as examples *de facto* residential segregation, unequal resources for K through 12 schools for minorities, limited minority access to resources and programs, and racial stereotyping.  According to Dr. Gary Orfield, who testified at the *Grutter* trial in this Court, even with affirmative action programs in effect, minority students' SAT scores typically are significantly lower that white students' scores regardless of income levels, and minority students do not have the same access to honors or advanced placement classes that can

-18-

boost grade point average. *Coalition* Resp. Br., Ex. M, Orfield testimony, at 11, 92, 103-104. In 2005, the University of Michigan undergraduate program offered no admission to students from fourteen different Detroit high schools which are intensely segregated. *Coalition* Resp. Br., Ex. J, Miller Decl. at 9.

      The attorney general did not reply to the *Coalition* plaintiffs' brief. Intervening defendant Russell replies to the *Coalition* plaintiffs' arguments primarily by referring to Ward Connerly's deposition testimony that he believes eliminating racial preferences favoring minorities will benefit minority students in the long run by eliminating artificial equalizers and forcing them to compete in the larger society on the basis of merit.

### 2. Difficulty Amending the State Constitution

      There is also some ambiguity concerning just how onerous it would be to secure an amendment repealing Proposal 2. Kristina Wilfore, executive director of Ballot Initiative Strategy Center, Inc., a non-profit organization that researches and trains people in the ballot initiative process, has submitted a declaration on behalf of the *Cantrell* plaintiffs positing that state-wide ballot initiatives are typically expensive and time-consuming and often unsuccessful. She has also suggested that repealing Proposal 2 would be particularly difficult due to unique features in Michigan's ballot initiative process and specific factors inherent in the subject matter of affirmative action. According to Wilfore, Michigan poses obstacles because (1) it is a "politically competitive state . . . with a large number of initiatives vying for voters' attention on any given ballot"; (2) its media market is expensive when compared with other states; (3) the state constitution requires signatures from 8% of the total vote cast for all candidates for governor in the preceding general election; and (4) "Michigan has an unusually short time frame for the gathering of signatures and

filing of petitions." *Cantrell* Mot. for Summ. J, Ex. C, Wilfore Decl. at ¶¶ 29-32.  In addition, she says that Proposal 2 would be particularly challenging to repeal due to the fact that (1) polling data regarding affirmative action is unreliable, i.e., individuals often behave differently when they get to the voting booth; (2) affirmative action is a tough cause to market because it is complex and elicits emotional responses; and (3) "[t]here is no single obvious financial benefactor who would support the pro-affirmative action policy."  *Id.* at ¶¶ 36-37.

Intervening defendant Russell counters this evidence with the testimony of Jennifer Gratz, director of the Michigan Civil Rights Initiative Committee, who believes that "Ms. Wilfore exaggerates both the effort and expense associated with putting an initiative or referendum on the ballot in Michigan."  Russell Resp. Br., Ex. 3, Gratz Decl. at ¶ 4.  According to Gratz, polling is not necessary; a popular initiative can be passed with less than $5 million; and Michigan does not have a particularly short signature-gathering period (California, Oklahoma, and Massachusetts have shorter periods).  Moreover, the funding marshaled in opposition to Proposal 2 shows that monetary support would not be a major obstacle.  "One United Michigan ('OUM'), the ballot initiative committee that was the chief opponent of Proposal 2 in the 2006 election, received and spent just a little less than $4.8 million," including contributions from General Motors Corporation, Chrysler Corporation, and Ford Motor Company.  *Id.* at ¶¶ 10, 12.

## II. The University Defendants' Motion

The *Coalition* plaintiffs (but not the *Cantrell* plaintiffs) sued the university defendants seeking mandatory injunctive relief with respect to Proposal 2's effect on admissions policies that include consideration of race.  The university defendants now ask this Court to dismiss them from the action pursuant to Federal Rule of Civil Procedure 21 on the grounds that they are not proper

parties to the case. They also contend that Count 6 of the *Coalition* plaintiffs' amended complaint – alleging a violation of the First Amendment – should be dismissed for lack of standing.

As to the Rule 21 argument, the university defendants point out that although they must follow Proposal 2, they did not draft or enact it; they cannot repeal it, amend it, or ignore it; and they have no responsibility to enforce it against anyone or defend it in court. Therefore, they argue, they are not proper parties from whom relief can be obtained. The university defendants contend that the *Coalition* plaintiffs have no standing to assert a First Amendment claim because the right to academic freedom does not belong to any of the plaintiffs, but rather to the universities. Because of Supreme Court authority generally stating that there is a prohibition against asserting the constitutional rights of others, these defendants argue that the *Coalition* plaintiffs cannot establish standing.

> Federal Rule of Civil Procedure 21 states:
>
> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.

Fed. R. Civ. P. 21. The Rule allows dismissal of misjoined parties; "[t]he cases make it clear that parties are misjoined when they fail to satisfy either of the preconditions for permissive joinder of parties set forth in Rule 20(a)." Wright, Miller & Kane, Federal Practice and Procedure § 1683 (3d ed. 2001) (citing *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1988)). According to Rule 20, defendants are properly joined when the claims asserted against them arise from a common transaction or occurrence and those claims present some common question of law or fact. Fed. R. Civ. P. 20(a).

-21-

With these criteria in mind, the Sixth Circuit has held that dismissal for misjoinder is proper where the party is not responsible for the alleged harm and does not have the power to accord relief. *See Sutherland v. Mich. Dep't of Treas.*, 344 F.3d 603, 612-13 (6th Cir. 2003) (approving dismissal of the State of Michigan where the only claim brought against the State was for employment discrimination and the State was not the plaintiff's employer). The one instance where a court may dismiss a party under Rule 21 notwithstanding her satisfaction of the Rule 20(a) requirements lies in the context of diversity jurisdiction. *See Soberay Mach. & Equip. Co. v. MRF Ltd.*, 181 F.3d 759, 763 (6th Cir. 1999) (noting that "[i]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered," to preserve complete diversity).

The Court believes that the university defendants are properly joined as parties to this case, and dismissal for misjoinder is not appropriate, because the claims brought against the universities are intertwined with those challenging Proposal 2 in general. The *Coalition* plaintiffs allege that it is discriminatory (in a conventional sense) to abolish preferential treatment in admissions policies, and both groups of plaintiffs claim that Proposal 2's impact on admissions amounts to a discriminatory restructuring of the political process. Because the claims against the university defendants and the attorney general share common questions of law and fact and arise out of the same occurrence, the preconditions of joinder under Rule 20(a) have been met, and dismissal is unwarranted. Although it is true that the universities are not responsible for the alleged harm resulting from the *passage* of Proposal 2, and they have no authority to repeal it, striking down that amendment would not grant the plaintiffs the relief they ultimately seek without action on the universities' part. If this Court were to find Proposal 2 unconstitutional, affirmative action would

-22-

not automatically be reinstated into the admissions process. Rather, the universities would have to choose to do so on their own. And given the undeniable stake that the universities have in all these issues, it would simply be inappropriate to cast them aside, even if they desire the ultimate result the plaintiffs seek to achieve.

The standing issue requires a different analysis. A plaintiff who establishes Article III standing requirements faces the additional "rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). There is an "exception" to this rule when "the party asserting the right has a 'close' relationship with the person who possesses the right," and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130. The "close relationship" element requires consideration of whether "'the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter.'" *Powers v. Ohio*, 499 U.S. 400, 413 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976)). This prudential barrier is also "'lessen[ed]'" in cases involving a First Amendment attack, but only when the challenge is premised on vagueness or overbreadth. *Kowalski*, 543 U.S. at 130; *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *Brandywine, Inc. v. City of Richmond, Kentucky*, 359 F.3d 830, 835 (6th Cir. 2004) ("[P]laintiffs may not assert third party standing in every First Amendment facial challenge; rather plaintiffs may only do so in vagueness and overbreadth challenges.").

Proposal 2 is not challenged here on grounds of vagueness or overbreadth. Rather, the right upon which the *Coalition* plaintiffs focus is the First Amendment right to academic freedom, which

-23-

began to take shape in the concurring opinion of Justice Felix Frankfurter in *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), where he stated:

> It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential freedoms' of a university – to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.

*Id.* at 263 (Frankfurter, J., concurring) (internal quotes omitted). In *Regents of University of Michigan v. Ewing*, 474 U.S. 214 (1985), the Court noted that academic freedom embodies both a freedom among professors and students to express ideas and "somewhat inconsistently, on autonomous decisionmaking by the academy itself." *Id.* at 226 n.12 (citing *University of California Regents v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) and *Sweezy v. New Hampshire*, 354 U.S. at 263 (Frankfurter, J., concurring in result)). "Discretion to determine, on academic grounds, who may be admitted to study, has been described as one of 'the four essential freedoms' of a university." *Ibid.*

Justice Powell, in providing the fifth vote to uphold the affirmative action program in *Bakke*, implied that the university's academic freedom had a constitutional dimension by emphasizing that "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment. The freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312 (Powell, J.). Yet Justice Powell noted that "[a]lthough a university must have wide discretion in making the sensitive judgments as to who should be admitted, constitutional limitations protecting individual rights may not be disregarded." *Id.* at 314. The idea of academic autonomy in the area of admissions provided an important foundational element for the majority in *Grutter v. Bollinger*

-24-

in upholding Michigan Law's affirmative action program.   The Court determined that the
university's interest in obtaining a diverse student body was a compelling state interest, choosing
to "defer" to the "Law School's educational judgment."   *Grutter*, 539 U.S. at 328.

It is plain that the First Amendment right to academic freedom in the area of admissions
belongs to the universities.   Yet the *Coalition* plaintiffs insist that they have standing to assert their
own First Amendment right to a racially diverse education because students are the primary
beneficiaries of the right to academic freedom.   They argue in the alternative that to the extent that
academic freedom rights are the exclusive province of universities, they have third-party standing
to assert the right.   Both of these positions, however, are fundamentally at odds with the academy's
right to determine who may be admitted to study.   In making their argument that Proposal 2 is
unconstitutional because it denies *students* the right to a racially diverse educational environment,
the *Coalition* plaintiffs necessarily must claim a right unto themselves to select – or at least influence
– who may be admitted to the universities.   However, under the First Amendment, that right does
not belong to them, but to the academy.   The *Grutter* Court explained:

> We have long recognized that, given the important purpose of public education and
> the expansive freedoms of speech and thought associated with the university
> environment, universities occupy a special niche in our constitutional tradition.   *See,
> e.g., Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring);
> *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Shelton v. Tucker*, 364 U.S.
> 479, 487 (1960); *Keyishian v. Board of Regents of Univ. of State of New York*, 385
> U.S. at 603.   In announcing the principle of student body diversity as a compelling
> state interest, Justice Powell invoked our cases recognizing a constitutional
> dimension, grounded in the First Amendment, of educational autonomy: "The
> freedom of a university to make its own judgments as to education includes the
> selection of its student body."   *Bakke, supra*, at 312.   From this premise, Justice
> Powell reasoned that by claiming "the right to select those students who will
> contribute the most to the 'robust exchange of ideas,'" a university "seek[s] to
> achieve a goal that is of paramount importance in the fulfillment of its mission." 438
> U.S., at 313 (quoting *Keyishian v. Board of Regents of Univ. of State of New York*,
> *supra*, at 603).

-25-

*Grutter*, 539 U.S. at 329.  Consistent with this view, Justice Powell in *Bakke* and the Court in *Grutter* invoked this right as a shield for the universities against the claims of students seeking admission on equal protection grounds.

These precedents convince the Court that the *Coalition* plaintiffs do not have a personal right to a diverse student body grounded in the First Amendment.  Their third-party standing argument likewise does not find support in the jurisprudence.  Schools routinely are granted standing to seek redress for injuries to their students.  *Runyon v. McCrary*, 427 U.S. 160, 175 n.13 (1976) ("It is clear that the schools have standing to assert these arguments [involving the student's right to privacy and free association and the parent's right to direct the child's education] on behalf of their patrons."); *Ohio Ass'n of Independent Schools v. Goff*, 92 F.3d 419, 422 (6th Cir. 1994) (holding that "schools . . . have standing to assert the constitutional right of parents to direct their children's education").  Other business enterprises may assert the rights of their costumers.  *Craig v. Borden*, 429 U.S. 190, 195 (1976) (holding that vendor of alcoholic beverages may assert equal protection claims of male patrons and stating "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function"); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998) (holding that newsletter may assert rights of readers in first amendment challenge because readers value anonymity and may be unwilling to come forward).  However, the courts have not been as willing to permit students to assert the rights of their schools.  *See, e.g., Eulitt ex rel. Eulitt v. Maine*, 386 F.3d 344, 352 (1st Cir. 2004) (holding that students could not assert Equal Protection Clause rights of school because there was no showing that the school lacked the ability to assert its

-26-

own rights, and because the student may not share the interest of the school). In fact, it would be ironic if the plaintiffs here are permitted to sue the universities to assert the universities' rights.

The *Coalition* plaintiffs cannot establish the grounds for third-party standing to assert a First Amendment claim for two more reasons. First, the students lack a "close relationship" with the universities within the framework of academic freedom. *See Powers*, 499 U.S. at 413. As noted above, it is the universities that enjoy the right to chose which students to admit, a right that inherently is in tension with the interests of students and prospective students seeking to influence the admissions system. Second, the students have not established that the universities are burdened by some hindrance to the assertion of their First Amendment rights. The universities have mounted a rigorous defense of their admissions policies in the past. Even in the present case, although nominal defendants, the universities supported the initial injunction to postpone the effective date of Proposal 2 and pressed an academic freedom argument before the Sixth Circuit on appeal of that injunction. *See Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 247 (6th Cir. 2006).

Because the *Coalition* plaintiffs lack standing to assert their First Amendment claim, the Court will grant the universities' motion to dismiss Count 6 of the *Coalition* plaintiffs' amended complaint.

### III. The Attorney General's Motion and the *Cantrell* Plainitffs' Motion

Attorney General Cox has moved in the alternative to dismiss under Rule 12(b)(6) or for summary judgment under Rule 56(c). Although a party may file a motion for summary judgment that is contingent upon the court's denial of its motion for dismissal, if matters outside the pleadings are submitted, the motion more properly should be considered under Rule 56, and courts will treat

the motion as one for summary judgment. Fed. R. Civ. P. 12(b) (stating that "if, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"); *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Soper v. Hoben*, 195 F.3d 845, 850 (6th Cir. 1999)). The parties have filed a number of exhibits with their motions. These documents plainly are relevant to the defendant's motion and should be examined by the Court. Therefore, the Court will treat the motion as one for summary judgment and apply the standards required by Rule 56.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The *Cantrell* plaintiffs and the defendants have filed cross motions for summary judgment, which might imply that there are no facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding such cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The attorney general contends that both sets of plaintiffs lack standing to sue, and, failing that, they have failed to state a claim upon which relief can be granted. The *Cantrell* plaintiffs, seeking summary judgment, argue that Proposal 2 is unconstitutional as a matter of law: first, because it singles out race while leaving various other elements of diversity untouched, thereby creating a classification that triggers Fourteenth Amendment scrutiny; and second, because Proposal 2 makes achieving race-conscious admissions policies more difficult than securing other types of beneficial legislation, thereby imposing an unequal and impermissible burden on people of color.

A. Standing

The attorney general divides his attack on the *Coalition* plaintiffs' standing to challenge Proposal 2 on equal protection and preemption grounds by categorizing these plaintiffs into two groups: organizational plaintiffs and individual plaintiffs. He contends that the organizational plaintiffs cannot satisfy the requirements that the organization's members would have standing to sue in their own right, the interests at stake are central to the organization's purpose, and neither the claim asserted nor the relief requested dictates the participation of individual members. He says that the individual plaintiffs cannot show actual or imminent harm because the individual *Coalition* plaintiffs do not have a legally protected right to attend college or receive preferential treatment in the admissions process. And even if this were not the case, the attorney general contends, none of

-29-

the plaintiffs have shown that they would be admitted in the absence of Proposal 2. With respect to the petition circulator, it is unclear what legal interest he has in the matter at all.

The attorney general also divides the *Cantrell* plaintiffs into two groups, faculty and students, and divides the latter into the subgroups of students currently attending the University of Michigan, high school students who have applied to the University of Michigan, and high school students who intend to apply there. He then posits that all of these students have failed to establish a legally cognizable injury in fact. This point overlaps the merits argument, since the attorney general reasons that the plaintiffs lack standing to pursue their political-restructuring claim because they are not and cannot be injured by an amendment that *prohibits* discriminatory treatment. He says that the faculty plaintiffs, while grounding their claim on a right to academic freedom under the First Amendment (since they are third-party beneficiaries of the universities' affirmative action programs), have failed to satisfy the requirements for third-party standing.

Standing, of course, is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). There are "three constitutional requirements for standing, *see McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 225-26 (2003) (reiterating that 'the irreducible constitutional minimum of standing' consists of 'an injury in fact, which is concrete, distinct and palpable, and actual or imminent,' 'a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of some third party not before the court,' and a 'substantial likelihood that the requested relief will remedy the alleged injury in fact') (internal quotes and citations omitted), as well as [three] prudential requirements, *see Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (reviewing the three elements that 'a plaintiff must assert his own legal rights and interests,' the claim 'must be

-30-

more than a generalized grievance,' and 'in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question') (internal quotes and citations omitted)." *City of Cleveland v. Ohio*, 508 F.3d 827, 835 (6th Cir. 2007).

In addition, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

Applying these well-established rules, it is easy to conclude that all of the parties have standing to bring their respective claims (save the First Amendment claim) except the petition circulator and the labor unions. The *Coalition* and *Cantrell* plaintiffs both contend that they have suffered harm in that they have been hindered unconstitutionally in advancing their legal objectives through the political process. The *Coalition* plaintiffs also allege that Proposal 2 directly discriminates against them by making it more difficult for minorities and females to gain admission to Michigan's public universities. In conducting the standing analysis, the Court must take the claims as they are fairly pleaded. The claims as pleaded plainly identify injuries recognized in the law.

Similarly, the professors who call themselves plaintiffs in this case have standing because of the limited nature of their claims. There are four professor-plaintiffs who signed on to the *Cantrell* complaint. Because the *Cantrell* plaintiffs have only asserted an equal protection claim based on *Hunter v. Erickson*, the professors do not face the problem that they would if they were

-31-

also asserting a conventional equal protection claim (i.e., the issue of third-party standing).  Since all of the professors have asserted that they support affirmative action in the admissions process, their allegations include facts that give rise to the injury recognized by *Hunter*: heightened difficulty in securing legislation or policies, such as affirmative action, that inure primarily to the benefit of minorities.  Likewise, the professor- and student-plaintiffs also have shown that there is a causal connection between their alleged injuries and the enforcement of Proposal 2 as enacted, and the requested remedy – a declaration of unconstitutionality and an injunction against its enforcement – will bring them relief.  These plaintiffs are asserting their own rights under the Equal Protection Clause, their grievances are specific, and their claims fall within the Clause's zone of interests.  The challenge to their standing is not well taken.

On the other hand, it is difficult to see how the petition circulator has a stake in any of this. The sole allegation concerning this plaintiff is: "The plaintiff Joseph Henry Reed was a petition circulator *for* Proposal 2." *Coalition* Sec. Am. Compl. at ¶ 29 (emphasis added).  There is no explanation in the complaint why a supporter of Proposal 2 would now seek to attack it.  Without an allegation that Mr. Reed has had a change of heart and a protectable interest, there is no basis to conclude that he has standing to attack the measure.  Mr. Reed will be dismissed as a plaintiff.

A closer question is presented as to the standing of the organizational plaintiffs.  To show that they have standing, these plaintiffs, all of which are parties to the *Coalition* case, must show that their members would otherwise have standing to sue, the interests at stake are germane to the organizations' purposes, and neither the claims asserted nor the relief requested require the participation of individual members.  *Friends of the Earth, Inc.*, 528 U.S. at 181.  Most of the organizations satisfy these requirements.  Apart from the labor unions, all of the organizations have

-32-

the achievement of racial equality as their stated mission, and the majority of them have the defense of affirmative action as their more specific goal. The Coalition to Defend Affirmative Action, Integration, and Immigrant Rights and Fight for Equality By Any Means Necessary (BAMN), the United for Equality and Affirmative Action Legal Defense Fund (UEAALDF), the Rainbow PUSH coalition, and the Defend Affirmative Action Party (DAAP), all meet the requirement that the subject matter of the lawsuit be germane to their purposes. In addition, they satisfy the requirement that their members otherwise would have standing to sue in their own right. Although some of the members of these organizations are not prospective students, and therefore it is unlikely that they have a stake in the conventional equal protection claim, they all appear to support affirmative action and have an interest in pursuing legislation and policies incorporating such programs. Therefore, they all have standing to pursue the *Hunter* claim. Finally, the last element for associational standing is met because the nature of the claims (constitutional) and the relief sought (declaratory and injunctive) do not necessarily require the participation of their individual members in the action.

The Court does not find that the six labor unions have standing to pursue these claims, however. They fail the test for associational standing because their fundamental purpose – the advancement of their workers' rights – bears a tenuous connection to the rights claimed in this lawsuit. The only connection the unions can claim is that they have large minority memberships. Although this feature might possibly satisfy the standing requirements if the *Coalition* plaintiffs were challenging Proposal 2 as it relates to preferential treatment in public contracting, they are not. The labor unions will be dismissed as plaintiffs.

-33-

B.  "Conventional" Equal Protection Argument

The *Coalition* plaintiffs (but not the *Cantrell* plaintiffs) allege that Proposal 2 violates the Equal Protection Clause by discriminating against them on account of race.  The attorney general, relying heavily on the Proposition 209 case, *Coalition for Economic Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997), asserts that it is simply ludicrous to contend that Proposal 2 discriminates against racial minorities and women because the terms of the provision explicitly outlaw disparate treatment on account of race and gender.  As noted earlier, the attorney general acknowledges that the clear effect – if not the purpose – of Proposal 2 is to ban affirmative action programs in public university admissions, public employment, and public contracting.  Although in that regard the provision implicates race, the attorney general insists that it does so in a constitutionally permissible way.

To understand the *Coalition* plaintiffs' response, the Court finds it necessary to review the ideological premise that undergirds their position.  Unlike many defenders of affirmative action, who acknowledge that such programs accord unequal treatment but who justify this inequity on utilitarian grounds, the *Coalition* plaintiffs do not view affirmative action as preferential treatment.  Instead, they see affirmative action as fundamentally necessary to desegregation and as a system that embodies equality by offsetting systemic handicaps (e.g., having grown up poor and having attended an underfunded school); and therefore affirmative action is a "benign" race-conscious policy.  As a corollary, they deem Proposal 2 discriminatory because it eliminates affirmative action as an "equalizer."  Therefore, they implore the Court to look at the "reality of the situation" – including evidence of *de facto* segregation – and not just focus on "verbal formulas."

Following that line of thinking, the *Coalition* plaintiffs insist that a trial is required to demonstrate the need to use race-conscious admission policies in order to allow minority students

-34-

to compete on an equal footing and overcome past disadvantages, which presumably result from past discrimination and social and economic privation.  They contend that facts at a trial will show that affirmative action programs are the only way that universities in Michigan will remain desegregated, and university admissions policies that do not consider race are *per se* discriminatory against blacks, Latinos, and Native Americans.

Unfortunately, however, college admission at elite universities is a zero-sum enterprise, and programs that prefer some students on the basis of race must do so necessarily at the expense of other applicants not of the preferred race.  That stark reality led Justice Powell to reject the proposition that race-based governmental action designed to benefit historically disadvantaged groups should be subject to a less exacting examination than "strict scrutiny," when he wrote in *Bakke* that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color."  438 U.S. at 289-90 (opinion of Powell, J.).

Although some opinions by members of the Supreme Court have advanced the idea that race-based state action designed to "remed[y] the present effects of past racial discrimination" should be allowed if it is "substantially related" to an "important governmental objective," *Fullilove v. Klutznick*, 448 U.S. 448, 518-19 (1980) (Marshall, J., concurring); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 359 (1978) (Brennan, J., concurring) – that is, under the less demanding review standard of intermediate scrutiny – that view never has commanded a majority of the Court except once, in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990), where the Court went slightly farther.  In that case, the Court held that "benign race-conscious measures mandated by Congress – even if those measures are not 'remedial' in the sense of being designed to compensate

-35-

victims of past governmental or societal discrimination – are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." *Id.* at 564-65. The life span of that rule was relatively short, however, since *Metro Broadcasting* was overruled five years later. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests. To the extent that *Metro Broadcasting* is inconsistent with that holding, it is overruled"). Under a traditional equal protection analysis, therefore, it does not appear that the issues upon which the *Coalition* plaintiffs seek a trial will materially impact the result in this case; and therefore they cannot forestall summary judgment on the ground of the existence of a "genuine issue as to a[] material fact." Fed. R. Civ. P. 56(c).

The Equal Protection Clause commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This language prohibits "official conduct discriminating on the basis of race," *Washington v. Davis*, 426 U.S. 229, 229 (1976), and its ultimate goal is to extinguish such discrimination, *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). Therefore, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand*, 515 U.S. at 230.

Because official discrimination can be imposed either expressly on the face of legislation or under the guise of a facially-neutral enactment, the first step in a conventional equal protection analysis is to determine whether the challenged legislation draws any classification. *Coalition for*

-36-

*Economic Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997); *United Black Firefighters v. City of Akron*, 976 F.2d 999, 1007 (6th Cir. 1992). The determining factor is not whether the enactment has race as its subject matter, but whether it facially purports to accord unequal treatment across racial lines. *See Crawford v. Bd. of Education of City of Los Angeles*, 458 U.S. 527, 538 (1982) (distinguishing "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters").

Proposal 2 is facially neutral. Although it certainly *deals* with racial classifications, it declares in essence that when public bodies make official decisions to admit students, offer employment, or let contracts, no race may be burdened and no race may be benefitted. The law, therefore, points the Court to a different standard by which it must assess the *Coalition* plaintiffs' challenge: "Where facially neutral legislation is challenged on the grounds that it discriminates on the basis of race, the enactment will be required to withstand strict scrutiny only if the plaintiff can prove that it 'was motivated by a racial purpose or object,' or 'is unexplainable on grounds other than race.'" *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 368 (6th Cir. 2002) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Mere awareness of discriminatory consequences is inadequate. *Personnel Administrator of Massachusetts v. Feeny*, 442 U.S. 256, 279 (1979). The requirement of discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Ibid.* In addition, a plaintiff challenging facially neutral legislation must show disparate impact. To show disparate impact, a plaintiff must demonstrate that a facially neutral law has the effect of discrimination. *Graoch Assoc. # 33, L.P., v. Louisville/Jefferson County Metro Human Relations Comm.*, 508 F.3d 366, 371 (6th Cir. 2007). However, proving that a law

-37-

has a racially disparate impact, without more, is insufficient to establish a violation of the Fourteenth Amendment. *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977).

"In *Village of Arlington Heights*, the Supreme Court identified five factors that are relevant for determining whether facially neutral state action was motivated by a racially discriminatory purpose: (1) the impact of the official action on particular racial groups, (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that preceded the state action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history." *Moore*, 293 F.3d at 369 (citing *Village of Arlington Heights*, 429 U.S. at 266-68).

Examining intent in the context of a ballot initiative presents a unique problem due to the sheer number of individuals whose intent is relevant. The Sixth Circuit took a hard line in *Arthur v. Toledo*, 782 F.2d 565 (6th Cir. 1986), holding that "absent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate's motivations in an equal protection clause context." *Id.* at 574. Although this standard remains good law, the Sixth Circuit has since expressed doubts about its legitimacy. *Buckeye Comm. Hope Foundation v. City of Cuyahoga Falls*, 263 F.3d 627, 638 n.2 (2001), *rev'd on other grounds* 538 U.S. 188 (2003). As the *Buckeye* panel noted, the Supreme Court's decision in *Seattle* casts doubt on the *Arthur* standard and shows that, whatever its legitimacy in other cases, it cannot be right in the case of a *Hunter* challenge to a referendum. *Buckeye Comm. Hope Foundation*, 263 F.3d at 638 n.2 (citing *Seattle*, 458 U.S. at 465). But the

-38-

parties have cited no authority that undercuts *Arthur*'s precedential application to a traditional equal protection challenge.

When a plaintiff has triggered strict scrutiny, either by showing an express racial classification or disparate impact and discriminatory purpose, the law will be deemed unconstitutional unless the State can justify it by establishing that it is narrowly tailored to serve a compelling state interest. *Johnson v. California*, 543 U.S. 499, 509 (2005).

In the Proposition 209 case, the Ninth Circuit made short work of the plaintiffs' conventional equal protection argument, observing that the measure did not classify individuals by race or gender, and therefore it could not run afoul of the Equal Protection Clause. *Coalition for Economic Equity*, 122 F.3d at 702 ("Rather than classifying individuals by race or gender, Proposition 209 *prohibits* the State from classifying individuals by race or gender. A law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender."). That court held: "Proposition 209's ban on race and gender preferences, as a matter of law and logic, does not violate the Equal Protection Clause in any conventional sense." *Ibid.* In staying this Court's preliminary injunction, the Sixth Circuit noted that "the color-blind goal of the Equal Protection Clause is to do away with all governmentally imposed discrimination based on race," 473 F.3d at 249 (internal quotes and citations omitted), and held that "[i]n the end, a law eliminating presumptively invalid racial classifications is not itself a presumptively invalid racial classification." *Id.* at 250. Neither of these cases discussed the idea that at least one purpose of the respective proposals was to eliminate affirmative action programs, which benefit minorities exclusively. Therefore, they did not consider the prospect that the facially neutral legislation might violate the Clause under the rationale of *Village of Arlington Heights*, *Graoch Assoc.*, and *Moore*. Neither of

these cases is binding precedent, *Cross Mountain Coal v. Ward*, 93 F.3d 211, 217 (6th Cir. 1996) (holding that although "decisions of other circuits are entitled to respect, they are not binding upon us"); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (noting that "a party is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits") (internal quotes omitted), and they do not obviate this Court's obligation to give the issues a fresh look.

The *Coalition* plaintiffs have offered sufficient evidence to establish a fact question on the disparate impact part of the test. The deposition testimony and affidavits of Theodore Spencer, Sarah Zearfoss, Frank Wu, William Bowen, Jeannie Oakes, Gary Orfield, and even Ward Connerly plainly show that Proposal 2's elimination of affirmative action programs will fall the heaviest on minorities while having little effect on white students. This conclusion is supported by some of these witnesses' statistics, but it also is intuitive: if affirmative action programs have had a positive effect on university admissions of minority students, eliminating them likely will have a negative effect. It is difficult to see how Proposal 2 could *not* have a disparate impact on minorities.

It is the demonstration of a discriminatory purpose that vexes the *Coalition* plaintiffs and dooms their conventional equal protection argument, since the plaintiffs must show that Proposal 2 was enacted "because of, not merely in spite of, its adverse effects upon an identifiable group." *Feeny*, 442 U.S. at 279 (quotations omitted). First, there is the hurdle presented by the *Arthur* standard, which bars "a district court [from] inquir[ing] into the electorate's motivations in an equal protection clause context" when reviewing a facially neutral law (unless "the only possible rationale [for a referendum] is racially motivated"). *Arthur*, 782 F.2d at 574. Based on the evidence

-40-

presented, the Court cannot say that the only purpose of Proposal 2 is to discriminate against minorities.  For instance, Ward Connerly testified that he was motivated to eliminate affirmative action programs because he thinks they are harmful to minorities, who would be better served by being forced to compete without official help with more advantaged white and Asian students.  *See Cantrell* Mot. for Summ. J., Ex. K, Connerly Dep. at 120 (expressing the view "that the only way we're going to close this academic gap between black and Latino on the one hand and Asian and white on the other, is not to keep papering over it with preferences, but to apply the tough love that's necessary to get black and Latino students up to the bar").  Jennifer Gratz appears to have been motivated by the desire to gain admission to the University of Michigan herself without having to yield to a minority candidate who would take her place with the benefit of a racial preference.  Whether one accepts or rejects Connerly's view that there is virtue in tossing minority students into the deep end and letting them sink or swim on their own (regardless that some might drown in the meantime), or the more craven approach of Gratz that affirmative action deprives her of her own slice of the pie, both of these viewpoints illustrate that racial discrimination is not the only rationale behind Proposal 2.

Second, even if the *Coalition* plaintiffs could overcome *Arthur*'s strict rule, they cannot satisfy the test for discriminatory intent using the traditional factors from *Village of Arlington Heights*.  The first factor courts normally consider in determining whether facially neutral legislation was motivated by a racially discriminatory purpose is the impact of the legislation on particular racial groups.  *Moore*, 293 F.3d at 369 (citing *Village of Arlington Heights*, 429 U.S. at 266-68).  For the reasons discussed above, that factor favors the plaintiffs.  Most of the other factors, however, cut in the opposite direction.  The historical background of Proposal 2 and sequence of events that

-41-

preceded its passage do not suggest discriminatory intent. The public arguments made in support of Proposal 2 did not appeal to racism or amount to a call for segregation; rather, they attempted to appeal to the public's belief in fairness and just treatment. Although Ward Connerly and other major supporters of the amendment knew that Proposal 2 might *lead* to fewer minority admissions, there is no evidence that they intended this. On the other hand, the fact that fraud was committed in the process of securing Proposal 2's place on the ballot does lend some credence to the idea that ulterior motives were at work. Nevertheless, the factor of "procedural or substantive departures from the government's normal procedural process," *Moore*, 293 F.3d at 369, clearly militates against a finding of discriminatory intent when one considers the most salient departure of all: Proposal 2 was a ballot initiative. To impugn the motives of 58% of Michigan's electorate, in the absence of extraordinary circumstances which do not exist here, simply is not warranted on this record.

To the extent that the *Coalition* plaintiffs' conventional equal protection argument is based on gender discrimination, it is even less compelling. Laws challenged under the Equal Protection Clause based on gender are subject to the less rigorous standard of "intermediate scrutiny," *Tuscon Woman's Clinic v. Eden*, 379 F.3d 531, 543 (2004), which requires "showing an 'exceedingly persuasive justification' for the classification." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). There is little evidence in this record showing that Proposal 2 will have a disparate impact on the admission of women at Michigan's colleges and universities, and virtually no evidence of an intent to discriminate against women in the historical background or procedures that led to the passage of the measure.

-42-

Because Proposal 2 is facially neutral, and the *Coalition* plaintiffs cannot show that the measure was enacted with a discriminatory intent, their conventional equal protection challenge must fail as a matter of law.

### C.  *Hunter/Seattle* Equal Protection Challenge

Both the *Coalition* and the *Cantrell* plaintiffs argue that Proposal 2 unlawfully restructures the political process to disadvantage minorities in achieving equal opportunity in higher education. They reason that before Proposal 2, minority groups could petition university officials to implement affirmative action programs, or at least consider race among a host of non-academic factors in making admissions decisions.  However, after Proposal 2, the only way racial minorities can secure programs that account for race in the assembly of a student body is to seek and obtain passage of another constitutional amendment.  That daunting process, they contend, imposes a unique and heavy burden upon them as a class and unconstitutionally distances them from the political process when they seek what the law allows, even if what they seek can be characterized as an advantage.

The attorney general advances five arguments against the plaintiffs' challenge.  First, he contends that women and racial minorities together constitute a majority of Michigan's population, and therefore Proposal 2, no matter how it is read, cannot constitute discrimination against a minority group.  Second, the attorney general notes that unlike the laws in *Hunter v. Erickson*, *Washington v. Seattle Sch. Dist. No. 1*, and *Romer v. Evans*, Proposal 2 does nothing to *facilitate* discrimination; it *prohibits* discrimination.  Third, the attorney general submits that the political restructuring argument requires proof of purposeful racial discrimination, which is absent here. Fourth, the attorney general states that women and racial minorities remain free to advocate practices

-43-

promoting diversity as long as they do not amount to discrimination.  Fifth, the attorney general

posits that the university admissions process is not a political process as contemplated in the *Hunter*

line of cases, since at Wayne State University the admissions criteria are formulated exclusively by

a committee and students are not allowed to vote on these criteria, and at the University of Michigan

the faculty are the primary architects of the admissions policy and there is no formal process by

which members of the public or prospective students can even comment on the policy.

The Equal Protection Clause affords protection against laws that grant benefits or impose

burdens on the basis of racial classifications, which have been acknowledged to be inherently

suspect.  *See, e.g. McLaughlin v. Florida*, 379 U.S. 184, 191-92 (1964).  The lesson of the

*Hunter/Seattle* line of cases is that the Clause also protects equal access to the political process

against different sorts of discrimination.  *See Romer v. Evans*, 517 U.S. 620, 633 (1996) (observing

that "[a] law declaring that in general it shall be more difficult for one group of citizens than for all

others to seek aid from the government is itself a denial of equal protection of the laws in the most

literal sense").

In *Hunter v. Erickson*, 393 U.S. 385 (1969), the citizens of Akron, Ohio amended the city

charter at a referendum election to require that city ordinances regulating the use or sale of real

property on the basis of race be approved by a majority of voters at a general election before such

ordinances could become effective.  The plaintiff unsuccessfully sought to enforce an open housing

ordinance that had been adopted by the city council but not submitted to the voters.  The Supreme

Court held the charter amendment unconstitutional because, although the amendment "declare[d]

no right to discriminate in housing" and "place[d] no ban on the enactment of fair housing

ordinances," it "was an explicitly racial classification treating racial housing matters differently from

-44-

other racial and housing matters." *Id.* at 389.  More importantly, the charter amendment imposed

more burdensome rules on those who would seek to win legislation combating race-based housing

discrimination.  *Id.* at 390 ("Those who sought, or would benefit from, most ordinances regulating

the real property market remained subject to the general rule [of council approval only]. . . .  But for

those who sought protection against racial bias, the approval of the City Council was not enough.").

This constituted a classification based on race because, although the amendment applied equally to

all races, it "nevertheless disadvantage[d] those who would benefit from laws barring racial . . .

discriminations as against those who would bar other discriminations or who would otherwise

regulate the real estate market in their favor." *Id.* at 391.  Further, despite the amendment's facial

neutrality, there was no doubt that it discriminated against minority interests:

> [A]lthough the law on its face treats Negro and white, Jew and gentile in an identical
> manner, the reality is that the law's impact falls on the minority.  The majority needs
> no protection against discrimination and if it did, a referendum might be bothersome
> but no more than that.  Like the law requiring specification of candidates' race on the
> ballot, *Anderson v. Martin*, 375 U.S. 399 (1964), § 137 places special burden on
> racial minorities within the governmental process.  This is no more permissible than
> denying them the vote, on an equal basis with others.

*Id.* at 391.  To be sure, the Court did not hold unconstitutional the mere act of conditioning

legislation on the approval of the people themselves.  Rather, it was the way in which this was

*selectively* done that denied equal protection:

> Even though Akron might have proceeded by majority vote at town meeting on all
> its municipal legislation, it has instead chosen a more complex system.  Having done
> so, the State may no more disadvantage any particular group by making it more
> difficult to enact legislation in its behalf than it may dilute any person's vote or give
> any group a smaller representation than another of comparable size.

*Id.* at 392-93.

In *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982), the Court invalidated a statewide voter initiative that prohibited school boards from assigning students beyond the schools in their neighborhoods. The initiative contained so many exceptions that it effectively prevented desegregative busing only. In most areas concerning assignment of pupils, the school boards retained their authority, but this was not the case when it came to efforts at desegregation. As in *Hunter*, the Supreme Court held that the initiative drew a racial classification by "remov[ing] the authority to address a racial problem – and only a racial problem – from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* at 474. That selective restructuring of school board authority burdened future attempts to integrate (and hence minority interests) "by lodging decision-making authority over the question at a new and remote level of government." *Id.* at 483. The Court noted that this was not "'the simple repeal or modification of desegregation or antidiscrimination laws[, which], without more, never has been viewed as embodying a presumptively invalid racial classification.'" *Ibid.* (quoting *Crawford*, 458 U.S. at 539). Rather, it stacked the deck against minority interests by subjecting them "to a debilitating and often insurmountable disadvantage." *Id.* at 484.

> These cases yield a simple but central principle. As Justice Harlan noted while concurring in the Court's opinion in *Hunter*, laws structuring political institutions or allocating political power according to "neutral principles"– such as the executive veto, or the typically burdensome requirements for amending state constitutions – are not subject to equal protection attack, though they may "make it more difficult for minorities to achieve favorable legislation." 393 U.S., at 394. Because such laws make it more difficult for *every* group in the community to enact comparable laws, they "provid[e] a just framework within which the diverse political groups in our society may fairly compete." *Id.*, at 393. Thus, the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process. State action of this kind, the Court said, "places *special* burdens on racial

-46-

> minorities within the governmental process," *id.*, at 391 (emphasis added), thereby "making it *more* difficult for certain racial and religious minorities [than for other members of the community] to achieve legislation that is in their interest." *Id.*, at 395 (emphasis added) (Harlan, J., concurring). Such a structuring of the political process, the Court said, was "no more permissible than [is] denying [members of a racial minority] the vote, on an equal basis with others." *Id.* at 391.

*Id.* at 469 (alterations in original).

Drawing heavily upon this passage, the *Cantrell* plaintiffs reason that in order to make out an equal protection violation under ths line of authority, they must establish only that Proposal 2 has a racial focus, and it places an unequal impediment to achieving official action that racial minorities perceive to be in their interest. They insist that they have satisfied both those elements. First, they argue that Proposal 2 singles out race while leaving various other elements of diversity untouched, thereby creating a classification that triggers Fourteenth Amendment scrutiny. Second, they contend that Proposal 2 makes it more difficult to achieve race-conscious admissions policies than other types of beneficial legislation, thereby imposing an unequal and impermissible burden on people of color.

The Court cannot accept entirely the arguments of either the attorney general or the plaintiffs. First, contrary to the attorney general's assertion, there can be no question that Proposal 2 has a racial focus. As noted above, Proposal 2's ban against "grant[ing] preferential treatment to[] any individual or group on the basis of race" can mean nothing less than barring affirmative action programs. Although it is true that no racial group – minority or majority – can benefit from affirmative action programs under the plain language of Proposal 2, to suppose that races other than minority races would feel the impact of such a restriction defies logic and contemporary reality. "[T]he reality is that the law's impact falls on the minority." *Hunter*, 393 U.S. at 391. To that extent, the related argument that racial minorities plus women constitute a majority of the

population, and therefore Proposal 2 does not discriminate against minorities, likewise borders on nonsense. The attempt to cobble together an artificial coalition of women and racial minorities in an effort to construct a numerical majority of citizens ignores the fact that affirmative action programs generally are targeted to benefit insular groups that separately have suffered from discriminatory practices in the past because of perceived traits unique to that group alone. Lumping minority groups into a contrived category does not allow any greater political influence over the process of advocating for affirmative action programs to achieve racial parity or otherwise render the process of changing the state constitution "bothersome but no more than that." *Ibid.* The Ninth Circuit accepted this premise in the Proposition 209 case. *Coalition for Economic Equity*, 122 F.3d at 705.

Second, the idea that a political restructuring claim must be based on purposeful discrimination finds no support in the cases. Rather, the Supreme Court requires only that "an inquiry into intent is necessary to determine whether the legislation *in some sense* was designed to accord disparate treatment on the basis of racial considerations." *Seattle School Dist.*, 458 U.S. at 485 (emphasis added). Proposal 2 plainly deals with racial considerations, and it was designed, among other purposes, to prohibit programs that granted racial preferences, that is, affirmative action programs, at least according to Ward Connerly, its principal drafter. Citation to *Crawford v. Board of Educ. of City of Los Angeles*, 458 U.S. 527 (1982), provides no help to the attorney general's position. In that case, the Court upheld an amendment to the state constitution that limited school districts' authority to reassign and bus students to those instances necessary to remedy a violation of the Equal Protection Clause, that is, when a school district had to respond to prior *de jure* segregation. In holding "that the Equal Protection Clause is not violated by the mere repeal of race-

-48-

related legislation or policies that were not required by the Federal Constitution in the first place," *id.* at 538, the Court made a point to distinguish that case from both *Hunter* and *Seattle School District* because the constitutional amendment in the California case did not involve political restructuring.

Third, the governance of a university, including the regulation of admissions criteria, is part of the political process. As the plaintiffs observe, the universities derive their authority from the state constitution. *See* Mich. Const. art VIII, § 5. Although the admissions criteria are not subject to a vote, prospective students have a right to ask university officials to take into consideration certain factors when they decide how to constitute an admissions class. That, after all, is how race-conscious admissions programs developed in the first place.

The clear effect of Proposal 2 is to prohibit the State and its political subdivisions – including university admissions departments – from adopting affirmative action programs; groups that would like to see such programs implemented now must seek a constitutional amendment that allows them. There is no question, therefore, that Proposal 2 makes it more difficult for minorities to obtain official action that is in their interest. However, the distinction drawn by the Ninth Circuit in the Proposition 209 case between laws that protect against *unequal* treatment on the basis of race and those that seek *advantageous* treatment on the basis of race is one yielded by precedent. As that court put it:

> Plaintiffs challenge Proposition 209 not as an impediment to protection against unequal treatment but as an impediment to receiving preferential treatment. The controlling words, we must remember, are "equal" and "protection." Impediments to preferential treatment do not deny equal protection. It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment. While the Constitution

-49-

protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms.

*Coalition for Economic Equity*, 122 F.3d at 708 (footnote omitted).

Since *Coalition for Economic Equity* was decided, the Supreme Court has stated that it is permissible for universities to consider race among several criteria for admission, since such schools have "a compelling interest in attaining a diverse student body." *Grutter*, 539 U.S. at 328. The Supreme Court has also since reaffirmed that states have a "compelling interest [in] remedying the effects of past intentional discrimination" with race-conscious programs. *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 127 S. Ct. 2738, 2752 (2007). It also appears that a majority of the justices agree that schools may employ race-based programs to address "the problem of *de facto* resegregation in schooling." *Id.* at 2791-92 (Opinion of Kennedy, J.) (declaring that "[i]n the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition"). But these decisions do not change the fact that affirmative action programs not mandated by the obligation to cure past discrimination are fundamentally different than laws intended to protect against discrimination.

According to the Ninth Circuit, "[e]ven a state law that does restructure the political process can only deny equal protection if it burdens an individual's right to equal treatment." *Coalition for Economic Equity*, 122 F.3d at 707. If the plaintiffs were to demonstrate that an admissions program that included racial preferences were *required* to combat racial discrimination or prevent resegregation, then perhaps Proposal 2's prohibition against racial preferences might become unconstitutional as applied, although the measure would then be at odds with itself, since it also bars "discriminat[ion] *against* . . . any individual or group on the basis of race." Mich. Const. art. I, §

-50-

26(1).  However, the *Hunter/Seattle* line of cases does not prohibit the State from banning programs

that give an advantage on the basis of race as a remedy to combating other social disadvantages.

The Court believes that Michigan may limit the ability of discrete groups to secure an

advantage based upon a racial classification without offending the Fourteenth Amendment.  Neither

*Hunter*, *Seattle*, nor *Romer v. Evans* holds otherwise.  Because the political restructuring effectuated

by Proposal 2 does not offend the Equal Protection Clause by distancing racial minority groups from

the means of obtaining *equal* protection, the plaintiffs' challenge to the measure based on these cases

cannot prevail.

### D.  Preemption Arguments

The *Coalition* plaintiffs' final claims allege that Proposal 2 is preempted by Title VI of the

Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

Title VI amounts to a blanket prohibition against racial discrimination in the context of

federally-funded programs, stating as follows:

> No person in the United States shall, on the ground of race, color, or national origin,
> be excluded from participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  By its terms, Title VI recognizes conflict preemption only.  42 U.S.C. § 2000h-4

("Nothing contained in any title of this Act shall be construed as indicating an intent on the part of

Congress to occupy the field in which any such title operates to the exclusion of State laws on the

same subject matter . . . [or] as invalidating any provision of State law unless such provision is

inconsistent with any of the purposes of this Act, or any provision thereof").  The Supreme Court

has explained that conflict preemption "arises when compliance with both federal and state

regulations is a physical impossibility, or when state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Fed. Sav. and Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 153 (1982) (internal quotations and citations omitted).

Title IX is the gender-based analog to Title VI, although it is limited to educational programs that receive federal funds.  20 U.S.C. § 1681(a). Although Title IX does not contain a clause defining the scope of its preemptive effect, the plaintiffs have not argued that it occupies the entire field of legislation to which it relates.  However, Title IX expressly provides that it shall not be construed to mandate preferential treatment:

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided*, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b).

Proposal 2 contains a failsafe provision that avoids conflicts with federal law insofar as federally funded programs (such as those ordained by Title VI and Title IX) are involved, which states that the measure "does not prohibit action that must be taken to establish or maintain eligibility for any federal program, if ineligibility would result in a loss of federal funds to the state." Mich. Const. art. I, § 26(4).  The language in the federal statutes and Proposal 2 therefore creates a cross-ruff of sorts that deftly avoids conflicts and at once resolves conflicts in favor of federal law. If either Title VI or Title IX require certain action as a condition of federal funding, then Proposal

-52-

2 will allow that action by its own terms.  And Proposal 2 is not subject to field preemption because neither federal Act purports to occupy the field.

However, the *Coalition* plaintiffs contend that Proposal 2 is nevertheless preempted because it conflicts with federal regulations promulgated pursuant to Titles VI and IX.  In the case of Title VI, the *Coalition* plaintiffs point to 34 C.F.R. § 100.3(b)(2), which states:

> A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration *which have the effect of subjecting individuals to discrimination* because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(2) (emphasis added).  The validity of this regulation has been questioned to the extent it purports to condemn acts that would be permissible under Title VI.  *See Alexander v. Sandoval*, 532 U.S. 275, 282 (2001).  But even if the Court assumes section 100.3(b)(2) is wholly valid, it still does not conflict with Proposal 2.  Proposal 2 does not have the effect of racial discrimination any more than does a law or policy whose use of neutral criteria leads to a disparate impact.   Disparate impact alone does not equate to racial discrimination; rather, illegal discrimination results in the case of neutral criteria only when the actors are motivated by a desire to discriminate.  Proposal 2 allows universities to use neutral criteria – grades, test scores, schools of origin, community geographics, economic factors, and a host of others – in the admissions process.  If these factors are not suitable proxies that generate racially diverse student populations, the universities will be all the poorer, but not because of conscious discrimination.

-53-

The plaintiffs' case is even weaker in terms of Title IX. With respect to that act, the plaintiffs rely on 34 C.F.R. § 106.23(a). The regulation reads as follows:

> **Nondiscriminatory recruitment.** A recipient to which this subpart applies shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action pursuant to § 106.3(a), and may choose to undertake such efforts as affirmative action pursuant to § 106.3(b).

34 C.F.R. § 106.23(a). To the extent this regulation *requires* preferential treatment, it may be inconsistent with Title IX itself. *See* 20 U.S.C. § 1681(b) (providing that it shall not be "interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex" over another). If affirmative action recruitment programs are required by this section to become eligible for or maintain federal funding, Proposal 2 expressly would allow such action. There is no conflict, therefore, between Proposal 2 and federal law.

## IV. Conclusion

The Court finds that all plaintiffs except Joseph Henry Reed, AFSCME Local 207, AFSCME Local 214, AFSCME Local 312, AFSCME Local 836, AFSCME Local 1642, and AFSCME Local 2920 have standing to bring this action. The *Coalition* plaintiffs' claims against the university defendants are all properly brought in this case, except the alleged violation of First Amendment rights alleged in Count 6 of the amended complaint. The Court finds no merit in the *Coalition* plaintiffs' conventional equal protection argument, and is constrained to conclude that the plaintiffs' allegations that Proposal 2 violates the Equal Protection Clause under the theory based on *Hunter v. Erickson* and progeny must fail as well. There is no conflict between Proposal 2 and the federal funding provisions discussed above.

-54-

Accordingly, it is **ORDERED** that the motion to dismiss by the university defendants [dkt #179] is **GRANTED IN PART AND DENIED IN PART**.  Count 6 of the *Coalition* plaintiffs' second amended complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the claims of plaintiffs Joseph Henry Reed, AFSCME Local 207, AFSCME Local 214, AFSCME Local 312, AFSCME Local 836, AFSCME Local 1642, and AFSCME Local 2920 are **DISMISSED** for lack of standing.

It is further **ORDERED** that the attorney general's motion for summary judgment [dkt #201] is **GRANTED**.

It is further **ORDERED** that the motion for summary judgment by the *Cantrell* plaintiffs [dkt #203] is **DENIED**.

It is further **ORDERED** that the amended complaints and these consolidated actions are **DISMISSED WITH PREJUDICE**.

s/David M. Lawson

DAVID M. LAWSON
United States District Judge

Dated: March 18, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 18, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

---