*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

<table>
<tr><td>

Nos. 08-1387/1534

COALITION TO DEFEND AFFIRMATIVE
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,
   *Plaintiffs-Appellants (08-1387)/*
       *Cross-Appellees,*

   *v.*

REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,
   *Defendants-Appellees/Cross-Appellants*
        *(08-1534),*

MICHAEL COX, Michigan Attorney General,
   *Intervenor-Defendant-Appellee.*

---

No. 08-1389

COALITION TO DEFEND AFFIRMATION
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,
       *Plaintiffs,*

CHASE CANTRELL, et al.,
       *Plaintiffs-Appellees,*

   *v.*

REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,

       *Defendants,*

ERIC RUSSELL,
   *Intervenor-Defendant-Appellant,*
JENNIFER GRATZ,
   *Proposed Intervenor-Appellant.*

</td><td>

Nos. 08-1387/1389/1534;
09-1111

</td></tr>
</table>

No. 09-1111

COALITION TO DEFEND AFFIRMATION
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,

*Plaintiffs,*

CHASE CANTRELL, et al.,

*Plaintiffs-Appellants,*

*v.*

REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,

*Defendants,*

MICHAEL COX, Michigan Attorney General,

*Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15024—David M. Lawson, District Judge.

Argued:  November 17, 2009

Decided and Filed:  July 1, 2011

Before:  DAUGHTREY, COLE, and GIBBONS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  George Boyer Washington, Shanta Driver, SCHEFF, WASHINGTON &
DRIVER, P.C., Detroit, Michigan, Karin A. DeMasi, CRAVATH, SWAINE & MOORE
LLP, New York, New York, Mark D. Rosenbaum, ACLU FOUNDATION OF
SOUTHERN CALIFORNIA, Los Angeles, California, for Plaintiffs.  Margaret A.
Nelson, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan,
Leonard M. Niehoff, LEN NIEHOFF & ASSOCIATES, Chelsea, Michigan, Jesse
Panuccio, COOPER & KIRK, PLLC, Washington, D.C., for Defendants.  **ON BRIEF:**
George Boyer Washington, Shanta Driver, SCHEFF, WASHINGTON & DRIVER, P.C.,
Detroit, Michigan, Karin A. DeMasi, CRAVATH, SWAINE & MOORE LLP, New
York, New York, Mark D. Rosenbaum, ACLU FOUNDATION OF SOUTHERN
CALIFORNIA, Los Angeles, California, Kary L. Moss, Michael J. Steinberg, Mark P.

Fancher, ACLU FUND OF MICHIGAN, Detroit, Michigan, Joshua I. Civin, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., Washington, D.C., for Plaintiffs. Margaret A. Nelson, Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Leonard M. Niehoff, LEN NIEHOFF & ASSOCIATES, Chelsea, Michigan, Jesse Panuccio, Charles J. Cooper, David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., Kerry L. Morgan, PENTIUK, COUVEREUR & KOBILJAK, Wyandotte, Michigan, Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., for Defendants.    Daniel M. Levy, MICHIGAN DEPARTMENT OF CIVIL RIGHTS, Detroit, Michigan, for Amicus Curiae.  Sharon L. Browne, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Amicus Curiae.

COLE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. GIBBONS, J. (pp. 41–59), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

COLE, Circuit Judge.  Proposal 2 is a successful voter-initiated amendment to the Michigan Constitution.  In relevant part, it prohibits Michigan's public colleges and universities from granting "preferential treatment to[] any individual or group on the basis of race, sex, color, ethnicity, or national origin."  Mich. Const. art. I, § 26.  Our task is to determine whether Proposal 2 is constitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Fortunately, the slate is not blank.  The Supreme Court has twice held that equal protection does not permit the kind of political restructuring that Proposal 2 effected.  *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Hunter v. Erickson*, 393 U.S. 385 (1969). Applying *Hunter* and *Seattle*, we find that Proposal 2 unconstitutionally alters Michigan's political structure by impermissibly burdening racial minorities. Accordingly, we **REVERSE** the district court's grant of summary judgment for the Defendants-Appellees and order the court to enter summary judgment in favor of the Plaintiffs-Appellants.  Also, we **AFFIRM** the district court's decision granting the Cantrell Plaintiffs' motion for summary judgment as to Eric Russell, and **AFFIRM** the

district court's decision denying the University Defendants' motion to be dismissed as parties.

# I. BACKGROUND

### A. Factual Background

These appeals are the latest chapter in the battle over the use of race-conscious admissions policies at Michigan's public colleges and universities. This saga began during the 1960s and 1970s, when African-American and other minority students and citizens first successfully lobbied for the adoption of these policies. The policies remained largely in place until challenges to them in the late 1990s, culminating in the Supreme Court's decisions in *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), which held that "universities cannot establish quotas for members of certain racial groups" or treat their applications uniquely. *Grutter*, 539 U.S. at 334. But the universities may "consider race or ethnicity more flexibly as a 'plus' factor in the context of individualized consideration," along with other relevant factors. *Id.*

Following these decisions, Ward Connerly, a former University of California Regent who had championed a proposition in California similar to the one at issue here, and Jennifer Gratz, the lead plaintiff in *Gratz*, mobilized to place on Michigan's November 2006 statewide ballot a proposal to amend the Michigan Constitution "to prohibit all sex- and race-based preferences in public education, public employment, and public contracting." *Operation King's Dream v. Connerly*, 501 F.3d 584, 586 (6th Cir. 2007). The initiative—officially designated Proposal 06-2 but commonly known as "Proposal 2"—was characterized as a proposal "to amend the State Constitution to ban affirmative action programs." *See* Notice of State Proposals for November 7, 2006 General Election, http://www.michigan.gov/documents/sos/ED-138_State_Prop_11-06_174276_7.pdf, at 5 (last visited June 24, 2011). Though Proposal 2 "found its way on the ballot through methods that undermine[d] the integrity and fairness of our democratic processes," *Operation King's Dream*, 501 F.3d at 591, once there it garnered

enough support among Michigan voters to pass, on November 7, 2006, by a margin of 58% to 42%, *see* Mich. Dep't of State, 2006 Official Michigan General Election Results, http://miboecfr.nicusa.com/election/results/06GEN/90000002.html (last visited June 24, 2011).

Proposal 2 amended the Michigan Constitution by adding the following pertinent provisions to Article I—titled "Affirmative action":

> (1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education or public contracting.

> (2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

> (3) For the purposes of this section "state" includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.

Mich. Const. art. I, § 26. It took effect in December 2006 and wrought two significant changes to the admissions policies at Michigan's public colleges and universities. First, it forced them to modify the policies they had in place for nearly a half-century to remove consideration of "race, sex, color, ethnicity, or national origin" in admissions decisions. No other admissions criteria—for example, grades, athletic ability, or family alumni connections—suffered the same fate. Second, Proposal 2 entrenched this prohibition at the state constitutional level, thus preventing the public colleges and universities or their boards from revisiting this issue without repeal or modification of Proposal 2. We review these changes later in greater detail, and there discuss their significance.

### B. Procedural Background

The litigation surrounding Proposal 2 has been lengthy and complicated. On November 8, 2006, the day after Proposal 2's approval, a collection of interest groups and individuals, including the Coalition to Defend Affirmative Action, Integration and Immigration Rights and Fight for Equality By Any Means Necessary ("Coalition Plaintiffs"), filed suit in the United States District Court for the Eastern District of Michigan. They named as defendants then-Governor Jennifer Granholm, the Regents of the University of Michigan, the Board of Trustees of Michigan State University, and the Board of Governors of Wayne State University ("University Defendants") and alleged that the provisions of Proposal 2 affecting public colleges and universities violated the United States Constitution and federal statutory law. About one month later, the Michigan Attorney General ("Attorney General") filed a motion to intervene as a defendant; the court granted his motion the same day.

On December 19, 2006, a group of faculty members and prospective and current students at the University of Michigan ("the Cantrell Plaintiffs") filed a similar suit in the United States District Court for the Eastern District of Michigan against then Governor Granholm. Eric Russell, then an applicant to the University of Michigan Law School, and Toward A Fair Michigan ("TAFM"), a non-profit corporation formed to ensure implementation of Proposal 2, intervened in the litigation as defendants soon thereafter. The district court consolidated the two cases on January 5, 2007, and the Attorney General was permitted to intervene in the Cantrell lawsuit as part of the consolidation order. Because the Attorney General effectively replaced then-Governor Granholm as the representative of Michigan in this litigation, both Plaintiffs' groups later stipulated to her dismissal as a party.

On December 19, 2006, the district court issued what was, in effect, a preliminary injunction, postponing application of Proposal 2 to the universities' admissions and financial-aid policies until July 1, 2007, the conclusion of the 2006-2007 admissions and financial-aid cycle. The district court's order stemmed from a stipulation

among the University Defendants, Coalition Plaintiffs, Granholm, and the Attorney General consenting to the injunction. (Amended Order Granting Temporary Injunction and Dismissing Cross-Claim, Dist. Ct. Docket No. 39 ("Coal. I").)  Russell and TAFM, while awaiting approval as intervenors, opposed the Attorney General's stipulation and sought a stay of the injunction from the district court.  When two days had passed without a ruling on their motions, Russell and TAFM filed with us an "Emergency Motion for a Stay Pending Appeal."  We granted their motion.  *Coal. to Defend Affirmative Action v. Granholm* (*Coal. II*), 473 F.3d 237, 252 (6th Cir. 2006), *application to vacate stay denied*, 549 U.S. 1176 (2007).  Meanwhile, we approved the district court's decision to allow solely Russell and TAFM to intervene in the Proposal 2 litigation.  *Coal. to Defend Affirmative Action v. Granholm* (*Coal. III*), 501 F.3d 775 (6th Cir. 2007).

On October 5, 2007, the Cantrell Plaintiffs filed a motion for summary judgment as to intervening defendant Russell, arguing that he should be dismissed from the litigation because he no longer represented an interest distinct from that of the Attorney General.  On October 17, 2007, the University Defendants filed a motion asking to be dismissed as parties.  On November 30, 2007, the Attorney General filed a motion to dismiss for lack of standing or, in the alternative, a motion for summary judgment on the merits as to all Plaintiffs.  Russell and the Cantrell Plaintiffs likewise filed motions for summary judgment the same day.  On March 18, 2008, the district court issued two orders addressing these motions.

In the first order, the court denied the University Defendants' request to be dismissed as parties and the Cantrell Plaintiffs' motion for summary judgment and granted the Attorney General's motion for summary judgment, rejecting the Plaintiffs' arguments that Proposal 2 violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.* (*Coal. IV*), 539 F. Supp. 2d 924, 950-58 (E.D. Mich. 2008).  In the second order, the court granted the Cantrell Plaintiffs' motion for summary judgment, dismissing Russell as an intervenor.  *Coal. to Defend Affirmative Action v.*

*Regents of the Univ. of Mich.* (*Coal. V*), 539 F. Supp. 2d 960 (E.D. Mich. 2008).  The
Cantrell Plaintiffs subsequently moved the court to reconsider the first order, but the
court denied the motion.  *Coal. to Defend Affirmative Action v. Regents of the Univ. of
Mich. (Coal. VI)*, 592 F. Supp. 2d 948 (E.D. Mich. 2008).

These appeals followed.  The University Defendants appeal the court's denial of
their motion to be dismissed as parties.  Russell appeals the court's grant of the Cantrell
Plaintiffs' motion for summary judgment dismissing him as a party to the action.  The
Cantrell Plaintiffs appeal the court's grant of the Attorney General's motion for
summary judgment and its denial of their motion for reconsideration.  Similarly, the
Coalition Plaintiffs appeal the court's grant of the Attorney General's motion for
summary judgment.

## II.  ANALYSIS

### A. Proposal 2's Constitutionality

The Equal Protection Clause provides that no state shall "deny to any person . . .
the equal protection of the laws."  U.S. Const. amend. XIV.  The Plaintiffs argue that
Proposal 2 violates this provision in two distinct ways.  Both Plaintiffs groups argue that
Proposal 2 violates the Equal Protection Clause by impermissibly restructuring the
political process along racial lines (the "political process" argument), and the Coalition
Plaintiffs contend that Proposal 2 violates the Equal Protection Clause also by
impermissibly classifying individuals on the basis of race (the "traditional" argument).

We review de novo a district court's grant of summary judgment and denial of
a motion for reconsideration of that decision.  *Chen v. Dow Chem. Co.*, 580 F.3d 394,
400 (6th Cir. 2009);  *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir.
2001). Whether a state's constitution violates the federal constitution is a question of
law, which we also review de novo.  *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423,
431 (6th Cir. 2008).

### 1. "Political Process" Equal Protection Analysis

The Equal Protection Clause "guarantees racial minorities the right to full participation in the political life of the community. It is beyond dispute . . . that given racial or ethnic groups may not be denied the franchise, or precluded from entering into the political process in a reliable and meaningful manner."[1] *Seattle*, 458 U.S. at 467. But the Equal Protection Clause reaches even further, and prohibits "a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." *Id.* (internal quotation marks and citation omitted). "[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Hunter*, 393 U.S. at 393.

The Supreme Court's statements in *Hunter* and *Seattle* clarify that equal protection of the laws is more than a guarantee of equal treatment under the law substantively. It is also an assurance that the majority may not manipulate the channels of change in a manner that places unique burdens on issues of importance to racial minorities. In effect, the political process theory hews to the unremarkable belief that, when two competitors are running a race, one may not require the other to run twice as far, or to scale obstacles not present in the first runner's course. Ensuring the fairness

---

[1] For this reason, the Supreme Court has repeatedly held that legislative enactments that burden racial minorities' ability to participate in the political process may violate the Constitution. *See, e.g.*, *White v. Regester*, 412 U.S. 755 (1973) (invalidating "multimember" electoral districts that minimized the voting strength of resident Mexican-Americans); *Harman v. Forssenius*, 380 U.S. 528 (1965) (holding unconstitutional a statute that required voters either to file an annual certificate of residence or pay a poll tax "born of a desire to disenfranchise the Negro"); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (holding that political redistricting that redefined municipal borders to exclude black residents would violate the Equal Protection Clause); *Smith v. Allwright*, 321 U.S. 649 (1944) (requiring the state Democratic party to admit black members in order that they be allowed to vote in the party primary election); *Lane v. Wilson*, 307 U.S. 268 (1939) (holding unconstitutional a statute having the effect of requiring all black citizens to apply for voting registration within a ten-day period or be forever barred from registering, but subjecting virtually no white citizens to the same requirement); *Nixon v. Herndon*, 273 U.S. 536 (1927) (holding unconstitutional a statute prohibiting black citizens from participating in primary elections for the state Democratic Party); *Guinn v. United States*, 238 U.S. 347 (1915) (holding unconstitutional a statute having the effect of subjecting all black citizens, but virtually no white citizens, to a literacy test in order to vote in state elections). In all these cases, the Court invalidated procedural hurdles that impeded racial minorities' political participation by either making it more difficult for these minorities to vote or diluting their voting power.

of political processes, in particular, is essential, because an electoral minority is by definition disadvantaged in its attempts to pass legislation; and "discrete and insular minorities" are especially so given the unique hurdles they face. *Cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

Ensuring a fair political process is nowhere more important than in education. Education is the bedrock of equal opportunity and "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Safeguarding the guarantee "that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective." *Grutter*, 539 U.S. at 331-32 (quoting Br. for United States as Amicus Curiae 13). "Moreover, universities, and in particular, law schools, represent the training ground for a large number of our Nation's leaders. . . . [T]o cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Id.* at 332 (citation omitted). Therefore, in the context of education, we must apply the "political process" protection with the utmost rigor given the high stakes.

Of course, the Constitution does not protect minorities from political defeat: Politics necessarily produces winners and losers. We must therefore have some way to differentiate between the constitutional and the impermissible. And *Hunter* and *Seattle* do just that. They provide the benchmark for when the majority has not only won, but also rigged the game to reproduce its success indefinitely.

### i. *Hunter* and *Seattle*

### a. *Hunter*

The Supreme Court in *Hunter* addressed a situation where the citizens of Akron, Ohio overturned a fair housing ordinance enacted by the City Council. 393 U.S. at 386. The citizenry did more than merely repeal the ordinance, however. It amended the city charter through a referendum to require the approval of a majority of the electorate

before any ordinance regulating real estate "on the basis of race, color, religion, national origin or ancestry"—past or future—could become effective. *Id.* at 387, 390 n.6. In other words, only ordinances based on the identified factors required approval of the majority; ordinances based on any other factor required only a vote by the City Council:

> In essence, the amendment changed the requirements for the adoption of one type of local legislation: to enact an ordinance barring housing discrimination on the basis of race or religion, proponents had to obtain the approval of the City Council *and* of a majority of the voters citywide. To enact an ordinance preventing housing discrimination on other grounds, or to enact any other type of housing ordinance, proponents needed the support of only the City Council.

*Seattle*, 458 U.S. at 468 (describing *Hunter*). The effect was not only to halt operation of the existing fair housing ordinance, but also to erect a barrier to any similar ordinance in the future. *Hunter*, 393 U.S. at 389.

The Court found that the disparity between the process for enacting a future fair housing ordinance and that for enacting any other housing ordinance "place[d] special burden[s] on racial minorities within the governmental process" by making it "substantially more difficult to secure enactment" only of legislation that would be to their benefit. *Id.* at 390-91. While the enactment treated "Negro and white, Jew and gentile" in an identical manner, the Court found that "the reality is that the law's impact falls on the minority." *Id.* at 391. That the law had been enacted via a popular referendum did not save it from implementing "a real, substantial, and invidious denial of the equal protection of the laws." *Id.* at 392-93.

### b. *Seattle*

In *Seattle*, a case identical in many respects to the one we confront here, the Supreme Court applied *Hunter* to strike down a state statute, also enacted via a referendum, that prohibited racially integrative busing. *Seattle*, 458 U.S. at 487. Prior to the referendum, Seattle School District No. 1 ("District") had implemented a school desegregation plan—making extensive use of mandatory reassignments—to accelerate

its program of desegregation. *Id.* at 460-61. The District was under no obligation to adopt this plan: Following *Brown v. Board of Education*, 347 U.S. 483 (1954), and 349 U.S. 294 (1955), school boards had been "charged with the affirmative duty to take whatever steps might be necessary" to integrate schools that were unconstitutionally segregated because of racial discrimination, *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437-38 (1968), but there had been no finding that the *de facto* segregation in Seattle's schools was the product of discrimination. Nonetheless, the school board implemented the plan to accelerate its existing program of voluntary busing, which some constituencies saw as insufficiently alleviating racial imbalances. *Seattle*, 458 U.S. at 460.

In response, Seattle residents drafted a statewide measure, Initiative 350, providing in relevant part that "no school board . . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence." *Id.* at 462 (alteration in original) (internal quotation mark omitted). Though the initiative was worded as a general ban on all forms of mandatory busing, its myriad exceptions made its real effect to eliminate school reassignments for racial purposes only, except where a court ordered such reassignments to remedy unconstitutional segregation. *Id.* at 462-63 (noting that Initiative 350 was phrased so as not to "prevent any court of competent jurisdiction from adjudicating constitutional issues relating to the public schools"). Initiative 350 made it on the Washington ballot and passed by a substantial margin, attracting over 65% of the statewide vote. *Id.* at 463.

The Court found that Initiative 350, like the Akron city charter amendment, violated the Equal Protection Clause. *Id.* at 487. Relying on *Hunter* and the Court's summary affirmance of *Lee v. Nyquist*, 318 F. Supp. 710 (W.D.N.Y. 1970) (three-judge panel), *aff'd*, 402 U.S. 935 (1971), the Court stated that these two cases yielded a "simple but central principle": While "laws structuring political institutions or allocating political power according to neutral principles" are not subject to challenges under the Fourteenth Amendment, "a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to

determine the decisionmaking process." *Seattle*, 458 U.S. at 469-70 (internal quotation marks omitted). Echoing *Hunter*, the Court explained that this distinct analysis is necessary because such non-neutral allocations of power "place[] *special* burdens on racial minorities within the governmental process, thereby making it *more* difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest." *Id.* at 470 (internal quotation marks, citations, and brackets omitted).

The Court dismissed the argument that Initiative 350 was not intended to prevent busing for racially-integrative purposes, and explained why Initiative 350 violated the "simple but central" principle animating *Hunter* and *Nyquist*. *Seattle*, 458 U.S. at 471.

First, as a threshold matter, the Court concluded that desegregation of the public schools, like the fair housing ordinance in *Hunter*, "at bottom inures primarily to the benefit of the minority, and is designed for that purpose." *Id.* at 472. The Court reasoned that, while "white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom," desegregation is of primary benefit to minority children because these children "can achieve their full measure of success only if they learn to function in—and are fully accepted by—the larger community. Attending an ethnically diverse school may help accomplish this goal by preparing minority children for citizenship in our pluralistic society." *Id.* at 472-73 (internal quotation marks omitted). Because racial minorities therefore had reason to "consider busing for integration to be 'legislation that is in their interest,'" the "racial focus of Initiative 350 . . . suffices to trigger application of the *Hunter* doctrine." *Id.* at 474 (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).

Second, having concluded that Initiative 350 targeted a busing program that "inures primarily to the benefit of the minority," the Court held that "the practical effect of Initiative 350 is to work a reallocation of power of the kind condemned in *Hunter*." *Id.* As the Court explained, Initiative 350, like the amendment to the city charter in *Hunter*, did more than repeal the school board's busing program:

> The initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests. Those favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate. Yet authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board. . . . As in *Hunter*, then, the community's political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government.

*Id.* By removing authority over busing for racial purposes from the school board and placing this authority at a more remote level of government, Initiative 350 required "those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action," and disadvantaged "those who would benefit from laws barring *de facto* desegregation." *Id.* at 474-75 (internal quotation mark omitted). Accordingly, the Court held that Initiative 350, in placing "special burdens on racial minorities," violated the Equal Protection Clause. *Id.* at 470.

In sum, *Hunter* and *Seattle* require us to apply strict scrutiny to enactments that change the governmental decisionmaking process for determinations with a racial focus. *Seattle*, 458 U.S. at 470; *Hunter*, 393 U.S. at 391; *cf. Carolene Prods.*, 304 U.S. at 153 n.4 (arguing that more exacting judicial scrutiny is required when the majority curtails "the operation of those political processes ordinarily to be relied upon to protect minorities").

### ii. Application of the *Hunter/Seattle* Test

*Hunter* and *Seattle* thus expounded the rule that an enactment deprives minority groups of equal protection of the laws when it: (1) has a racial focus, targeting a goal or program that "inures primarily to the benefit of the minority"; and (2) works a reallocation of political power or reordering of the decisionmaking process that places "special burdens" on a minority group's ability to achieve its goals through that process. *Seattle*, 458 U.S. at 470; *Hunter*, 393 U.S. at 391.

Applying this rule here, we conclude that Proposal 2 targets a program that "inures primarily to the benefit of the minority" and reorders the political process in Michigan in such a way as to place "special burdens" on racial minorities.

### a. Racial Focus

The first prong of the *Hunter*/*Seattle* test requires us to determine whether Proposal 2 has a "racial focus." *See Seattle*, 458 U.S. at 473. The Court explained that the question is not whether "members of the racial majority both favored and benefited from" the program or policy at issue, but whether the policy targeted by the law "at bottom inures primarily to the benefit of the minority, and is designed for that purpose." *Id.* at 472.

In *Seattle*, the Court observed that programs—in that context, the busing of children to increase the number of integrated schools—furthering the education of minority children enable them "to function in—and . . . [be] fully accepted by—the larger community." *Id.* at 473. Such programs do so, the Court explained, through "preparing minority children for citizenship in our pluralistic society, while . . . teaching members of the racial majority to live in harmony and mutual respect with children of minority heritage." *Id.* (internal quotation marks and citation omitted); *see also Grutter*, 539 U.S. at 330-32 ("[T]he [University of Michigan] Law School's [race-conscious] admissions policy promotes cross-racial understanding, helps to break down racial stereotypes, and enables [students] to better understand persons of different races. . . . [T]he diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals regardless of race or ethnicity." (fourth alteration in original) (internal quotation marks omitted)). The *Seattle* Court then concluded that Initiative 350 had a racial focus, because "it is enough that minorities may consider busing for integration to be 'legislation that is in their interest.'" *Seattle*, 458 U.S. at 474 (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).

Proposal 2, like Initiative 350, has a "racial focus," because the Michigan universities' affirmative-action programs "inure[] primarily to the benefit of the

minority, and [are] designed for that purpose," for the reasons articulated by the Court in *Seattle*. *See id.* at 472. Just as the desegregative busing programs at issue in *Seattle* were designed to improve racial minorities' representation at many public schools, *see id.* at 460, race-conscious admissions policies increase racial minorities' representation at institutions of higher education, *see, e.g.*, *Grutter*, 539 U.S. at 316, 328-33 (describing the University of Michigan Law School's minority-student-enrollment aims); *Gratz*, 539 U.S. at 253-56 (describing admissions policies at the University of Michigan regarding underrepresented minority groups). Indeed, underrepresented minorities lobbied for the adoption of such policies at Michigan's universities in the first place for this reason, (*see* Anderson Report, Dist. Ct. Docket No. 222 Ex. L, at 16-23), and, further, the unrebutted evidence in the record indicates that Proposal 2 will likely negatively impact minority representation at Michigan's institutions of higher education, (*see* Connerly Dep., Dist. Ct. Docket No. 222 Ex. A, at 119-21; Spencer Dep., Dist. Ct. Docket No. 203 Ex. D, at 100-01; Wu Dep., Dist. Ct. Docket No. 203 Ex. F, at 78; Zearfoss Dep., Dist. Ct. Docket No. 205 Ex. 3, at 56-57). Ample evidence thus grounds our conclusion that race-conscious admissions policies "inure[] primarily to the benefit of the minority." *See Seattle*, 458 U.S. at 472.

Yet the Attorney General argues, and we previously suggested, that the now-defunct Michigan admissions policies benefitted women as well, and that saves them. *See Coal. II*, 473 F.3d at 250-51. Our prior suggestion does not bind us, *see Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), and we now reject it. The Supreme Court made it clear that even policies benefitting the majority—let alone another minority—may have a "racial focus," so that lens does not clarify anything. *See Seattle*, 458 U.S. at 472. In fact, it serves only to blur what is in reality a clear test: The question is not whether the challenged law "burdens minority interests and minority interests alone," *Coal. II*, 473 F.3d at 250, but whether the law targets policies that minorities *may* consider in their interest, *Seattle*, 458 U.S. at 472. Even a cursory examination of the cases confirms this understanding. In *Hunter*, the ordinance likewise burdened non-racial minorities, including Catholics, Hispanics

and numerous other groups (which, grouped together, would constitute a majority of the electorate), but the Court held that the law had a racial focus. 393 U.S. at 387. The same was true of the policy at issue in *Nyquist*, and the Court again agreed that it had a racial focus. 318 F. Supp. at 716-17. Likewise, as explained above, the race-conscious admissions policies stymied by Proposal 2 are in the interest of racial minorities and inure primarily to their benefit, so the polices have a racial focus as well.

This conclusion is not impacted by the fact that increased representation of racial minorities in higher education also benefits students of other groups and our nation as a whole. *Cf. Grutter*, 539 U.S. at 327-33 (describing the varied benefits supporting Michigan's compelling interest in increasing racial diversity at public institutions of higher education). Similar benefits accrued to children at integrated public schools under Seattle's desegregative busing plan, which the Supreme Court explicitly recognized: "[I]t should be . . . clear that white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom . . . [by] teaching members of the racial majority to live in harmony and mutual respect with children of minority heritage." *Seattle*, 458 U.S. at 472-73. Nonetheless, the *Seattle* Court found that the wider benefits of the busing plan did not serve to distinguish *Hunter*, "for we may fairly assume that members of the racial majority both favored and benefited from Akron's fair housing ordinance." *Id.* at 472. By the same token, race-conscious admissions policies' wider benefits do not undermine the conclusion that their primary beneficiaries are racial minorities.

We therefore find that the race-conscious admissions policies now barred by Proposal 2 inure primarily to the benefit of racial minorities and that Proposal 2, insofar as it prohibits consideration of applicants' race in admissions decisions, has a "racial focus."

### b. Reordering the Political Process to Place Special Burdens on Racial Minorities

The second prong of the *Hunter/Seattle* test asks us to determine whether Proposal 2 works a reallocation of political power or reordering of the political process that places "special burdens" on racial minorities. *See Seattle*, 458 U.S. at 470; *Hunter*, 393 U.S. at 391.

#### 1. Does Proposal 2 Reorder a "Political" Process?

The first issue within this prong is whether the Michigan admissions committees are "political," as that term is used in the *Hunter/Seattle* test. We begin by examining the word itself. "Political" has two possible meanings relevant to our discussion: "of or relating to government," Merriam-Webster, Webster's Third New International Dictionary: Unabridged 1755 (1993) (first definition), or "of, relating to, or involved in party politics," *id.* (third definition). Examining the Court's language, we conclude that the "political" requirement seeks to ensure that the process at issue relates to government.

The political processes relevant in *Hunter* and *Seattle* were the Akron public-housing structure and the Washington public schools' student-assignment system, respectively. *See Seattle*, 458 U.S. at 474; *Hunter*, 393 U.S. at 390, 393. Clarifying the "political" nature of the latter, the Court referred to the "political process" interchangeably as a "decisionmaking process" and a "governmental process," and explained that the political power allocation in question is of "governmental power." *Seattle*, 458 U.S. at 470. The Court elsewhere identified the relevant characteristics that made the school boards "political": They were "creatures of the State" and had to "give effect to policies announced by the state legislature." *Id.* at 476. In other words, the boards were "political" because they were *governmental* entities, not necessarily electoral or partisan ones. *Id.* Even more explicitly, the Court found that Initiative 350's flaw was "us[ing] the racial nature of an issue to define the *governmental decisionmaking structure*." *Id.* at 470 (emphasis added); *see also id.* at 474 ("As in

*Hunter*, then, the community's *political* mechanisms are modified to place effective *decisionmaking* authority over a racial issue at a different level of *government*." (emphasis added)).  Indeed, the Court noted that the political "reallocation of power of the kind condemned in *Hunter*" is the removal of "authority . . . from the existing *decisionmaking* body."  *Id.* (emphasis added); *see also id.* at 477 ("[I]t is irrelevant that the State might have vested all *decisionmaking authority* in itself, so long as the *political structure* it in fact erected imposes comparative burdens on minority interests . . . ." (emphasis added)).  Thus, a process is "political" under *Hunter* and *Seattle* if it involves governmental decisionmaking.

The dissent disagrees.  It defines a "political process" narrowly, as one "through which the people exercise their right to govern themselves," Slip Op. at 13, or one that is "electoral,"[2] *id.* at 18-19 & n.6, and suggests that a process is political only if it involves direct elections.  In so doing, the dissent misapprehends the "political" nexus required in the *Hunter/Seattle* test.  The electoral nature of a state system is relevant *not* to the political nature of a process, but to the reordering at issue.  The Court's point in requiring that there be reordering of a "political process" was merely to ensure that the process was state-directed ("governmental") and mattered ("decisionmaking"), the same way Title VII cases require the alleged discriminatory act to relate to a company agent with relevant authority.  No link to the electoral process is required to find a given process "political."

The dissent latches on to a lone mention of an "electorate" in *Seattle* to argue that the *Hunter/Seattle* political process must be an electoral, or voting-centered, political process.  The statement at issue, however, was simply the Court's quotation of the language setting forth the school board's authority under Washington law.  *See Seattle*, 458 U.S. at 478 (quoting Wash. Rev. Code § 28A.58.758(1)).  And that quotation sits in

---

[2]By "electoral," the dissent must mean "of or relating to election."  *See* Merriam-Webster, Webster's Third New International Dictionary: Unabridged 731 (1993).  Nothing in either definition of "political," however, relates more than tangentially to an election or voting:  Yes, in a democracy, government exists because of elections, but the Court did not require there to be a "political process" for the purpose of elucidating first principles.  The second meaning of government—in effect, "partisan"—is more related to elections, but the cases do not support (and the dissent does not advocate) such a reading.

a section explaining the structure of Washington's educational system generally and the power of the school boards specifically. *See id.* To argue that the key insight to the entire *Hunter/Seattle* test lies in this solitary quotation is unsupportable, especially given the abundance of language to the contrary in those cases. Moreover, there is no language in this section of *Seattle* suggesting that the Court was defining what it meant by a "political process." A process thus is "political" if it involves governmental decisionmaking. Nothing more is required.

This point is hammered home by the Court's affirmance of, and subsequent reliance (in *Seattle*) on, *Nyquist*. In *Nyquist*, the Court agreed with the three-judge panel that an enactment to New York's laws unconstitutionally reordered the political process when the enactment "prohibit[ed] state education officials and *appointed* school boards" from performing various education-related functions "for the purpose of achieving racial equality in attendance." 318 F. Supp. at 712 (emphasis added). The fact that the school boards at issue were not elected did not affect the Court's decision.[3] The *Hunter/Seattle* test therefore requires simply that the process at issue involve governmental decisionmaking.

Yet even using the dissent's erroneous definition of "political" as "electoral," the admissions committees here still qualify as "political." For in addition to possessing the same character as the school boards in *Seattle* and *Nyquist* and the Akron housing institutions in *Hunter*, they fall squarely within Michigan's electoral system.

The Michigan Constitution, the foundation of Michigan's government, establishes three public universities—the University of Michigan, Michigan State University, and Wayne State University—and grants the governing board of each university control of its respective institution. Mich. Const. art. VIII, § 5; *see also id.* art. VIII, § 6 (allowing the establishment of other institutions of higher learning, such as

---

[3]Likewise, the dissent's dwelling on the term "legislation," *see* Slip Op. at 13-14, misapprehends that term's usage in the *Hunter/Seattle* test, for the Court considered the school board policies in *Seattle* and *Nyquist* to constitute such "legislation," *see Seattle*, 458 U.S. at 470, 474-75 & n.17; *Nyquist*, 318 F. Supp. at 718-19, and the admissions policies at Michigan's colleges and universities are of an identical character.

Michigan's other public colleges and universities, and according their governing boards similar control). At each institution, these boards and their members have slightly differing names—"Board of Trustees," "Board of Governors," "Board of Regents," and so on—but the same role: to run, with plenary authority, their respective institution. *Id.* art. VIII, §§ 5-6; *Glass v. Dudley Paper Co.*, 112 N.W.2d 489, 490 (Mich. 1961). Michigan law has confirmed this absolute authority again and again. *See, e.g.*, *Glass*, 112 N.W.2d at 490; *Attorney Gen. ex rel. Cook v. Burhans*, 7 N.W.2d 370, 371 (Mich. 1942); *Bd. of Regents of Univ. of Mich. v. Attorney Gen.*, 132 N.W. 1037, 1040 (Mich. 1911); 1979-80 Mich. Op. Atty Gen. 578, 1980 WL 114008, at *1-2 (Mich. A.G. Jan. 31, 1980).

Eight elected individuals populate each of these boards, and they hold office for eight years. Mich. Const. art. VIII, § 5; *see also id.* art. VIII, § 6. The boards govern the universities, including enacting the regulations that direct the university's government and determining when to retain or remove the president or faculty. *See* Mich. Comp. Laws §§ 390.3-.6 (University of Michigan).[4] The meetings at which the board takes such action are generally public. *See id.* § 390.20. Meanwhile, the bylaws, over which the boards have complete authority, detail the admissions procedures.[5] *See* Univ. of Mich., Bylaws of the Bd. of Regents § 8.01, *available at*

---

[4]Though the statutes and bylaws cited in this paragraph govern only the University of Michigan, the boards of the other public colleges and universities in Michigan are similarly empowered. *See, e.g.*, Mich. Comp. Laws §§ 390.102-.107 (Michigan State University), 390.641-.645 (Wayne State University).

[5]At Michigan State University, the Provost of the University "shall be appointed by the Board [of Trustees]," "shall serve at the pleasure of the Board," and "[s]hall be responsible for supervising procedures and policies relating to the admission of students." Mich. State Univ., Bd. of Trs. Bylaws, art. 4, *available at* http://www.trustees.msu.edu/bylaws (last visited June 24, 2011). The Board retains the authority to "determine and establish the qualifications of students for admission at any level" upon the recommendation of the President, whom the Board elects and who also serves at its pleasure, *id.* arts. 1, 4, as well as the more general authority to reallocate responsibility for admissions to other officers or to itself, *see id.* art. 17.

At Wayne State University, the President, elected by the Board, is authorized to establish specific admissions standards for undergraduate and graduate degree programs after (s)he has consulted with the relevant college or school and the Graduate Council, *see* Mich. Const. art. VIII § 5; Wayne State Univ. Statutes §§ 2.34.09.090, 2.34.12.350, *available at* http://www.bog.wayne.edu/code (last visited June 24, 2011), and the Board may amend its regulations to alter, remove, or shift this authority as it sees fit, *see* Wayne State Univ., Bd. of Governor Bylaws 10, *available at* http://www.bog.wayne.edu/files/bylaws.pdf (last visited June 24, 2011) (describing the Board's authority to enact bylaws and regulations for the governance of the University).

http://www.regents.umich.edu/bylaws (last visited June 24, 2011). Nothing prevents the boards from altering this framework for admissions decisions if they are so inclined. *See* Mich. Const. art. VIII, § 5; Mich. Comp. Laws §§ 390.3-.6; Univ. of Mich., Bylaws of the Bd. of Regents § 8.01, *available at* http://www.regents.umich.edu/bylaws (last visited June 24, 2011).

Attempting to argue to the contrary, the dissent claims that the admissions committees are not connected to Michigan's electoral political system because the governing boards of the universities "have *fully delegated* the responsibility for establishing admissions standards." Slip Op. at 11 (emphasis added). The dissent rests this argument on "the testimony of the law school deans in this case." *Id.* at 14. But the dissent's argument fails for two reasons. First, the testimony the dissent references does not support the dissent's claim of "full delegation" or the idea that the boards could not theoretically change the policies; it merely describes the current admissions structures. There is one exception to this observation, however: former-Dean Wu's personal opinion that modification of the admissions structure might "precipitate a constitutional crisis." (Wu Dep., Dist. Ct. Docket No. 203 Ex. F, at 191-92). But this opinion is inadmissible as both speculation and a legal conclusion (notably, with no basis in Michigan law). *See Torres v. Cnty. of Oakland*, 758 F.2d 147, 149-51 (6th Cir. 1985).

Second, and much more to the point, the structure of Michigan's colleges and universities is a question of law, for it is set by constitution, statutes and regulations. *See United States v. Dedman*, 527 F.3d 577, 584-85 (6th Cir. 2008). And we would be remiss to rely on witness testimony to decide such questions, *see* Fed. R. Evid. 701; *Torres v. Cnty. of Oakland*, 758 F.2d 147, 149-51 (6th Cir. 1985); *cf. Becht v. Owens Corning Fiberglas Corp.*, 196 F.3d 650, 654 (6th Cir. 1999), particularly where as here a clear statutory structure is weighed against unfounded supposition. Still, the dissent protests: "As they currently stand, the faculty admissions committees are islands unto themselves, vested with the full and unreviewed authority to set admissions policy for their respective university programs." Slip Op. at 14. The current boards' policies, however, are besides the point. The key question is whether the boards' current

policies—in the form of bylaws and regulations—could be altered, for example if the people of Michigan elected different boards dedicated to changing the universities' admissions policies. Michigan law provides a resounding "yes," *see* Mich. Const. art. VIII, §§ 5-6; *cf.* Mich. State Univ., Bd. of Trs. Bylaws, art. 5 (stipulating that "[t]he delegation of any authority by the Board to any committee shall not operate to relieve the Board or any member thereof of any responsibility imposed by law or the State Constitution"), and the dissent points us to no *law* indicating otherwise.

Moreover, because the dissent does not question the boards' electoral nature, the dissent's argument implies another untenable proposition: that delegation of admittedly electoral power to an unelected body renders the power ultimately exercised non-electoral. As an initial matter, the appointed boards in *Nyquist* soundly rebuff this argument. Yet the argument cannot hold water even aside from *Nyquist*. Let us begin by dissecting the dissent's contention in a more familiar electoral framework: the federal system. In parallel to Michigan's university structure, the members of the National Security Council ("NSC") are likewise unelected individuals receiving delegated electoral political power, though from the President of the United States. Do we consider the power *they* wield to be electoral? Of course. That they are a step removed from the electoral process does not mean that they are not exercising electoral political power. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 296 (1936) ("And the Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides . . . . It is by that law, and not otherwise, that the legislative, executive, and judiciary agencies which it created exercise *such political authority* as they have been permitted to possess." (emphasis added)); *see also Mistretta v. United States*, 488 U.S. 361, 393 (1989) (referring to the United States Sentencing Commission's work as of a "significantly political nature"); *cf. Walsh v. Heilmann*, 472 F.3d 504, 506 (7th Cir. 2006) ("Many units of government delegate important decisions to middle management, and when they do this they may insist that the holders of the delegated power be reliable implementers of the *elected officials' platforms*." (emphasis added)). If American voters do not like

what the NSC does, they may exact an *electoral* price against the person from whom the NSC receives its power: the President.[6]  The same is true of the admissions committees here, which wield the *electoral* power bestowed on them—through the boards—ultimately by the Michigan Constitution.  *See* Part II.A.1.ii.b.2, *infra*.

In sum, we find apt the Court's rejoinder to claims similar to those the Attorney General and the dissent make:  "[T]hat a State may distribute legislative power as it desires . . . furnish[es] no justification for a legislative structure which otherwise would violate the Fourteenth Amendment."  *Seattle*, 458 U.S. at 476 (quoting *Hunter*, 393 U.S. at 392) (first alteration added).  Michigan, like "Washington[,] . . . has chosen to make use of a more complex governmental structure" than direct administration by the legislature, or even the university boards, of admissions decisions in university and college affairs.  *See id.* at 476-77.  However, as we have explained, the fact that the admissions committees received the political power they exercise through delegation rather than direct election is irrelevant to the *nature* of that power and thus the applicability of the *Hunter/Seattle* test.

Therefore, the admissions committees are "political" because they are governmental decisionmaking bodies.  And even if they had to be tied to the electoral system, they are, because the individuals delegated with principal responsibility for admissions policies at Michigan's public colleges and universities are appointed by the institutions' governing boards—which are either elected by the citizens of Michigan or appointed by elected officials—and the boards are free to reassign this responsibility as

---

[6]Put more pointedly, it is the electoral *structure* that renders the power wielded electoral, not the nature of the person's position.  No matter how many times this power is delegated, or to whom, an elected official is ultimately responsible for it.  For example, though two State Department employees may reach their posts by different paths, one hired and one appointed, both individuals' power stems from the President, and they perform the same function: the work of the President.  And a building manager working for the General Services Administration ("GSA"), like a faculty member on a public university's admissions committee, is hired and performs a function existing equally in the private sector.  The building manager's private counterpart does not exercise electoral power, yet the GSA employee and Michigan faculty member do.  The difference lies in the ultimate source of these latter two individuals' authority: the government.  The fact remains that an elected official—be it the President of the United States, the Governor of Michigan, or a member of one of the university boards—is accountable to the electorate for the power that he delegated to the GSA, State Department, or university admissions committees, and he could equally choose to delegate that power to someone else or exercise it himself.  This is what it means for power to be electoral.

they see fit. Thus, there is little doubt that Proposal 2 affects a "political process" under *Hunter* and *Seattle*.

> ### 2. Does Proposal 2 Effect a "Reordering" of the Political Process so as to Place Special Burdens on Racial Minorities?

The next issue is whether Proposal 2 reordered the political process to place special burdens on racial minorities. We find that Proposal 2 burdens *racial minorities* for the reasons articulated in Part II.A.1.ii.a, *supra*. As to whether there was a *reordering*, the Court has found that both implicit and explicit reordering violates the Fourteenth Amendment. *See Seattle*, 458 U.S. at 474; *Hunter*, 393 U.S. at 387, 390. In *Hunter*, the express language of the charter amendment required any ordinance regulating real estate "on the basis of race, color, religion, national origin or ancestry" to be approved by a majority of the electorate and the City Council, as opposed to solely the City Council for other real-estate ordinances. 393 U.S. 387, 390.

In *Seattle*, however, the reordering was implicit: On its face, Initiative 350 simply prohibited school boards from using mandatory busing, but its practical effect was that "[t]hose favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate" through overturning Initiative 350. 458 U.S. at 474. Nonetheless, "authority over all other student assignment decisions . . . remains vested in the local school board." *Id.* The *Seattle* Court then clarified what sort of reordering contravenes the "political process" theory: "The evil condemned by the *Hunter* Court was not the particular political obstacle of mandatory referenda imposed by the Akron charter amendment; it was, rather, *the comparative structural burden placed on the achievement of minority interests*."[7] *Id.* at 474 n.17 (emphasis added). Thus, any "comparative structural burden," be it local or state-wide or national, satisfies the reallocation prong of the *Hunter/Seattle* test. *Id.*

---

[7] The Court's statement here rebuffs the dissent's attempt to argue that the "relevant lawmaking authority" also must be reallocated from a "local legislative body" to a "more complex government structure" with a broader constituency. *See* Slip Op. at 7.

We face here an enactment even more troubling than those at issue in *Hunter* and *Seattle*, as the hurdle Proposal 2 creates is of the highest possible order. An interested Michigan citizen may use any number of avenues to change the admissions policies on an issue unrelated to race. He may lobby the admissions committees directly, through written or in-person communication if the latter is available, or petition higher administrative authorities at the university: the dean of admissions, the president or dean of the university, or the university's board. *See* Part II.A.1.ii.b.1, *supra*; *see also, e.g.*, Univ. Defs. Admis., Dist. Ct. Docket No. 172 Ex. I, at 11, 14-15, 17-20; Wu Dep., Dist. Ct. Docket No. 203 Ex. F, at 190; Zearfoss Dep., Dist. Ct. Docket No. 205 Ex. 3, at 209-10. And there is no question that the admissions committees are very much accountable to the universities' boards, which retain ultimate—and politically accountable—responsibility over admissions policies. *See* Mich. Const. art. VIII, §§ 5-6.

The individual seeking this non-race-related change may also seek to affect the election—through voting, campaigning, or otherwise—of any one of the eight board members whom the individual believes will champion his cause and revise the review of admissions determinations accordingly. These elections, though state-wide in scope, would likely be much more manageable than those surrounding constitutional amendments, which can be expensive, lengthy, and complex, (*see* Wilfore Decl., Dist. Ct. Docket No. 203 Ex. C ¶¶ 10, 29-30). Only as a last resort would the effort and expense of campaigning for an amendment to the Michigan Constitution be required—the only option that remains open for proponents of race-based admissions criteria.

Meanwhile, a Michigan citizen seeking that Michigan universities adopt race-based admissions policies must now *begin* by convincing the Michigan electorate to amend the Michigan Constitution. Placing a proposed constitutional amendment abrogating Proposal 2 on the ballot would require either the support of two-thirds of both the Michigan House of Representatives and Senate, *see* Mich. Const. art. XII, § 1, or the signatures of a number of voters equivalent to at least ten percent of the number of votes cast for all candidates for governor in the preceding general election, *see id.* art XII, § 2.

A majority of the voting electorate would then have to approve the amendment. *See id.* art. XII, §§ 1-2.

Only after traversing this difficult and costly process, (*see* Wilfore Decl., Dist. Ct. Docket No. 203 Ex. C ¶¶ 10, 29-30), would the now-exhausted Michigan citizen reach the starting point of his opponent who sought a non-race-related admissions policy change. By amending Michigan's Constitution to prohibit university admissions units from utilizing race-conscious admissions policies, proponents of Proposal 2 thus removed the authority to institute racially-focused policies from Michigan's universities and lodged it at the most remote level of Michigan's government, the state constitution.

In other words, as with the unconstitutional enactment in *Hunter*, proponents of race-conscious admissions policies now have to obtain the approval of the Michigan electorate *and* (if they are successful) the admissions units or other university powers, whereas proponents of other admissions policies need only the support of the latter. *See Seattle*, 458 U.S. at 468, 474 (describing *Hunter*).

The stark contrast between the avenues for political change available to different admissions proponents following Proposal 2 illustrates why the amendment cannot be construed as a mere repeal of an existing race-related policy. Had those favoring abolition of race-conscious admissions successfully lobbied the universities' admissions units, just as underrepresented minorities did to have these policies adopted in the first place, there would be no equal protection problem. As the Supreme Court has made clear, "'the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification.'" *Seattle*, 458 U.S. at 483 (quoting *Crawford v. Bd. of Educ.*, 458 U.S. 527, 539 (1982)); *accord Hunter*, 393 U.S. at 390 n.5. *Crawford* brings this distinction into focus, because the Court-approved political action in that case (amendment of the California constitution) occurred at the same level of government as the original enactment (a prior amendment of the California constitution), thus leaving the rules of the political game unchanged. 458 U.S. at 532, 540.

As illustrated above, however, Proposal 2 "works something more than the 'mere repeal' of a desegregation law by the political entity that created it." *Seattle*, 458 U.S. at 483. Rather, like Initiative 350 did for any future attempt to implement race-based busing (and the Akron city charter amendment did for any future attempt to enact a fair housing ordinance), "by lodging decisionmaking authority over the question at a new and remote level of government," Proposal 2 "burdens all future attempts" to implement race-conscious admissions policies. *Id.*

By the same token, precisely because Proposal 2 places special burdens on a political program of particular importance to racial minorities, it is not a sufficient response to point out that these minorities remain free to repeal it. The "simple but central principle" of *Hunter* and *Seattle* is that the Equal Protection Clause prohibits requiring racial minorities to surmount more formidable obstacles to achieve their political objectives than other groups face. *See id.* at 469-70. As the Supreme Court has recognized, such special procedural barriers to minority interests discriminate against racial minorities just as surely as—and more insidiously than—substantive legal barriers challenged under the traditional equal protection rubric. *See id.* at 467 ("[T]he Fourteenth Amendment also reaches a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." (internal quotation marks and citation omitted)). Because less onerous avenues to effect political change remain open to those advocating consideration of non-racial factors in admissions decisions, Michigan cannot force those advocating for consideration of racial factors to go down a more arduous road than others without violating the Fourteenth Amendment.

We thus conclude that Proposal 2 reorders the political process in Michigan to place special burdens on minority interests.

iii. Proposed Permutations of the *Hunter/Seattle* Test

a. Is Prohibiting "Preferential Treatment" Different From
Prohibiting "Discrimination"?

The Attorney General asserts that *Hunter* and *Seattle* are inapplicable to Proposal 2 because the cases govern only enactments that burden racial minorities' ability to obtain protection from *discrimination* through the political process, whereas Proposal 2 burdens racial minorities' ability to obtain *preferential treatment*. In support of this distinction, the Attorney General points to our preliminary injunction ruling, and decisions of the Ninth Circuit and the district court. *See Coal. II*, 473 F.3d at 251; *Coal. for Econ. Equity*, 122 F.3d at 708; *Coal. IV*, 539 F. Supp. 2d at 956-57. None of these decisions is binding on us. *See Tenke Corp.*, 511 F.3d at 542 ("[C]onclusions of law made by a court granting [a] preliminary injunction are not binding at trial on the merits." (internal quotation mark omitted)); *Cross Mountain Coal. v. Ward*, 93 F.3d 211, 217 (6th Cir. 1996) ("[T]he decisions of other circuits are entitled to our respect, [but] they are not binding upon us."). And we do not find them persuasive.

We turn first to the distinction at issue and its true meaning. Differentiation between "discrimination" and "preference" in this context finds its origin in the Ninth Circuit. *See Coal. for Econ. Equity*, 122 F.3d at 707-09. The *Coalition for Economic Equity* court began by stating that "[e]ven a state law that does restructure the political process can only deny equal protection if it burden's an individual's *right* to equal treatment." *Id.* at 707 (emphasis added). The court then continued: "It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment." *Id.* at 708. In so positing, the Ninth Circuit added another element to the *Hunter/Seattle* test. That element, stripped of the controversial and obfuscating distinction between "discrimination" and "preference," boils down to a belief that an enactment violates the Equal Protection Clause under *Hunter* and *Seattle* only if it undermines state action that is constitutionally mandated

("discrimination"), as opposed to constitutionally permissible ("preference").[8]  Put differently:  An enactment is unconstitutional if it transgresses a constitutionally-mandated action, i.e., an enactment is unconstitutional under the "political process" framework only if the enactment is already unconstitutional under the "traditional" rubric.  But this reasoning defies logic.  Using this rationale, the political process theory would be superfluous, for an aggrieved citizen could sue to enjoin the unconstitutional law under the traditional equal protection analysis.  For that very reason, the Court created the "political process" theory in the context of cases addressing state action that is constitutionally permissible (or "preferential" to use the Attorney General and Ninth Circuit's terminology).  The facts of those very cases thus prohibit this distinction.

The Court in *Hunter* rejected the argument that the Akron amendment's effect was moot because the amendment was invalid under the 1968 Civil Rights Act, *see Hunter*, 393 U.S. at 388-89, or that traditional equal protection resolved the case, *id.* at 389.  *Seattle* even more clearly involved constitutionally-permissible state action, as Initiative 350 responded to a voluntary school board effort to reduce the impact of *de facto* segregation.  458 U.S. at 460-61.  The school board was under no obligation to undertake this effort because there had been no finding that the segregation was motivated by racial discrimination—a fact that the *Seattle* dissent repeatedly pointed out.  *See, e.g.*, *id.* at 491-92 (Powell, J., dissenting) ("The Court has never held that there is an affirmative duty to integrate the schools in the absence of a finding of unconstitutional segregation. . . . Certainly there is no constitutional duty to adopt mandatory busing in the absence of such a violation.").  Rather, the Board's plan was an ameliorative measure designed to combat the effects of Seattle's segregated housing patterns and "alleviate the isolation of minority students."  *Id.* at 460.  It is inaccurate, therefore, to suggest that Initiative 350 made it "more difficult for minorities to obtain *protection from*

---

[8]This must be so because there is no free-floating "right" to be free of discrimination.  That right must therefore find its basis in either the United States Constitution—primarily through the Equal Protection Clause—or a federal statute.  The latter was not at issue in *Coalition for Economic Equity*, so the Equal Protection Clause must ground the right discussed by the Ninth Circuit.  Therefore, the only possible reading of the Ninth Circuit's decision is that the Equal Protection Clause, through the "political process" theory, only protects action which the Equal Protection Clause, through the "traditional" theory, already protects.

*discrimination* through the political process." *Coal. II*, 473 F.3d at 251.  Quite the
contrary: As the district court recognized, "[b]ecause prohibiting integration (when it is
not constitutionally mandated) is not tantamount to discrimination, . . . the Court in
*Seattle* did not (and could not) rely on the notion that the restructuring at issue impeded
efforts to secure *equal* treatment."[9]  *Coal. VI*, 592 F. Supp. 2d at 951.

Similarly, in *Nyquist*, the New York Legislature responded to attempts to remedy
*de facto* segregation "generated in large part by local housing patterns and economic
conditions," 318 F. Supp. at 717, by passing a law prohibiting "state education officials
and appointed school boards from assigning students, or establishing, reorganizing or
maintaining school districts . . . for the purpose of achieving racial equality in
attendance," *id.* at 712.  Applying *Hunter*, the court concluded that "by prohibiting the
implementation of plans designed to alleviate racial imbalance in the schools," the
statute "creates a clearly racial classification, treating educational matters involving
racial criteria differently from other educational matters and making it more difficult to
deal with racial imbalance in the public schools."  *Id.* at 718-19.  In reaching this
conclusion, the court rejected the defendants' argument that this classification did not
violate the Equal Protection Clause because "in the absence of de jure segregation, the
state is under no obligation to take affirmative action to reduce de facto segregation."
*Id.* at 719.  The court reasoned that the process-based nature of the *Hunter* inquiry
precluded this distinction:

---

[9]In holding that Proposal 2 nonetheless does not violate the Equal Protection Clause, the district
court asserted that the race-conscious admissions policies at issue here should be distinguished from the
voluntary desegregative busing program at issue in *Seattle* because, unlike race-conscious admissions
policies, "school desegregation programs are not inherently invidious, do not work wholly to the benefit
of certain members of one group and correspondingly to the harm of certain members of another group,
and do not deprive citizens of rights." *Coal. VI*, 592 F. Supp. 2d at 951 (quoting *Coal. for Econ. Equity*,
122 F.3d at 708 n.16).

This purported distinction is erroneous and flies in the face of the Supreme Court's decisions in
*Grutter* and *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007).
In *Grutter*, the Supreme Court showed how narrowly-tailored race-conscious admissions programs are not
"inherently invidious," *see* 539 U.S. at 334-44, and do not work "wholly to the benefit of members of one
group," *see id.* at 330.  The Court explained:  "[T]he skills needed in today's increasingly global
marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and
viewpoints." *Id.* In *Parents Involved*, the Court held that voluntary school desegregation programs can
impose injury, depriving citizens of rights.  551 U.S. at 719.

> [T]he argument that the state has not discriminated because it has no
> constitutional obligation to end de facto racial imbalance fails to meet the
> issue under Hunter v. Erickson.  The statute places burdens on the
> implementation of educational policies designed to deal with race on the
> local level. . . . The discrimination is clearly based on race alone, and the
> distinction created in the political process, based on racial considerations,
> operates in practice as a racial classification.

*Id.*   Accordingly, the court held the law unconstitutional, a decision that the Supreme
Court summarily affirmed, 402 U.S. 935 (1971), and then subsequently relied on in
*Seattle*.

It should be unsurprising, then, that the language of these decisions encompasses
any legislation *in the racial minorities' interest*, and thus is broader than it would be
were the Attorney General's distinction valid.  *See, e.g.*, *Seattle*, 458 U.S. at 467 (noting
the Fourteenth Amendment protects against distortions of the political process that
"place special burdens on the ability of minority groups to achieve *beneficial legislation*"
(emphasis added)); *id.* at 470 (requiring searching judicial scrutiny where state action
makes it more difficult for racial minorities "to achieve *legislation that is in their
interest*" (emphasis added) (internal quotation mark omitted)); *id.* at  474 (finding it
"enough that minorities may consider busing for integration to be *legislation that is in
their interest*" (emphasis added) (internal quotation mark omitted)); *Hunter*, 393 U.S.
at 393 ("[T]he State may no more disadvantage any particular group by making it more
difficult to enact *legislation in its behalf* than it may dilute any person's vote . . . ."
(emphasis added)); *cf. Nyquist*, 318 F. Supp. at 720 (holding that the state "has acted to
make it more difficult for racial minorities to achieve *goals that are in their interest*"
(emphasis added)).

The cases' context and reasoning, discussed above, crystallize the point of the
*Hunter/Seattle* doctrine.  The political process theory does not serve as a duplicative
backstop against already unconstitutional action.  Instead, it prevents the placement of
special procedural obstacles on minority objectives, whatever those objectives may be.
The distinction urged by the Attorney General thus erroneously imposes an *outcome-*

based limitation on a *process*-based right. Again, what matters is if racial minorities are forced to surmount procedural hurdles in reaching this goal over which other groups do not have to leap. If racial minorities do, the disparate procedural treatment violates the Equal Protection Clause, regardless of the goal sought. Accordingly, whether "all governmental use of race must have a logical end point," as the dissent asserts, Slip Op. at 21 (quoting *Grutter*, 539 U.S. at 342), is irrelevant to the constitutionality of Proposal 2 under *Hunter* and *Seattle*. The equal protection injury imposed by Proposal 2 is not the Michigan electorate's attempt to end affirmative action, but the method by which it sought to do so.

> b. Does a Law Place Special Burdens on *Minorities* Even When Multiple Minorities Affected by the Enactment, Cobbled-Together, Would Constitute a Numerical Majority?

As to the issue of burdening *minorities*, the Attorney General argues that Proposal 2 places no special burden on racial minorities because they, together with women, constitute a numerical majority of voters and thus could theoretically repeal Proposal 2.[10] In so arguing, he points to the *Hunter* Court's statement in dicta that "[t]he majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." 393 U.S. at 391.

The Attorney General's argument is without merit. Examination of the context of that statement from *Hunter* reveals that the quotation referred to the *racial* majority at issue in that case, not the ad-hoc and theoretical numerical majority posited by the Attorney General. *See id.* And as the district court cogently stated:

> The argument that racial minorities plus women constitute a majority of the population, and therefore Proposal 2 does not discriminate against minorities . . . borders on nonsense. The attempt to cobble together an artificial coalition of women and racial minorities in an effort to construct a numerical majority of citizens ignores the fact that affirmative action programs generally are targeted to benefit insular groups that separately

---

[10] We address this argument separately because our "racial focus" analysis does not encompass it fully. *See* Part II.A.1.ii.a, *supra*.

> have suffered from discriminatory practices in the past because of
> perceived traits unique to that group alone. Lumping minority groups
> into a contrived category does not allow any greater political influence
> over the process of advocating for affirmative action programs to achieve
> racial parity or otherwise render the process of changing the state
> constitution "bothersome but no more than that."

*Coal. IV*, 539 F. Supp. 2d at 956 (quoting *Hunter*, 393 U.S. at 391); *cf. Growe v. Emison*, 507 U.S. 25, 41 (1989) (noting that, under the Voting Rights Act, "a court may not presume bloc voting within even a single minority group," and so "it ma[kes] no sense for . . . [a court to] indulge that presumption as to bloc voting within an agglomeration of distinct minority groups").

Finally, as the Supreme Court has long recognized, minority groups may face political disadvantages independent of their numerical strength. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973) (noting that minority groups may be "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *cf. Frontiero v. Richardson*, 411 U.S. 677, 686 n.17 (1973) (observing that women are underrepresented politically even though "[i]t is true, of course, that when viewed in the abstract, women do not constitute a small and powerless minority"). Therefore, it is a considerable oversimplification—and simply inaccurate—to conflate a simple numerical majority comprised of members of different minority groups with a political majority for which "a referendum might be bothersome but no more than that." *Hunter*, 393 U.S. at 391.

### c. Does the *Hunter/Seattle* Test Contain an Intent Requirement?

Drawing on the language from *Seattle* that Initiative 350 "was effectively drawn for racial purposes," and "enacted because of, not merely in spite of, its adverse effects upon busing for integration," 458 U.S. at 471 (internal quotation marks omitted), the Attorney General also argues that a reallocation of political decisionmaking violates the

Equal Protection Clause only if the Plaintiffs can demonstrate it was motivated by purposeful racial discrimination.

However, "the idea that a political restructuring claim must be based on [a finding of] purposeful discrimination finds no support in the [Supreme Court's] cases." *Coal. IV*, 539 F. Supp. 2d at 956. Indeed, in *Seattle*, the Court expressly rejected this argument. Acknowledging that "'purposeful discrimination is the condition that offends the Constitution,'" 458 U.S. at 484 (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 274 (1979)), the Court nonetheless emphasized that "[w]e have not insisted on a particularized inquiry into motivation in all equal protection cases." *Id.* at 485. Rather, "'[a] racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.'" *Id.* (quoting *Feeney*, 442 U.S. at 272). Legislation like that in *Hunter*, *Seattle*, and here, which restructures the political process along racial lines and places special burdens on racial minorities, thus "falls into an inherently suspect category," regardless of whether purposeful racial discrimination is its demonstrated motivation. *Id.*

### iv. "Political Process" Conclusion

Proposal 2 thus modifies Michigan's political process "to place special burdens on the ability of minority groups to achieve beneficial legislation." *See Seattle*, 458 U.S. at 467.

### v. Strict Scrutiny

Because Proposal 2 fails the *Hunter/Seattle* test, it must survive strict scrutiny to stand. *See Seattle*, 458 U.S. at 485. Under strict scrutiny, the Attorney General must prove that Proposal 2 is "necessary to further a compelling state interest." *Crawford*, 458 U.S. at 536. In *Seattle*, the Court did not consider whether a compelling state interest might justify a state's enactment of a racially-focused law that restructures the political process, because the government did not make the argument. *Seattle*, 458 U.S.

at 485 n.28.  Because the Attorney General likewise does not assert that Proposal 2 satisfies a compelling state interest, we need not consider this argument either.[11]

We therefore hold that those portions of Proposal 2 that affect Michigan's public institutions of higher education violate the Equal Protection Clause.[12]

### 2. "Traditional" Equal Protection Analysis

Having found that Proposal 2 deprives the Plaintiffs of equal protection of the law under a "political process" theory, we do not reach the question of whether it also violates the Equal Protection Clause when assessed under the traditional framework.

### B. Ancillary Matters

We now turn briefly to the ancillary questions of whether the district court properly dismissed Russell and refused to dismiss the University Defendants.

### 1. The University Defendants' Non-Dismissal

The University Defendants appeal the district court's denial of their motion to be dismissed as misjoined parties under Rule 21 of the Federal Rules of Civil Procedure. We review the district court's decision for abuse of discretion and must affirm unless we are "left with a definite and firm conviction that the trial court committed a clear error of judgment."  *Letherer v. Alger Group*, 328 F.3d 262, 266 (6th Cir. 2003) (internal quotation marks omitted), *overruled on other grounds by Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224 (2007).

---

[11]Further, the two "compelling interests" advanced by amicus Russell are not actually compelling interests, as their rationale presumes that Proposal 2 does not suffer from any constitutional infirmity. Moreover, Russell does not show that Proposal 2 is *necessary* to further these "compelling" state interests.

[12]The dissent also makes much ado of the *Seattle* majority's response to Justice Powell's dissenting argument that the majority's decision would require finding unconstitutional a situation in which a higher authority within a university attempted to alter an admissions committee's decision to develop an affirmative-action plan.  *See Seattle*, 458 U.S. at 480 n.23 (responding to *id.* at 498 n.14 (Powell, J., dissenting)).  However, the hypothetical situation Justice Powell described is entirely distinguishable from that at issue here, in which decisonmaking authority has been removed to the highest level of state government, not to a higher level of authority within the university.  The fact that *some* reorderings of political processes may be *de minimis* does not mean that *all* are.  Accordingly, Justice Powell's argument and the *Seattle* majority's Delphic response—made in dicta in a footnote with no supporting explanation—are inapposite.

The district court concluded that the University Defendants were properly joined parties under Federal Rule of Civil Procedure 20(a) because "[i]f this Court were to find Proposal 2 unconstitutional, affirmative action would not automatically be reinstated into the admissions process. Rather, the universities would have to choose to do so on their own." *Coal. IV*, 539 F. Supp. 2d at 941. The court therefore found that dismissal under Rule 21 was inappropriate. The University Defendants contend, however, that they lack the authority to provide Plaintiffs with the requested relief, an injunction against Proposal 2's enforcement, and therefore should be dismissed. In support of their argument, the University Defendants point us to an unpublished district court opinion. *See Brooks v. Glenn Cnty.*, No. CV288-146, 1989 U.S. Dist. LEXIS 4776 (S.D. Ga. Apr. 25, 1989). We are not persuaded.

Rule 21 states in relevant part: "On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. "The Federal Rules of Civil Procedure do not define misjoinder, but the cases make clear that misjoinder of parties occurs when [parties] fail to satisfy the conditions for permissive joinder under Fed. R. Civ. P. 20(a)." *Glendora v. Malone*, 917 F. Supp. 224, 227 (S.D.N.Y. 1996). Rule 20(a) requires that a right to relief be asserted against joined defendants. Therefore, "[a] misjoinder of parties . . . frequently is declared because no relief is demanded from one or more of the parties joined as defendants." *Letherer*, 328 F.3d at 267 (quoting 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1683, at 475-76 (3d ed. 2001)).

The discretionary language of Rule 21, coupled with our deferential standard of review, presents a high hurdle for reversal of the district court's determination. Here, because Proposal 2 is unconstitutional and university action is necessary to re-implement affirmative-action policies, we **AFFIRM** the district court's denial of the University Defendants' motion.

### 2. *Russell's Dismissal*

Intervening defendant Russell, a law student at Wayne State University at the time of oral argument, challenges the district court's decision to dismiss him from the case because he no longer satisfied the requirements for intervention. We review de novo a district court's grant of summary judgment. *Chen*, 580 F.3d at 400. "Summary judgment should be granted when the moving party can 'show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). We also review de novo district court decisions on motions to intervene as of right, except for the element of timeliness, which is reviewed for abuse of discretion. *Northland Family Planning Clinic v. Cox*, 487 F.3d 323, 344 (6th Cir. 2007).

Under Federal Rule of Civil Procedure 24(a), an interested party must meet several requirements before being permitted to intervene as of right: (1) his motion to intervene must be timely; (2) he must have a substantial legal interest in the subject matter of the case; (3) he must demonstrate that his ability to protect that interest will be impaired in the absence of intervention; and (4) he must demonstrate that the parties already before the court do not adequately represent his interest. *See Coal. III*, 501 F.3d at 779. An intervenor also must continue to meet these requirements throughout the duration of the litigation, as courts must be able to ensure that parties maintain a live interest in a case. *Accord Morgan v. McDonough*, 726 F.2d 11, 14-15 (1st Cir. 1984) (affirming the dismissal of an intervening party whose legal interest had lapsed because "even if [the party's original] intervention . . . were of right, . . . it would have gained no absolute entitlement to continue as a party until the termination of the suit"); *Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, 758 A.2d 916, 927 n.15 (Conn. App. Ct. 2000) ("A court also has the authority to dismiss intervenors once their interest in the matter has expired. Federal cases illustrate that intervention as of right does *not* grant absolute entitlement to continue as a party until termination of the suit."); *see also* Fed. R. Civ. P. 24 advisory committee's note ("An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the

requirements of efficient conduct of the proceedings."); *cf. Friends of Tims Ford v. Tenn. Valley Auth.*, 585 F.3d 955, 963 n.1 (6th Cir. 2009) (declining to consider the defendant-intervenors' arguments regarding plaintiff's standing because the intervenors' ability to protect their interests was impaired only at later stages of litigation).

Here, there is no genuine issue of material fact as to whether the Attorney General adequately represents Russell's interests. While Russell's burden in showing that "representation of his interest 'may be' inadequate" is "minimal," *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972), he still must overcome "the presumption of adequate representation" that arises if he shares "the same ultimate objective as a party to the suit," *United States v. Michigan*, 424 F.3d 438, 443-44 (6th Cir. 2005). Although the Attorney General's and Russell's interests initially diverged—the Attorney General agreed to a stipulation to delay the application of Proposal 2, whereas Russell had an interest in Proposal 2's immediate enforcement—their interests are now aligned. Both now share the same ultimate objective: the validation of Proposal 2. The Attorney General has mounted a firm defense of Proposal 2 and succeeded in convincing the district court to grant summary judgment in his favor. *See Coal. IV*, 539 F. Supp. 2d at 924. As the district court noted, the Attorney General's and Russell's summary judgment motions "duplicate each other." *Coal. V*, 539 F. Supp. 2d at 971. Thus, we agree with the district court's conclusion that "Russell's presence in the litigation is a mere makeweight that adds nothing of substance to the debate over Proposal 2's constitutionality." *Id.* Russell's intervention in this litigation is therefore no longer proper.

Accordingly, we **AFFIRM** the district court's grant of the Cantrell Plaintiffs' motion for summary judgment regarding Russell. While Russell is hereby dismissed as a party to this case, we nonetheless have considered his filings as we would those of amicus curiae.

## III. CONCLUSION

For the reasons above, we **AFFIRM** the district court's decision granting the Cantrell Plaintiffs' motion for summary judgment as to Eric Russell, **AFFIRM** the district court's decision denying the University Defendants' motion to be dismissed as parties, and, because those provisions of Proposal 2 affecting Michigan's public colleges and universities are unconstitutional as a matter of law, **REVERSE** the district court's decision granting the Defendants-Appellees' motion for summary judgment and order the court to enter summary judgment in favor of the Plaintiffs-Appellants.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and dissenting in part. I join the majority's opinion with respect to the procedural issues discussed in part II.B. I disagree, however, with the majority's conclusion that Proposal 2 is unconstitutional under a political restructuring theory of the Equal Protection Clause. In my view, Proposal 2 does not impermissibly restructure the political process in the state of Michigan to burden the ability of minorities to enact beneficial legislation. Moreover, Proposal 2 is not unconstitutional under traditional equal protection analysis. I therefore respectfully dissent.

### I.

In November 2006, the people of Michigan amended the Michigan Constitution to prohibit the state, including its public colleges and universities, from discriminating against or granting preferential treatment to any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, and public contracting. Mich. Const. art. I, § 26. A primary purpose and effect of this amendment was to remove the ability of state colleges and universities to employ then-existing race- and gender-preference admissions policies. Accordingly, the plaintiffs challenge the amendment as it relates to the state's colleges and universities.

Because "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause," *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003), it is important to consider the legal backdrop from which the effort to amend the Michigan Constitution unfolded. *See Hunter v. Erickson*, 393 U.S. 385, 391–92 (1969) (assessing the challenged referendum provision against the relevant legislative and legal background). The race-based admissions polices used by state universities in Michigan are familiar to the courts and the people of Michigan. *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 240 (6th Cir. 2006). The policies employed by the

University of Michigan formed the basis of the significant and highly publicized Equal Protection challenges in *Grutter* and *Gratz v. Bollinger*, 539 U.S. 244 (2003). And, as noted by the majority, the effort by Ward Connerly and Jennifer Gratz to mobilize for a statewide ballot initiative occurred in direct response to the result in *Grutter*. *Granholm*, 473 F.3d at 240.

In *Grutter*, the Supreme Court concluded that diversity is a compelling state interest that can justify the narrowly tailored use of race in selecting applicants for admission to public universities. 539 U.S. at 325, 328. Analyzing the highly individualized, holistic approach taken by the University of Michigan Law School, which considered "all pertinent elements of diversity," *id.* at 341 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 317 (1978) (opinion of Powell, J.)), the Court found that the university had narrowly tailored its approach to the purpose of diversity in higher education. *Id.* at 333–41. In *Grutter*'s companion case the Court, however, reaffirmed that the use of racial classifications are a "highly suspect tool," *id.* at 326 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion)), subject to strict scrutiny because "'[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.'" *Gratz*, 539 U.S. at 270 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 537 (1980) (Stevens, J., dissenting)). The Court reiterated that "remedial race-based governmental action generally 'remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit.'" *Grutter*, 539 U.S. at 341 (quoting *Bakke*, 438 U.S. at 308 (opinion of Powell, J.)). Finally, the Court was mindful that because "'[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race' . . . race-conscious admissions policies must be limited in time." *Id.* at 341–42 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984)).

The Court also indicated that the ability to fashion a time limit on the use of race-conscious admissions policies is not a tool placed primarily in the hands of the courts. Rather, it is first and foremost in the hands of states and their public universities. *See*

*Grutter*, 539 U.S. at 342 ("[T]he durational requirement can be met by sunset provisions in race-conscious academic polices and periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity."); *see also id.* (describing state-law prohibitions on the use of racial preferences in admissions in California, Florida, and Washington). Indeed, the Court has repeatedly confirmed that the repeal or modification of race-related polices does not necessarily run afoul of the Equal Protection Clause. *See Hunter*, 393 U.S. at 390 n.5; *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 483 (1982) ("[T]he simple repeal or modification of desegregation or antidiscrimination laws, without more, has never been viewed as embodying a presumptively invalid racial classification." (quoting *Crawford v. Bd. of Educ.*, 458 U.S. 527, 539 (1982))). A state or university may conclude, for example, that the use of racial preferences may no longer be necessary to further the interest in diversity, that the burdens associated with those preferences are too heavy, or that the means employed no longer enjoy legitimacy in the eyes of the people. And, as was the case with the California prohibition mentioned by the Court, it follows that a state or its electorate may act to impose a time limit, or end the use of racial preferences outright, when its public universities have not. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997).

It is from this legal backdrop that the popular effort to amend the Michigan Constitution to prevent the use of affirmative action in admissions developed. Taking it into account, we must turn to whether Michigan's repeal of this type of racial classification by constitutional amendment violates the Equal Protection Clause.

## II.

As an initial matter, a broad view of plaintiff's contentions provides context and a bit of common sense about the requirements of the Constitution. Plaintiffs' argument is that the Equal Protection Clause prohibits Michigan from prohibiting discrimination in admissions to public colleges and universities through the passage of Proposal 2. Calling an admissions practice a preference does not transform the practice into a

nondiscriminatory one; preferences do indeed permit discrimination. Yet, we know that the Equal Protection Clause prevents "official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229 (1976).

*Grutter* and *Gratz* represent the Supreme Court's response to a university's use of racial preferences in admissions and together develop the circumstances under which policies that take race into account may be used. The burden on the university is a difficult one; it may use race as a factor only when there is a compelling interest in doing so and when the use is narrowly tailored. Racial preferences are not favored under the law but must be exactingly justified. No constitutional jurisprudence exists that requires their use. And, as the Supreme Court has told us, "the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place." *Crawford*, 458 U.S. at 538–39.

Within this broad constitutional landscape, plaintiffs contend that passage of Proposal 2 violated the Equal Protection Clause. They base their argument on *Hunter* and *Seattle*. These cases, without a doubt, secure racial minorities the right to equal process within the political arena. *Seattle*, 458 U.S. at 467; *Hunter*, 393 U.S. at 391. They prohibit a "distortion of the political process," *Crawford*, 458 U.S. at 538 n.14, by which a state "disadvantage[s] [a] particular group by making it more difficult to enact legislation in its behalf," *Seattle*, 458 U.S. at 476 (quotation marks and citation omitted), by "mak[ing] use of a more complex governmental structure," *id.* at 477, or "lodging decisionmaking authority over the question at a new and remote level of government," *id.* at 483. But they do not guarantee that racial minorities will win every political battle. *Id.* at 484 ("If a governmental institution is to be fair, one group cannot always be expected to win . . . ." (quoting *Hunter*, 393 U.S. at 394 (Harlan, J., concurring))). Nor do they hold that the repeal of those policies is impermissible, although they may be preferred by significant numbers of racial minorities. Rather, *Hunter*, *Seattle*, and *Crawford* outline the constitutional limits on a particular type of political restructuring: the enactment of comparative structural burdens on "the ability of minority groups to achieve beneficial legislation." *Seattle*, 458 U.S. at 467. Because these cases do not

prohibit "every attempt to address a racial issue, " *id.* at 485, it is important to consider the limiting bounds of this type of political restructuring challenge.

## A.

In reviewing a *Hunter* political process challenge, we must, of course, consider whether the particular legislation or popular referendum at issue serves to impermissibly "distort" the state's political processes. *Crawford*, 458 U.S. at 541. *Seattle* makes clear that "the voters of the polity may express their displeasure through an established legislative or referendum procedure when particular legislation arouses passionate opposition." 458 U.S. at 483 (internal quotation marks and citation omitted). The state or its voters, however, may not "make[] the enactment of racially beneficial legislation difficult" by "lodging decisionmaking authority over the question at a new and remote level of government." *Id.* And they may "no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than [they] may dilute any person's vote." *Id.* at 476 (quoting *Hunter*, 393 U.S. at 392–93). *Seattle* and *Hunter* therefore protect "the ability of minorities to participate in the process of self-government." *Id.* at 480 n.23.

In *Hunter*, the impermissible political restructuring took the form of a more burdensome extra step in the City of Akron's legislative process. The people of Akron had amended their city charter by popular referendum to require that any city ordinance regulating real property "on the basis of race, color, religion, national origin, or ancestry" be subject to approval by a mandatory popular referendum, while all other ordinances regulating real estate only required the approval of the City Council. *Hunter*, 393 U.S. at 387, 390. The *Hunter* Court concluded that this amounted to an unconstitutional political restructuring because the charter amendment "obviously made it substantially more difficult to secure enactment of ordinances" barring discrimination in real estate. *Id.* at 390. Indeed, those minority voters supporting property-related anti-discrimination ordinances would not only have to win a legislative battle in the Akron City Council, but they would then have to win a public-referendum battle as well. *Id.* The default political

structure entrenched in the mechanisms of a city council, which may allow for particularized and localized electoral pressure on individual council members, was therefore supplemented with the far more diffuse, and potentially onerous, political structure inherent in winning popular approval of a law with a discrete set of immediate beneficiaries.

In *Seattle*, the voters of the state effectuated a more implicit restructuring of the legislative process. In the 1970s, the locally elected Seattle school board passed and implemented a series of school desegregation programs aimed at alleviating the isolation of minority students caused by segregated housing patterns. *Seattle*, 458 U.S. at 459–60. In 1977, local opponents of these measures, having previously failed in their attempt to recall School Board members who had voted for desegregation programs, *id.* at 460 n.1, organized to end Seattle's use of the programs at the statewide level, *id.* at 461–62. Their statewide initiative provided that local school boards could not employ mandatory desegregative busing except possibly when required as part of a judicial decree. *Id.* at 462–63. In enacting this initiative, the people of Washington thus moved the locus of political authority over this particular issue from the local to the statewide level, "requir[ing] those championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action." *Id.* at 474.

In both cases where the Court found an impermissible political restructuring, the relevant lawmaking authority was reallocated from a local legislative body to the "more complex government structure," *id.* at 477, of the city- or state-wide general electorate,[1] thereby placing a "comparative structural burden . . . on the political achievement of minority interests," *id.* at 475 n.17. A key consideration in analyzing a *Hunter* political structure challenge, therefore, is whether the challenged law impacts the ability of minorities to secure "legislation that is their interest" as minorities. *Id.* at 474; *see also id.* at 475 n.17 ("Thus, in *Hunter*, the procedures for enacting racial legislation were modified in a such a way as to place effective control in the hands of the citywide

---

[1] In *Seattle*, Initiative 350 could also have been repealed by the state legislature after a period of two years. *See* 458 U.S. at 463 n.4.

electorate.  Similarly here [in *Seattle*], the power to enact racial legislation has been reallocated.").  Given the structural considerations inherent in this type of Equal Protection challenge, it is important to fully examine the particular political structures at work in this case to determine whether the people of Michigan have restructured the state's lawmaking process in the manner prohibited by *Hunter* and *Seattle*.

### i.

"The Michigan Constitution confers a unique constitutional status on [its] public universities and their governing boards."  *Federated Publ'ns, Inc. v. Bd. of Trustees of Mich. State Univ.*, 594 N.W.2d 491, 495–96 (Mich. 1999) (citing Mich. Const. art. VIII, §§ 5 and 6).  The status of these boards has been described by the Michigan Supreme Court as "the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature."  *Id.* at 496 n.8 (quoting *Bd. of Regents of the Univ. of Mich. v. Auditor Gen.*, 132 N.W. 1037, 1039 (Mich. 1911)).  Each governing board is vested with the power of "general supervision of its institutions and the control and direction of all expenditures from the institution's funds."[2]  Mich. Const. art. VIII, § 5.  With this power comes significant independence, as the state constitution "limit[s] the Legislature's power" over the universities such that it "may not interfere with the management and control of" the universities.  *Federated Publ'ns*, 594 N.W.2d at 497 (quotation marks and citation omitted).  Therefore, the "constitutional autonomy of these institutions is plenary as to its educational programs, but does not insulate them from the health and safety laws of the state."  1979-1980 Mich. Op. Att'y Gen. 578, 1980 WL 114008 (1980); *see also Federated Publ'ns*, 594 N.W.2d at 497.

---

[2]The Michigan Constitution divides its state public universities into two categories.  The first category, detailed in Mich. Const. art. VIII, § 5, consists of the University of Michigan, Michigan State University, and Wayne State University.  The second category includes "other institutions of higher education established by law having authority to grant baccalaureate degrees." Mich. Const. art. VIII, § 6.  This category includes, for example, Eastern Michigan University, Central Michigan University, and Grand Valley State University.  *See* Mich. Const. art. VIII, § 4 (listing universities for which the state legislature shall appropriate moneys).  Because the Plaintiffs focus on the universities described in section five, and because it is unclear from the record whether the universities described in section six employ race-conscious admissions policies, the following discussion will primarily pertain to the University of Michigan, Michigan State University, and Wayne State University.

The constitution provides for eight-member governing boards, elected to statewide office for eight-year terms.[3]  Mich. Const. art. VIII, § 5.  Elections are typically staggered, with, for example, an election every two years for regents of the University of Michigan.  *See* About the Board of Regents, http://www.regents.umich.edu/about/ (last visited May 4, 2011); MSU Board of Trustees, http://www.trustees.msu.edu/about/establishment.html (last visited May 4, 2011); About the Board of Governors, http://bog.wayne.edu/about.php (last visited May 4, 2011).

As a preliminary matter, the majority suggests that our examination of the pertinent political structures must end with the Michigan Constitution.  The majority opinion concludes that we may not rely on the testimony of university officials because the structure of the colleges and universities is a "question of law, for it is set by constitution, statutes and regulations."  (Maj. Op. at 22.)  Here, the nature of the decision-making process for admissions is one of both law and fact, and the witnesses gave instructive testimony that was within their personal knowledge.[4]  Examination of the record is appropriate to ascertain how the decisions at issue are in fact made.

Although these universities and their respective boards are created by the Michigan Constitution, the admissions policies are placed within the control of the boards or school authorities only within each board's bylaws.  *See* University of Michigan Board of Regents, Bylaws Chapter VIII: Admission and Registration of Students, http://www.regents.umich.edu/bylaws/bylaws08.html (last visited May 4, 2011) (vesting responsibility for the admission of students in the associate vice provost and executive director of undergraduate admissions at the Ann Arbor campus, in the director of admissions and orientation at the Dearborn campus, and in the director of

---

[3] By contrast, the governing boards of the other state universities are appointed by the governor by and with the advice and consent of the state senate.  Mich. Const. art. VIII, § 6.

[4] Oddly, the majority characterizes this testimony as opinion testimony inadmissible under Federal Rule of Evidence 701.  To the extent the witnesses offered opinions, which were hardly the thrust of their testimony, their lay opinions were perfectly admissible.  Any opinions were rationally based on the witnesses' perceptions, helpful to an understanding of the testimony or a fact in issue, and not based on the specialized knowledge of experts.

undergraduate admissions at the Flint campus); Michigan State University Board of Trustees, Bylaws, http://www.trustees.msu.edu/bylaws/#article8 (last visited May 4, 2011) ("The [MSU] Board encourages and supports the faculty in the development of educational and other programs . . . . Upon the recommendation of the President the Board may determine and establish the qualifications of students for admission at any level . . . ."); Wayne State University Board of Governors, Statutes, http://bog.wayne.edu/code/2_34_09.php (last visited May 4, 2011) ("After consultation with the College or School, the [Board-elected] President or his/her designee is authorized to establish specific admissions standards for degree programs."). Thus, the admissions policies are not set forth by the state constitution, and it is necessary to look to testimony to determine where the power to set admissions policy lies.

The governing boards have fully delegated the responsibility for establishing admissions standards to several program-specific administrative units within each institution, which set admissions criteria through informal processes that can include a faculty vote. (DE 172, Pls.' Russ. Mot., Ex. I (Univ. Defs.' Resp.) Nos. 4, 7; DE 203, Pls.' SJ Mot., Ex. E. (Zearfoss Dep.) at 64, 213–14, Ex. F. (Wu Dep.) at 190–91.) For example, as noted by the majority, the University of Michigan Law School admissions policy is set exclusively by the law school faculty admissions committee, with major substantive changes occasionally voted upon by the entire law school faculty. (Maj. Op. at 25 (referring to the admissions committees as "the individuals delegated with principle responsibility for admissions policy"); Zearfoss Dep. at 213.) Similarly, as described by its former dean, at the Wayne State University Law School the ultimate decision whether to change admissions standards rests with the faculty alone. (Wu Dep. at 190–91.) Thus, as the Cantrell Plaintiffs readily admit, the "faculty are the primary architects of all the admissions criteria and protocols." (Reply Br. at 20 n.11.)

At neither university, however, is there a system in place to review or alter admissions policies at a level above a vote of the faculty. Sarah Zearfoss, the dean of admissions at the University of Michigan Law School, testified that no one could change the school's admissions policy other than the faculty admissions committee or the faculty

itself, because "there's no higher body" to which someone unhappy with an admissions policy could advocate change. (Zearfoss Dep. at 214.) And Frank Wu, then the dean at Wayne State University Law School, agreed that "only the faculty at the law school has the authority to create and approve the admissions policy" at the school. (Wu Dep. at 191.) Indeed, Wu testified that the admissions policy is not subject to the approval of the Wayne State University Board of Governors, and, in his view, if the Board of Governors attempted to alter the decision of the law school's faculty with respect to criteria for admission, "it would precipitate a constitutional crisis." (Wu Dep. at 192.) Each institution's board may superficially have "plenary authority" over its respective institution (*see* Maj. Op. at 21), but the ultimate authority to set admissions policy rests exclusively with each program-specific faculty within the universities.

### ii.

The majority characterizes the dissent as reading *Hunter* and *Seattle* too narrowly by defining the political processes with which they deal as "electoral" processes. While the political processes in *Hunter* and *Seattle are* electoral in the sense that they relate to what electoral methods are employed to make policy, the majority opinion, not the dissent, draws the line between political and electoral. The point is simply that the situation here differs greatly from that of *Hunter* and *Seattle* in the ways described in this opinion; these program-specific faculty admissions committees are far afield from the legislative bodies from which lawmaking authority was removed in *Hunter* and *Seattle*. The most crucial and overarching difference, of course, is that the faculty admissions committees and individual faculty members are not politically accountable to the people of Michigan.

In *Seattle*, the court emphasized that the type of action it found objectionable was the creation of comparative burdens "on minority participation in the political process." 458 U.S. at 480 n.23; *see id.* at 486 ("[M]inorities are no less powerless with the vote than without it when a racial criterion is used to assign governmental power in such a way as to exclude particular racial groups 'from effective participation in the political

proces[s].'" (quoting *Mobile v. Bolden*, 446 U.S. 55, 94 (1980) (White, J., dissenting))).
The *Seattle* majority, however, did not view state university admissions committees as
a part of the "political process" in the manner of an elected school board or city council.
A dialogue between the majority and dissent in *Seattle* is particularly instructive on this
point.   In dissent, Justice Powell, critiquing the potential breadth of the majority's
holding, argued:

> Thus, if the admissions committee of a state law school developed an
> affirmative-action plan that came under fire, the Court apparently would
> find it unconstitutional for any higher authority to intervene unless that
> authority traditionally dictated admissions policies.  As a constitutional
> matter, the dean of the law school, the faculty of the university as a
> whole, the university president, the chancellor of the university, and the
> board of regents might be powerless to intervene despite their greater
> authority under state law.

*Id.* at 498 n.14 (Powell, J., dissenting).  The majority, however, flatly dismissed this
concern as a misunderstanding of the court's decision: "It is evident, then, that the
horribles paraded by the dissent, *post*, at [footnote 14 of the dissent]—*which have
nothing to do with the ability of minorities to participate in the process of self-
government*—are entirely unrelated to this case."  *Id.* at 480 n.23 (emphasis added).

For the *Seattle* majority, then, an impermissible reordering of the political
process meant a reordering of the processes through which the people exercise their right
to govern themselves.  *See id.* at 486 ("And when the State's allocation of power places
unusual burdens on the ability of racial groups to *enact legislation* specifically designed
to overcome the 'special condition' of prejudice, the governmental action seriously
'curtail[s] the operation of those political processes ordinarily to be relied upon to protect
minorities' . . .  from the 'majoritarian political process.'" (emphasis added) (citing
*United States v. Carolene Prods. Co.* 304 U.S. 144, 153 n.4 (1938) and *San Antonio
Indep. Sch. Dist. v. Rodriquez*, 411 U.S. 1, 28 (1973))); *id.* at 467 ("But the Fourteenth
Amendment also reaches a "political structure that treats all individuals as equals . . . yet
more subtly distorts governmental processes in such a way as to place special burdens

on the ability of minority groups to *achieve beneficial legislation*." (emphasis added) (quoting *Bolden*, 446 U.S. at 84)).

The evidence reveals that the academic processes at work in state university admissions in Michigan are not "political processes" in the manner contemplated in *Seattle*. Unlike the Seattle School Board and the Akron City Council, the various university admissions committees in Michigan and their faculty members are unelected. As at most public universities, tenured faculty members have significant vested rights associated with their employment in order to preserve academic freedom and independence. The faculty members who are permitted to vote on policy matters are therefore significantly insulated from political pressure by virtue of their tenure. Such faculty are beholden to no constituency—student, local, or otherwise. And, as demonstrated by the testimony of the law school deans in this case, the people of Michigan have no ability to exert electoral pressure on the university decision makers to change their admissions polices. As they currently stand, the faculty admissions committees are islands unto themselves, vested with the full and unreviewed authority to set admissions policy for their respective university programs.

The majority opinion discounts the differences between facts here and those of *Hunter* and *Seattle* by arguing that processes are considered "political" as long as there is "governmental decisionmaking." In this argument it relies on *Nyquist v. Lee*, 318 F. Supp. 710 (W.D.N.Y. 1970), *aff'd Nyquist v. Lee*, 402 U.S. 935 (1971), a case from the Western District of New York that was summarily affirmed by the Supreme Court and cited in *Seattle*. In *Nyquist*, the court found that a New York statute that "prohibit[ed] state education officials and appointed school boards from assigning students, or establishing, reorganizing or maintaining school districts, school zones or attendance units for the purpose of achieving racial equality in attendance" unconstitutionally reordered the political process in violation of the Equal Protection Clause. *Nyquist*, 318 F. Supp. at 712, 720. The majority suggests that because *appointed* school boards were part of the political process at issue in *Nyquist*, the university faculty admissions committees are similarly part of the political process. (Maj. Op. at 20.) The decision in

*Nyquist*, however, made note of how the local boards were accountable to the community: "Parties considering themselves aggrieved by local board actions may seek to have the Commissioner enforce those policies.  [The New York statute], however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial imbalance."  *Id.* at 719 (internal citations omitted).  Thus, even the *appointed* school boards were accountable to the community in a way in which the faculty admissions committees certainly are not.  Again, the point is not selecting a label for the processes, but examining the factual similarities or dissimilarities of the situations.

There is no "local" university constituency as there is a local constituency for a city council or city school board, i.e., the city's voters.  Rather, despite there being a broad student, faculty, and staff *community* associated with each university, Michigan's state universities were established as state-wide institutions with a state-wide *constituency*.[5]  The faculty admissions committees therefore do not "represent" any local constituency at all.  This is particularly important because the *Seattle* majority looked closely at the fact that Washington's lodging of political decisionmaking authority over the busing question at the statewide level directly burdened minority interests by "making the enactment of racially beneficial legislation difficult, [because] the particular program might not have inspired opposition had it been promulgated through the usual [local] legislative processes used for comparable legislation."  458 U.S. at 483–84.  The court continued:

> That phenomenon is graphically demonstrated by the circumstances of this litigation.  The longstanding desegregation programs in Pasco and Tacoma, as well as the Seattle middle school integration plan, have functioned for years without creating undue controversy.  Yet they have been swept away, along with the Seattle Plan, by Initiative 350.  As a practical matter, it seems most unlikely that proponents of desegregative busing in small communities such as Tacoma or Pasco will be able to

---

[5]Indeed, some students, prospective students, alumni, and faculty members at each university are not members of that state-wide constituency, comprised of citizens and voters of the state of Michigan.

> obtain the statewide support now needed to permit them to desegregate
> the schools in their communities.

*Id.* at 484 n.27. The availability of "local" decisionmaking is therefore important when the political power of groups who could succeed at the local level is "diluted" in the statewide decisionmaking process. The universities here, however, are statewide institutions with a statewide constituency. There is nothing local about them.

The committees are also hardly the model of accessibility and locus of effective lobbying assumed by the majority. While members of the public may attend faculty meetings at which admissions standards are reviewed, there is no mechanism by which a member of the public—student or not—can move the committees to amend the admissions standards. (Wu Dep. at 190; Zearfoss Dep. at 209.) And, while interested students and members of the public are, with advance notice, permitted to speak at faculty meetings to comment on the admissions policies, the committees are not required to consider these comments seriously, issue written findings addressing these concerns, or do more than provide a forum for interested individuals to speak. (Zearfoss Dep. at 209–10; Wu Dep. at 190.) Rather, it appears that the main source of divergent views on admissions policies is the faculty members themselves. (Zearfoss Dep. at 210.)

While the majority appears to see no reason to distinguish between these unelected and unresponsive program-specific faculty admissions committees and the legislative bodies from which lawmaking authority was removed in *Hunter* and *Seattle*, a consideration of political accountability in the political process is squarely grounded in the *Seattle* opinion. In *Seattle*, the Court undertook a close examination of Washington's system of "establish[ing] the local school board, rather than the State, as the entity charged with making decisions of the type at issue," 458 U.S. at 477:

> But Washington has chosen to meet its educational responsibilities
> primarily through "state and local officials, boards, and committees," and
> the responsibility to devise and tailor educational programs to suit local
> needs has emphatically been vested in the local school boards. . . . Thus
> "each common school district board of directors" is made *accountable
> for the proper operation of [its] district to the local community and its*

> *electorate*." To this end, each school board is "vested with the final responsibility for the setting of policies ensuring quality in the content and the extent of its educational program."

*Id.* at 478 (citations omitted) (emphasis added); *see also id.* (noting the "disclosure and reporting provisions specifically designed to *ensure the board's 'accountability' to the people of the community*" (emphasis added)). It was only upon its consideration of the state statutory structure's vesting of decisionmaking in local and politically accountable school boards that the Court could conclude that "placing power over desgregative busing at the state level . . . restructured the Washington political process." *Id.* at 480.

Taking this into account, it is difficult to conclude that, in amending their state constitution to prohibit the use of racial preferences in university admissions, the people of Michigan modified "the community's *political mechanisms* . . . to place effective decisionmaking authority over a racial issue at another level of *government*." *Id.* at 474 (emphasis added). Michigan has not "'burden[d] all future attempts' to implement race-conscious admissions policies" "'by lodging decisionmaking authority over the question at a new and remote level of government.'" (Maj. Op. at 28 (quoting *Seattle*, 458 U.S. at 483).) Having *no* direct or indirect influence on the bodies vested with authority to set admissions standards—the faculty committees—the people of Michigan made a political change at the *only* level of government actually available to them as voters. The Michigan electorate, therefore, as opposed to choosing a more complex structure for lawmaking, employed *the one* method available to exert electoral pressure on the mechanisms of government.

The lack of a viable electoral mechanism to change university admissions policies at a sub-constitutional level also means that the voters' use of a constitutional amendment in this instance also does not serve to create "comparative structural burden[s] on the political achievement of minority interests." *Seattle*, 458 U.S. at 474 n.17. If, as is the evidence before this court, the voters cannot exert electoral pressure on the fully independent faculty committees, then all voters regardless of racial identity compete on the same level for the political achievement of their higher-education

interests: the constitutional level. That some academic decisionmaking remains at the faculty-committee level after the implementation of Proposal 2 is of no moment, because that decisionmaking is affirmatively not part of the state's electoral political process. The same policies that fully insulate faculty members from political opprobrium in their academic pursuits also protect them from political influence on their admissions policymaking. Michigan has chosen to structure its university system such that politics plays no part in university admissions at all levels within its constitutionally created universities. The Michigan voters have therefore not restructured the political process in their state by amending their state constitution; they have merely employed it.[6]

## III.

If Proposal 2 does not effectuate an invalid restructuring of Michigan's political process, it is not necessary to reach broader questions relating to the substantive reach of the political restructuring doctrine. But again returning to the broader context, it is useful to highlight the tension between the doctrine and recent decisional law on the constitutionality of racial preferences.

Several courts have grappled with the question of whether racial preferences, those policies "potentially so dangerous" that they must be subject to strict scrutiny and "limited in time," *Grutter*, 539 U.S. at 342, may be eliminated when the people of a state amend their constitution to do away with all classifications based on race. The core

---

[6]Even if—contrary to the evidence before the court—the people of Michigan could exercise effective electoral control over the board of governors at each respective state institution such that they could repeal the use of racial preferences, it is not clear that a choice to make use of a constitutional amendment in that instance would amount to the creation of a comparative political burden on the achievement of minority interests. Indeed, it would make use of neither a more complex or onerous structure of government nor remove the locus of political power from the local to statewide level. *Seattle*, 458 U.S. at 477, 480. Given the eight-year terms and staggered elections for board members, and the fact that electoral change must happen at the governing board of each individual state university, the process of effectuating political change through the board of governors appears to be arguably a *more* complex process than the comparative burden of a statewide referendum. And both types of elections—the board member elections and the constitutional referendum—occur at the statewide level with an electorate composed of the at-large statewide voting pool. There are therefore no inherent structural benefits or protections for minority voters in one system over the other. As opposed to the multi-district Akron city council in *Hunter*, for example, there is no mechanism by which minority voters could exercise bloc or regional voting in the board of governors system in a way that they could not in the state's constitutional referendum process. The use of the constitutional amendment mechanism, therefore, would not work to create a comparative political burden of the kind found in *Hunter* and *Seattle*.

constitutional question in each of these decisions is clear: should a race-based classification that is presumptively invalid, but permissible under limited circumstances and for a finite period of time, receive the same structural protections against statewide popular repeal as other laws that inure to the interest of minorities?

The Ninth Circuit in *Wilson* answered in the negative, concluding that California's Proposition 209 did not violate equal protection because "[i]mpediments to preferential treatment do not deny equal protection." 122 F.3d at 708. The court relied on an essential constitutional principle: "While the Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms. . . . The Equal Protection Clause, parked at our most 'distant and remote' level of government, singles out racial preferences for severe political burdens—it prohibits them in all but the most compelling circumstances." *Id.* The California Supreme Court recently agreed with this conclusion, holding that "*Seattle* cannot fairly be read as holding that the political structure doctrine protects presumptively unconstitutional racial preferences, as opposed to programs intended to bring about immediate equal treatment." *Coral Constr., Inc. v. San Francisco*, 235 P.3d 947, 960 (Cal. 2010). This logic has been further cemented by the Northern District of California, reinforcing the holding in *Wilson* in light of *Grutter*. In *Coalition to Defend Affirmative Action, Integration and Immigrant Rights v. Schwarzenneger*, No. 10-641 SC, 2010 WL 5094278 (N.D. Cal. Dec. 8, 2010), the federal district court stated, "*Grutter* does not hold that the Constitution *requires* the use of race in student admission decision; rather, it holds that the Constitution *tolerates* the use of race as one of many admission factors." *Id.* at *6. The court went on to note, "*Grutter* held that racial preferences, while not presumptively unconstitutional, must be limited in time. In so holding, the Supreme Court cited the 'race neutral alternatives' to racial preferences used by '[universities], where racial preferences are prohibited by state law.'" *Id.* (citing *Grutter*, 539 U.S. at 342) (internal citations omitted).

These cases take the same approach as the district court in this case,[7] and their teaching is that equal treatment is the baseline rule embodied in the Equal Protection Clause, from which racial-preference programs are a departure. We therefore must review them with utmost care. Governing precedent is clear on this point: "'A core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race,'" *Grutter*, 539 U.S. at 341–42 (quoting *Palmore*, 466 U.S. at 432), and "all governmental use of race must have a logical end point," *id.* at 342. Because racial preference programs are exceptional, it is not altogether clear that the political structure doctrine would invalidate Proposal 2 even if it worked a restructuring of the political process in Michigan. *See Coral*, 235 P.3d at 966 (Corrigan, J., concurring) (noting that the United States Supreme Court has "approvingly referred to [California's Proposition 209] as a step in [the] direction" of ending the "governmental use of race" (citing *Grutter*, 538 U.S. at 342)). However, because Proposal 2 itself works no improper political restructuring under the circumstances before us, we need not address that issue today.

## IV.

It should also be noted that Proposal 2 is constitutional under a traditional equal protection analysis. Because the majority's holding turns on the political restructuring analysis, it declines to address this issue.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). We apply strict scrutiny to those laws that racially classify individuals, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 216 (1995), and intermediate scrutiny to those laws that classify individuals based on gender, *United States v. Virginia*, 518 U.S. 515, 531 (1996). Racial classifications are subject to strict scrutiny if (1) the law classifies on its face or (2) the law has a discriminatory

---

[7] "[A]ffirmative action programs not mandated by the obligation to cure past discrimination are fundamentally different than laws intended to protect against discrimination." *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.*, 539 F. Supp. 2d 924, 957 (E.D. Mich. 2008).

impact and a discriminatory purpose. *See Davis*, 426 U.S. at 241. The district court concluded that Proposal 2, which prohibits racial classifications, *a fortiori* does not classify facially on the basis of race. *Coal. to Defend Affirmative Action*, 539 F. Supp. 2d at 951. Although the district court did find "sufficient evidence to establish a fact question on the disparate impact part of the test," it did not find a discriminatory purpose. *Id.* Indeed, it stated that "the demonstration of a discriminatory purpose . . . dooms [the] conventional equal protection argument." *Id.* Furthermore, the district court found the equal protection argument based on gender "even less compelling" due to the less exacting level of scrutiny. *Id.* at 952. I agree with the conclusions of the district court.

Proposal 2 does not establish a facial racial classification because its text does not draw distinctions on the basis of race; in fact, it prohibits them. Additionally, Proposal 2 does not classify racially on an impact theory because it lacks a discriminatory purpose. "[A]bsent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate's motivations in an equal protection clause context." *Arthur v. Toledo*, 782 F.2d 565, 574 (6th Cir. 1986). Thus, no heightened level of scrutiny need be applied to Proposal 2, and under rational basis review, Proposal 2 is easily justifiable. Proposal 2 does not violate the Equal Protection Clause under the conventional analysis.

## V.

For the foregoing reasons, I would conclude that Proposal 2 does not violate the Equal Protection Clause of the United States Constitution under either a political restructuring theory or traditional theory of Equal Protection. Accordingly, I would affirm the judgment of the district court.

FILED

**Jul 01, 2011**

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Nos. 08-1387/1389/1534; 09-1111

---

Nos. 08-1387/1534

COALITION TO DEFEND AFFIRMATIVE ACTION, INTEGRATION AND IMMIGRANT RIGHTS AND FIGHT FOR EQUALITY BY ANY MEANS NECESSARY (BAMN), et al.,

*Plaintiffs-Appellants (08-1387)/Cross-Appellees,*

v.

REGENTS OF THE UNIVERSITY OF MICHIGAN, BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; BOARD OF GOVERNORS OF WAYNE STATE UNIVERSITY; MARY SUE COLEMAN; IRVIN D. REID; LOU ANNA K. SIMON,

*Defendants-Appellees/Cross-Appellants (08-1534),*

MICHAEL COX, Michigan Attorney General,

*Intervenor-Defendant-Appellee.*

---

No. 08-1389

COALITION TO DEFEND AFFIRMATION ACTION, INTEGRATION AND IMMIGRANT RIGHTS AND FIGHT FOR EQUALITY BY ANY MEANS NECESSARY (BAMN), et al.,

*Plaintiffs,*

CHASE CANTRELL, et al.,

*Plaintiffs-Appellees,*

v.

REGENTS OF THE UNIVERSITY OF MICHIGAN, BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; BOARD OF GOVERNORS OF WAYNE STATE UNIVERSITY; MARY SUE COLEMAN; IRVIN D. REID; LOU ANNA K. SIMON,

*Defendants,*

ERIC RUSSELL,

*Intervenor-Defendant-Appellant,*

JENNIFER GRATZ,

*Proposed Intervenor-Appellant.*

---

No. 09-1111

COALITION TO DEFEND AFFIRMATION ACTION, INTEGRATION AND IMMIGRANT RIGHTS AND FIGHT FOR EQUALITY BY ANY MEANS NECESSARY (BAMN), et al.,

*Plaintiffs,*

CHASE CANTRELL, et al.,

*Plaintiffs-Appellants,*

v.

REGENTS OF THE UNIVERSITY OF MICHIGAN, BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY; BOARD OF GOVERNORS OF WAYNE STATE UNIVERSITY; MARY SUE COLEMAN; IRVIN D. REID; LOU ANNA K. SIMON,

*Defendants,*

MICHAEL COX, Michigan Attorney General,

*Intervenor-Defendant-Appellee.*

---

Before:  DAUGHTREY, COLE, and GIBBONS, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.  IN CONSIDERATION WHEREOF, it is ORDERED that the decision of the district court is AFFIRMED IN PART.  IT IS FURTHER ORDERED that the district court's grant of summary judgment for the Defendants-Appellees is REVERSED and this court orders the district court to enter summary judgment in favor of the Plaintiffs-Appellants.

**ENTERED BY ORDER OF THE COURT**

---

Leonard Green, Clerk

# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Leonard Green
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 01, 2011

Ms. Sharon Louise Browne
Pacific Legal Foundation
3900 Lennane Drive
Suite 200
Sacramento, CA 95834-0000

Ms. Shanta Driver
Scheff, Washington & Driver
645 Griswold
Suite 1817
Detroit, MI 48226-0000

Ms. Sherri Sokeland Kaiser
City Attorney's Office
1 Dr. Carlton B. Goodlett Place
City Hall Room 234
San Francisco, CA 94102-0000

Ms. Winifred V. Kao
Asian Law Caucus
55 Columbus Avenue
San Francisco, CA 94111

Mr. Daniel M. Levy
Michigan Department of Civil Rights
3054 W. Grand Boulevard
Suite 3-600
Detroit, MI 48202

Ms. Heather S. Meingast
Office of the Michigan Attorney General
P.O. Box 30736
Lansing, MI 48909

Ms. Margaret A Nelson
Office of the Michigan Attorney General
Public Employment & Elections Division
P.O. Box 30736
Lansing, MI 48909

Mr. Leonard M. Niehoff
Len Niehoff & Associates
570 Oak Dale Drive, Chelsea, MI 48118

Mr. Joseph E. Potchen
Public Employment Elections & Tort Division
P.O. Box 30736
Lansing, MI 48909-0000

Mr. George Boyer Washington
Scheff, Washington & Driver
645 Griswold, Suite 1817
Detroit, MI 48226-0000

Mr. William F. Young
White, Schneider, Young & Chiodini
2300 Jolly Oak Road
Okemos, MI 48864

Re: Case Nos. 08-1387/1389/1534; 09-1111 *Coalition to Defend Affirmativ, et al v. Regents of the University of Mich., et al*
Originating Case No.  06-15024

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                              Yours very truly,

                              Leonard Green, Clerk

                              Linda K. Martin
                              Deputy Clerk

Enclosures

Mandate to issue.